# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| AMERICAN MAPLAN CORPORATION, d/b/a battenfeld-cincinnati USA , <br><br> Plaintiff, <br><br> v. <br><br> HEBEI QUANEN HIGH-TECH PIPING CO., LTD.; J-M MANUFACTURING COMPANY, INC.; and WALTER WANG. <br><br> Defendants. | Civil Action No. |

## COMPLAINT WITH JURY DEMAND

Plaintiff American Maplan Corporation, d/b/a battenfeld-cincinnati USA ("Battenfeld US" or "Plaintiff"), as and for its complaint against Defendants Hebei Quanen High-Tech Piping Co., Ltd. ("Hebei Quanen"), J-M Manufacturing Company, Inc. ("JM Eagle"), and Walter Wang ("Mr. Wang" and, together with Hebei Quanen and JM Eagle, the "Defendants"), alleges as follows:

## NATURE OF THE CASE

1.      Defendants Walter Wang and JM Eagle, long-time clients of Battenfeld US, induced Battenfeld US to enter into a contractual arrangement with their newly-formed Chinese subsidiary, Hebei Quanen, to supply millions of dollars in pipe extrusion equipment at enormous up-front cost to Battenfeld US.  At the direction of Mr. Wang and JM Eagle, Hebei Quanen refuses to perform under the contracts in good faith, including by making payments under the contracts, which has caused and continues to cause Battenfeld US severe financial distress.  Upon information and belief, Hebei Quanen continues to wrongfully convert and use the

extrusion equipment for its own benefit, despite refusing to pay, and continues to derive and retain the ill-gotten gains from its wrongful possession and use of Plaintiff's equipment.

<div align="center">

**JURISDICTION AND VENUE**

</div>

2.      Under the more than fifty purchase orders governing the sales of the equipment at issue (the "Purchase Orders," and, together with the accompanying "Terms and Conditions," the "Purchase Agreements"), Hebei Quanen agreed to be subject to and accept jurisdiction in the Kansas federal and state courts for all disputes with Battenfeld US.

3.      Mr. Wang and JM Eagle made fraudulent representations to Battenfeld US representatives located in Kansas, which were intended to induce Battenfeld US to supply extrusion equipment to Mr. Wang's nascent China expansion project with little investment by Mr. Wang and JM Eagle.  Mr. Wang and JM Eagle were aware of the Purchase Agreements, including the Kansas choice of law and choice of forum provision, and purposefully interfered with those Purchase Agreements.  Hebei Quanen, Mr. Wang, and JM Eagle's tortious conduct also caused substantial harm to Battenfeld US in Kansas.

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in the District of Kansas pursuant to the Purchase Agreements and pursuant to 28 U.S.C. § 1391(b) because a substantial part of Defendants' actions giving rise to the claims asserted herein had a substantial impact on and were purposefully directed toward Battenfeld US in McPherson, Kansas.

6.      Pursuant to the District of Kansas Local Rule 40.2(a), Battenfeld US requests trial in Wichita, Kansas, at the Wichita U.S. Courthouse, 401 N. Market, Wichita, Kansas 67202.

CORE/0775731.0012/132396826.1

## PARTIES

7.     Plaintiff Battenfeld US is a Kansas corporation with its principal place of business at 823 South By-Pass, McPherson, Kansas 67460.

8.     On information and belief, defendant Hebei Quanen is a corporation organized and existing under the laws of the People's Republic of China, with its principal place of business in Langfang City, Hebei Province, China.  On information and belief, Hebei Quanen manufactures and sells pipe to customers in China.

9.     On information and belief, defendant JM Eagle is a Delaware corporation with its principal place of business at 5200 West Century Boulevard, Los Angeles, CA 90045.  On information and belief, JM Eagle is a manufacturer of plastic pipe, including polyvinyl chloride pipe (known as "PVC" pipe) and polyethylene pipe (known as "PE" pipe), for industrial uses. JM Eagle has 22 manufacturing plants throughout North America.

10.     On information and belief, defendant Walter Wang is a citizen of the State of California.  Mr. Wang is the President and CEO of JM Eagle as well as the Chairman of Hebei Quanen.

## FACTS

### I.     Walter Wang & JM Eagle's Representations to Battenfeld US and the Forming of Hebei Quanen

11.     Battenfeld US has been a leading manufacturer of energy-efficient, high-performance plastic extruders and complete extrusion lines, including extrusion systems for the manufacture of pipe—specifically PVC and PE pipe—since 1995.  Battenfeld US manufactures and sells extrusion equipment to some of the world's largest pipe producers, including Defendant JM Eagle.  Battenfeld US has done business with JM Eagle and Mr. Wang for decades.

CORE/0775731.0012/132396826.1

12.    In or around 2011, Mr. Wang informed Battenfeld US that he was planning to expand JM Eagle's operation into the Chinese market by forming a new affiliated company in Langfang, China.  Walter Wang also informed Battenfeld US that he was interested in having Battenfeld US supply extrusion equipment for the soon-to-be formed Chinese affiliate of JM Eagle.  JM Eagle provided Battenfeld US with information concerning the new Chinese entity, including the type of PE and PVC pipe it planned to manufacture, output rates and efficiencies it desired for the requested extrusion equipment, and other information necessary for Battenfeld US to provide price quotations and equipment specifications.

13.    On January 19, 2012, then-CEO of Battenfeld US, Kurt Waldhauer, met with Mr. Wang.  During that meeting, Mr. Wang represented that JM Eagle's soon-to-be formed Chinese affiliate would have the requisite infrastructure, capacity, and know-how to operate pipe extrusion equipment and assured Battenfeld US that Hebei Quanen would pay for the extrusion equipment it ordered.  At the time, Mr. Wang and JM Eagle knew that Battenfeld US would need to incur millions of dollars in production and operating costs to undertake the manufacture and delivery of the requested equipment.

14.    Given their decades-long relationship, and the representation that Hebei Quanen had the backing and support of Mr. Wang and JM Eagle, Battenfeld US naturally relied upon the representations by Mr. Wang and JM Eagle that Hebei Quanen would have the infrastructure, capacity, and know-how to produce PE and PVC pipe in China and the financial ability to pay Battenfeld US in full for any purchase orders for extrusion equipment.

15.    On January 24, 2012, Mr. Waldhauer sent an email to Mr. Wang with a proposed delivery schedule for the requested large-diameter extrusion equipment.

-4-

16.     Because of the long lead time necessary to manufacture this equipment, in or around April 2012, Mr. Wang and Mr. Waldhauer agreed that Battenfeld US should begin preparations to manufacture the large diameter pipe extrusion equipment for the planned China expansion.  Mr. Wang represented that Battenfeld US's delivery of the extrusion equipment to China on a tight schedule was critical for his China expansion.

17.     By June 19, 2012, Jürgen Arnold, a member of Battenfeld US's Board of Directors, alerted Mr. Wang that Battenfeld US had already started investing the substantial costs, time, and effort needed to prepare to manufacture the extrusion equipment, including reserving time in Battenfeld US's production schedules and negotiating with suppliers.

18.     Upon information and belief, JM Eagle and Mr. Wang caused Hebei Quanen to be incorporated on or about July 23, 2012 as the Chinese affiliate of JM Eagle.  Upon information and belief, Mr. Franco An has been the President of Hebei Quanen since it was formed in July 2012.

19.     Upon information and belief, Hebei Quanen is the alter ego of Mr. Wang.  Hebei Quanen operates under the direction and control of Mr. Wang, and Mr. Wang incorporated Hebei Quanen as a vehicle to carry out his personal business for his own personal advantage to such an extent that Hebei Quanen has no separate interests of its own and in reality functions as his mere alter ego.  On information and belief, Hebei Quanen was grossly under-capitalized and at all times mentioned herein was financed entirely by Mr. Wang and/or JM Eagle, of which Mr. Wang is the President and CEO.  On information and belief, Hebei Quanen also failed to observe corporate formalities and was used as a façade for Mr. Wang's own business activities.  For all effective purposes, Mr. Wang and Hebei Quanen are one and the same because that is the perception that Mr. Wang seeks to create in the minds of third parties, including Battenfeld US.

CORE/0775731.0012/132396826.1

Recognition of Hebei Quanen as a distinct legal entity would result in injustice to Battenfeld US, and adherence to the corporate fiction between Hebei Quanen and Mr. Wang would sanction Mr. Wang's attempt to escape his legal obligations owed to Battenfeld US.

20.    On August 24, 2012, Battenfeld US and representatives of JM Eagle and Hebei Quanen, including Mr. Wang, Mr. Kaider Liao, Director of Engineering at JM Eagle, and Mr. An, met to negotiate the terms of Battenfeld US's sale of extrusion equipment to Hebei Quanen. During that August 24, 2012 meeting, Mr. Wang, Mr. Liao, and Mr. An represented to Battenfeld US that Hebei Quanen would have the necessary infrastructure, capacity, and know-how to operate the required pipe extrusion equipment and that Hebei Quanen had the prospective client base to generate sales and cash flow needed to pay Battenfeld US for the extrusion equipment that was being delivered. Mr. Wang and Mr. Liao leveraged the established track record and business relationship between Battenfeld US and JM Eagle in their efforts to make Battenfeld US comfortable with the large outlay of time, resources, and financial risk that entering into such a significant contract with a new foreign company like Hebei Quanen would require.

21.    To further induce Battenfeld US to enter into a contract with the newly founded Hebei Quanen, Mr. Wang, Mr. Liao, and Mr. An promised that Hebei Quanen would place very significant orders with Battenfeld US. Based on these representations, Battenfeld US agreed to provide a 40% discount from the list price on Hebei Quanen's purchase of extrusion equipment in return for Hebei Quanen ordering at least $75 million (list price) worth of extrusion equipment from Battenfeld US and from Battenfeld US's affiliate in China. On January 15, 2013, Battenfeld US confirmed a framework agreement with Hebei Quanen and JM Eagle (the

-6-

"January 15 Framework Agreement"), which provided various price increases above the 40% discount if the volume of sales did not reach $75 million by December 31, 2015.

22.     Battenfeld US, JM Eagle, and Hebei Quanen continued to discuss the extrusion machinery necessary for Hebei Quanen throughout the Fall of 2012, including, in some instances, during on-site meetings in China.  Throughout these meetings, Mr. An, Mr. Liao, and Mr. Wang reiterated that Hebei Quanen, although a new company, had the backing of JM Eagle and Mr. Wang, and, therefore, would have the infrastructure, capacity, and know-how to install and operate pipe extrusion equipment and that Hebei Quanen would have ability to pay Battenfeld US for the extrusion equipment.  Battenfeld US relied on those representations to its detriment.  By leveraging the business relationship between Battenfeld US and JM Eagle, Mr. Wang and JM Eagle effectively sought to have Battenfeld US underwrite Mr. Wang and JM Eagle's China expansion because the large discounts on extrusion equipment furthered Mr. Wang's own interest in using Battenfeld US to help capitalize his planned China expansion at vastly reduced cost.  Thus, Hebei Quanen received functional, high-performance extrusion equipment with relatively little capital investment by Mr. Wang.

## II.     Battenfeld US Entered into the Purchase Agreements with Hebei Quanen

23.     On or around September 27, 2012, Battenfeld US provided the Terms and Conditions that would govern the sales of the equipment at issue.  The Terms and Conditions, which were substantially the same as those agreed to by Mr. Wang and JM Eagle for years, specify that they will govern "all sales," and also provide for interest at the rate of 1.5% monthly (18% per annum) on all amounts not paid by Hebei Quanen.  The Terms and Conditions also provide that all objects delivered by Battenfeld US shall remain the property of Battenfeld US until payment of all sums due for any legal reason, even if the payments for particularly

designated items have been made, and that the reservation of ownership shall count as security for the balance due to Battenfeld US. The January 15 Framework Agreement similarly provides that all objects delivered by Battenfeld US shall remain the property of Battenfeld US until payment of all sums due for any legal reason, even if the payments for particularly designated items have been made, and that the reservation of ownership shall count as security for the balance due to Battenfeld US.

24. Between November 2012 and March 2013, Hebei Quanen submitted more than fifty Purchase Orders to Battenfeld US for the delivery and installation of pipe extrusion equipment. These Purchase Orders totaled approximately $22 million after applying the 40% volume discount off the list price. These Purchase Orders were subject to the Terms and Conditions.

25. The Purchase Orders and the January 15 Framework Agreement generally required a 30% down payment at the time a Purchase Order was placed, 50% payment upon delivery of the products to Hebei Quanen, and the final 20% payment after acceptance.

26. Hebei Quanen has made partial payments under the Purchase Agreements for the extrusion equipment, but has refused to pay millions of dollars still outstanding under the Purchase Agreements.

## III.    At the Direction of JM Eagle and Mr. Wang, Hebei Quanen Refused to Pay Battenfeld US for the Delivered, Installed, and Functional Extrusion Equipment

27. On or around March 31, 2013, Battenfeld US, though Battenfeld China, began delivering and installing extrusion equipment at the Langfang City plant.

28. However, and contrary to the representations made by JM Eagle and Mr. Wang, Hebei Quanen did not have the capacity, infrastructure, or know-how to receive, install, or operate the extrusion equipment it ordered from Battenfeld US.

CORE/0775731.0012/132396826.1

29.    For example, the plant that Hebei Quanen broke ground on in 2012 was not large enough to operate the extrusion equipment delivered by Battenfeld US.  Although the extrusion lines delivered and installed by Battenfeld US fit within Hebei Quanen's facility, Hebei Quanen did not design its facility to process the hot, uncured pipe as it exited the extrusion line so that it could be sufficiently cooled or cut.  As one example, in an attempt to circumvent its self-inflicted infrastructure design failures, Hebei Quanen erected a temporary tent to cover the extruded pipe during the pipe curing process.  The temporary tent was insufficient, because it could—and did—brush against the hot, uncured pipe, causing damage to the pipe.  Hebei Quanen, JM Eagle, and Mr. Wang decided to have Battenfeld US suffer the consequences of Defendants' own failures and started implementing a plan to withhold payments or otherwise cause Hebei Quanen to avoid its good faith obligations to perform under the Purchase Agreements and allow Mr. Wang to avoid further capital contributions at Battenfeld US's expense.

30.    As one example, Hebei Quanen refused to provide a proper commissioning plan for acceptance of the PE and PVC lines and, therefore, Battenfeld US could not start the commissioning process for delivered extrusion lines until June 2015.  Thereafter, Hebei Quanen and JM Eagle repeatedly cancelled or rescheduled commissioning visits (often at the last minute) to avoid Hebei Quanen's payment obligations under the Purchase Agreements.  Hebei Quanen's refusal, at Mr. Wang's and JM Eagle's direction, to commission many of the delivered extrusion lines, wrongfully delayed payment of the final 20% balance due after acceptance, as provided in the Purchase Orders.  Despite Battenfeld US's repeated pleas for Hebei Quanen to cooperate, become current on their accounts, and timely pay what was owed, Hebei Quanen refused.

31.    Not only did Hebei Quanen not have the capacity, infrastructure, and know-how to receive, install, and operate the extrusion equipment when it was delivered by Battenfeld US,

-9-

Hebei Quanen also lacked the necessary client base and sufficient cash flow to pay Battenfeld US pursuant to the payment schedule in the Purchase Orders and the January 15 Framework Agreement, contrary to the representations of Mr. Wang and JM Eagle.

32.     Thus, in another attempt to avoid its contractually mandated payments to Battenfeld US, Hebei Quanen, under the direction of Mr. Wang and JM Eagle, refused to accept delivery of some of the extrusion equipment by refusing access to Hebei Quanen's plant, causing Battenfeld US to incur improper storage costs as well as further delaying Hebei Quanen's payments under the Purchase Agreements. This bad faith refusal to accept delivery was made with the full knowledge that Battenfeld US needed to invest time and resources—long in advance of delivery—to reserve factory time, coordinate with suppliers, and actually deliver the extrusion lines.

33.     In a further effort to avoid payment of outstanding amounts, Hebei Quanen also made numerous reports of allegedly defective components in the extrusion equipment. Hebei Quanen's complaints are almost entirely without merit. While a project of this size inevitably involves a certain amount of on-site adjustments, the extrusion equipment that Battenfeld US delivered to and installed at Hebei Quanen's Langfang City plant operated well within industry standards. Nevertheless, to the extent Hebei Quanen identified any issues with the extrusion equipment, Battenfeld US worked diligently, professionally, and successfully to rectify all such issues.

34.     Although Hebei Quanen refused—and still refuses—to pay in full for the extrusion lines, upon information and belief, Hebei Quanen has nevertheless been using at least some of the extrusion equipment to produce PVC and PE pipe. Indeed, upon information and belief, Hebei Quanen has operated the still-uncommissioned extrusion lines in excess of 4,600

-10-

hours to date. Under the Purchase Agreements that equipment is owned by Battenfeld US, and Battenfeld US has not authorized Hebei Quanen to use it for commercial purposes.

35. For the extrusion equipment that Hebei Quanen did not commission or otherwise begin using, it improperly stored such equipment over the last several years, which completely destroyed its value, thus making return of the equipment impossible because Battenfeld US can no longer sell it for any value.

36. Hebei Quanen's refusal to pay for the extrusion equipment Battenfeld US delivered, installed, and rendered fully capable of producing PE and PVC pipe started to cause enormous financial strain, not just on Battenfeld US but on the entire battenfeld-cincinnati corporate family. The strain on the corporate family led to the CEO of BC Extrusion Holding GmbH ("BC Extrusion Holding"), the company responsible for managing the financial risk for the corporate family, to plead with Mr. Wang to direct Hebei Quanen to make its required payments because it was threatening their covenants with creditors. Battenfeld US was jointly liable for default under the credit support agreements with its affiliated companies. Thus, a default by any of the battenfeld-cincinnati group of companies exposed Battenfeld US to liability. Nonetheless, Hebei Quanen, at the direction of Mr. Wang, continued to withhold payment, notwithstanding repeated written promises to remit payment for the extrusion equipment.

37. After all of these efforts to obtain payment failed, but still relying on the good faith of Defendants, representatives from Battenfeld US, BC Extrusion Holding, Hebei Quanen, and Mr. Wang agreed on a written global business resolution and go-forward plan on May 27, 2015 ("May 27 Agreement"). In the May 27 Agreement, Hebei Quanen recommitted to the original payment terms whereby Battenfeld US would provide a 40% list price discount to Hebei

Quanen in exchange for $75 million worth of extrusion equipment orders. The parties also agreed on a framework to resolve any technical complaints and set extrusion equipment commissioning schedules in Hebei Quanen's Langfang City plant. Yet, that was not good enough for Mr. Wang and JM Eagle. Understanding the financial distress caused by their bad faith conduct, and to further Mr. Wang's personal interest, Mr. Wang leveraged Battenfeld US's compromised financial situation to extract additional commitments from Battenfeld US to agree on a new 40% list price discount and "a special ONE TIME only discount of an additional 30%" on orders for plants JM Eagle owned and operated in the United States. Unbeknownst to Battenfeld US at the time, Defendants had no intention of performing their obligations under the May 27 Agreement.

38. Despite its promises to perform under the May 27 Agreement, Hebei Quanen still cancelled, obstructed, and delayed technical delivery and commissioning of the extrusion equipment.

39. Battenfeld US delivered or offered to deliver to Hebei Quanen's Langfang City plant, only to be denied, on all of its obligations under the original Purchase Orders and the May 27 Agreement. Nevertheless, Hebei Quanen—at the direction of JM Eagle and Mr. Wang—still refused to pay Battenfeld US.

40. During the following months, Battenfeld US and BC Extrusion Holding repeatedly followed up with Hebei Quanen and JM Eagle in an effort to secure Hebei Quanen's overdue payments. In response to those efforts, Hebei Quanen and JM Eagle personnel repeatedly advised Battenfeld US and BC Extrusion Holding that Mr. Wang would not authorize payment by Hebei Quanen.

CORE/0775731.0012/132396826.1

IV.    **Defendants' Actions Caused the Battenfeld-Cincinnati Corporate Family to Default on Its Bank Covenants, Which Destroyed the Value of Battenfeld US and the Entire Battenfeld-Cincinnati Corporate Family**

41.    Upon information and belief, Mr. Wang refused in bad faith to allow Hebei Quanen to satisfy its obligations to Battenfeld US because he intended to ruin Battenfeld US and the entire battenfeld-cincinnati corporate family's credit rating and business value for his own benefit.

42.    The battenfeld-cincinnati corporate family entered into a contractual relationship with West LB, Germany, as lead arranger of a credit consortium, on March 7, 2007 which included Battenfeld US as a guarantor with joint liability (the "Bank Covenants").  The Bank Covenants included EBITDA, cash flow, capital expenditure, and EBITDA/interest ratios as key performance indicators.

43.    The battenfeld-cincinnati corporate family's Bank Covenants were structured such that Battenfeld US's default would adversely impact the entire battenfeld-cincinnati corporate family.  In other words, the cross default provisions of the Bank Covenants provided that the insolvency of any entity within the battenfeld-cincinnati corporate family would cause the entire credit facility to default and give the credit consortium the right to credit the Bank Covenants.

44.    Mr. Wang and JM Eagle knew how consequential Hebei Quanen's Langfang City project was for Battenfeld US.  Indeed, the approximately $22 million worth of equipment (after a 40% discount from the list price) ordered by Hebei Quanen represented a significant percentage of Battenfeld US's overall business during 2013 and 2014.  Mr. Wang and JM Eagle leveraged the payment obligations under this very large contract to ruin the value of Battenfeld US and the entire battenfeld-cincinnati corporate family.

-13-

45.     Further, Mr. Wang knew, because representatives from Battenfeld US and BC Extrusion Holding expressly advised him that continued refusal to pay Battenfeld US would jeopardize the battenfeld-cincinnati corporate family's Bank Covenants and push the entire battenfeld-cincinnati corporate family into insolvency.  In response to this information, Mr. Wang purposefully instructed Hebei Quanen to withhold payments or otherwise comply with its good faith obligations toward Battenfeld US.

46.     Once Battenfeld US and the battenfeld-cincinnati corporate family defaulted and the credit consortium cancelled the Bank Covenants as a result of Hebei Quanen's refusal to pay the overdue amounts—at the direction of Mr. Wang—Battenfeld US and the other battenfeld-cincinnati entities were denied access to credit markets and were forced to operate on a cash-on-hand basis with its suppliers, causing Battenfeld US to lose millions of dollars in sales.

47.     Before Mr. Wang undertook his efforts to destroy the value of the battenfeld-cincinnati corporate family, the then-ultimate parent of the battenfeld-cincinnati corporate family, Shogun Sweden Holding AB, Sweden ("Shogun"), planned to sell the battenfeld-cincinnati corporate family for tens of millions of Euros.  After Defendants destroyed the value of the battenfeld-cincinnati corporate family through their wrongful conduct, Shogun sold the entire battenfeld-cincinnati corporate family for 1 Euro to a trustee corporation in December 2015, in a distressed state.

48.     In or around May 2016, Mr. Wang and JM Eagle exposed their duplicity by inquiring into purchasing the battenfeld-cincinnati corporate family at a rock-bottom, deflated price.  Upon information and belief, the only reason Mr. Wang and JM Eagle believed they could purchase the battenfeld-cincinnati corporate family at such a low price was because of their wrongful plan to ruin the value of the businesses through their bad faith, tortious conduct.  Upon

-14-

information and belief, by offering to purchase the battenfeld-cincinnati corporate family, Mr. Wang and JM Eagle also sought a massive discount on the outstanding amounts under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement because such amounts could be written off by JM Eagle and Mr. Wang after the purchase of the battenfeld-cincinnati corporate family. In June 2016 the trustee sold the battenfeld-cincinnati corporate family to an investor.

## FIRST CLAIM FOR RELIEF

### (BREACH OF CONTRACT AGAINST HEBEI QUANEN)

49.     Battenfeld US incorporates paragraphs 1-48 as though fully set forth herein.

50.     Battenfeld US has a contractual relationship with Hebei Quanen under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement for the delivery and installation of extrusion equipment.

51.     The Purchase Orders and the January 15 Framework Agreement between Hebei Quanen and Battenfeld US generally required a 30% down payment at the time a Purchase Order was placed, 50% payment upon delivery of the products to Hebei Quanen, and the final 20% payment after acceptance.

52.     Battenfeld US delivered, installed, and rendered fully operational all of the extrusion equipment Hebei Quanen ordered pursuant to the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement.

53.     Battenfeld US performed all of its obligations, covenants, and promises under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement.

54.     Hebei Quanen breached the payment provision of the Purchase Agreements by failing to pay Battenfeld US the entire agreed-upon amount of approximately $22 million (after a

-15-

40% discount from the list price) for the extrusion equipment lines Battenfeld US delivered, installed, and brought online at Hebei Quanen's pipe-making facilities in China. It has also failed to become current on the interest due for its delayed payments as required under the Purchase Agreements. Hebei Quanen also breached the payment provision of the January 15 Framework Agreement and the May 27 Agreement.

55.     Hebei Quanen purposefully and baselessly delayed receipt of some of the extrusion equipment and also refused to commission some of the extrusion equipment lines, thereby wrongfully seeking to avoid Hebei Quanen's payment obligation under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement, causing Battenfeld US to suffer harm.

56.     Despite refusing to pay Battenfeld US for the non-commissioned lines, Hebei Quanen has nevertheless been using those non-commissioned lines to produce pipe, including, in some instances, logging in excess of 4,600 hours of operation on the non-commissioned lines.

57.     Hebei Quanen failed to order the promised $75 million in equipment and, is thus not entitled to the 40% volume discount previously negotiated.

58.     As a result of Hebei Quanen's breach of the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement, Battenfeld US has suffered damages and will continue to suffer damages, including accruing interest, until Hebei Quanen's contractual obligations to Battenfeld US have been fully satisfied.

## SECOND CLAIM FOR RELIEF

### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST HEBEI QUANEN)

59.     Battenfeld US incorporates paragraphs 1-48 as though fully set forth herein.

CORE/0775731.0012/132396826.1

60.     The Purchase Agreements, the January 15 Framework Agreement, the May 27 Agreement, the relationship between the Hebei Quanen and Battenfeld US, and Kansas Statute 84-1-2013 imply a covenant of good faith and fair dealing between Battenfeld US and Hebei Quanen.

61.     The parties agreed that Hebei Quanen would pay Battenfeld US for the extrusion equipment Battenfeld US delivered and installed in Hebei Quanen's pipe-making facilities in China.

62.     Hebei Quanen breached the payment provisions of the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement by failing to pay Battenfeld US for the extrusion equipment Battenfeld US delivered and installed in Hebei Quanen's facilities in China.

63.     Hebei Quanen breached the covenant of good faith and fair dealing concerning the payment provision of the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement by purposefully delaying payment, refusing to schedule the commissioning of the extrusion equipment lines, refusing delivery of equipment ordered from Battenfeld US months in advance, inducing Battenfeld US to provide additional discounts to JM Eagle as a condition for Hebei Quanen to perform and in using non-commissioned extrusion equipment belonging to Battenfeld US for its own benefit and without paying for it.

64.     As a result of Hebei Quanen's breach of the covenant of good faith and fair dealing, Battenfeld US has suffered damages and will continue to suffer damages, until Hebei Quanen's contractual obligations to Battenfeld US have been fully satisfied.

CORE/0775731.0012/132396826.1

# THIRD CLAIM FOR RELIEF

## (CONVERSION AGAINST HEBEI QUANEN)

65. Battenfeld US incorporates paragraphs 1-48 as though fully set forth herein.

66. At all times mentioned herein, pursuant to the terms of the Purchase Agreements and the January 15 Framework Agreement, Battenfeld US was, and still is, the rightful owner and entity entitled to possession and rights in the extrusion equipment lines designed and manufactured by Battenfeld US and delivered to Hebei Quanen in Langfang City, China.

67. Battenfeld US delivered and installed extrusion equipment in Hebei Quanen's facilities in China, which Hebei Quanen is currently using, but has not paid for as required by the Purchase Agreements. Under the terms of the Purchase Agreements and the January 15 Framework Agreement, all extrusion equipment delivered to Hebei Quanen remains Battenfeld US's property until payment of all sums due.

68. Despite not paying Battenfeld US all sums due under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement, Hebei Quanen is exercising sole possession of and control over the extrusion equipment, and is currently using the extrusion equipment to produce PE and PVC pipe.

69. Hebei Quanen has wrongfully converted Battenfeld US's property for its own use and benefit by continuing to manufacture pipe using the extrusion equipment without Battenfeld US's consent and without having paid all sums due under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement.

70. The wrongful conduct of Hebei Quanen as alleged herein was with malice, ill will, and reckless or conscious indifference to the rights of Battenfeld US.

CORE/0775731.0012/132396826.1

71.     As a result of Hebei Quanen's wrongful conversion of the extrusion lines, Battenfeld US has suffered and continues to suffer harm warranting compensatory, exemplary, and punitive damages, including disgorgement of all profits Hebei Quanen has earned from the manufacture of pipe using Battenfeld US's extrusion lines and judgment in favor of Battenfeld US enjoining Hebei Quanen from using the extrusion equipment for which it has not paid Battenfeld US in full.

## FOURTH CLAIM FOR RELIEF

### (UNJUST ENRICHMENT AGAINST HEBEI QUANEN)

72.     Battenfeld US incorporates paragraphs 1-48 as though fully set forth herein.

73.     Battenfeld US delivered and installed extrusion equipment in Hebei Quanen's facilities in China, but Hebei Quanen has not paid for the extrusion equipment as required by the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement.

74.     Despite not paying Battenfeld US all sums due under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement, Hebei Quanen has nevertheless been using the extrusion equipment to produce pipe, including, in some instances, logging in excess of 4,600 hours of operation on the extrusion equipment. Hebei Quanen has been selling the pipe produced by the extrusion equipment, which remains Battenfeld US's property under the terms of the Purchase Agreements and the January 15 Framework Agreement, and for which Battenfeld US has not been paid and has not authorized such commercial use.

75.     Hebei Quanen knew that Battenfeld US had conferred a benefit upon Hebei Quanen in the form of extrusion equipment which was fully capable of producing pipe and Hebei Quanen further knew that it did not pay Battenfeld US in full for that benefit.

CORE/0775731.0012/132396826.1

76.     Hebei Quanen nevertheless has retained that benefit by maintaining possession over the extrusion equipment, producing pipe using that extrusion equipment and selling that pipe for a profit.

77.     As a result of Hebei Quanen's conduct, Battenfeld US has suffered and continues to suffer harm warranting compensatory and exemplary damages, including disgorgement of all profits Hebei Quanen has earned from the manufacture of pipe using Battenfeld US's extrusion equipment.

## FIFTH CLAIM FOR RELIEF

### (INTENTIONAL INTERFERENCE WITH CONTRACT AGAINST JM EAGLE AND MR. WANG)

78.     Battenfeld US incorporates paragraphs 1-48 as though fully set forth herein.

79.     Battenfeld US has a contractual relationship with Hebei Quanen for the delivery of extrusion equipment as described herein.

80.     Battenfeld US also has contractual relationships with West LB, Germany as lead arranger of a credit consortium whereby Battenfeld US's default under the Bank Covenants would adversely impact the entire battenfeld-cincinnati corporate family.

81.     As the affiliate of Hebei Quanen and the Chairman of Hebei Quanen, respectively, JM Eagle and Mr. Wang knew of the Purchase Agreements between Hebei Quanen and Battenfeld US.  Further, JM Eagle and Mr. Wang knew of Battenfeld US and the battenfeld-cincinnati corporate family's Bank Covenants because representatives from Battenfeld US and BC Extrusion Holding advised JM Eagle and Mr. Wang on numerous occasions about those Bank Covenants, that Battenfeld US had stretched its financing capabilities to deliver the extrusion lines on time, and that Battenfeld US was in severe financial distress as the result of not being paid by Hebei Quanen.

-20-

82. By intentionally causing Hebei Quanen to breach its contractual obligation to pay Battenfeld US for the extrusion equipment delivered and installed in Hebei Quanen's pipe-making facilities, JM Eagle and Mr. Wang intended to disrupt the existing contractual relationship between Hebei Quanen and Battenfeld US.

83. Additionally, by directing Hebei Quanen to withhold payment to Battenfeld US, JM Eagle and Mr. Wang intended to disrupt the existing contractual relationship between West LB, Germany and Battenfeld US.

84. Upon information and belief, at all times relevant hereto, Mr. Wang's interference with the contracts described herein was for his own individual advantage and not the benefit of Hebei Quanen.

85. As a result of JM Eagle and Mr. Wang's actions, Battenfeld US defaulted and West LB, Germany cancelled the Bank Covenants, causing Battenfeld US to suffer harm in its relationship with customers and suppliers. JM Eagle and Mr. Wang's conduct as alleged herein was willful, wanton, malicious, and oppressive.

86. As a result of JM Eagle and Mr. Wang's conduct in interfering with Battenfeld US's contracts with Hebei Quanen and West LB, Germany, Battenfeld US has suffered and continues to suffer harm, warranting compensatory and exemplary damages.

## SIXTH CLAIM FOR RELIEF

### (FRAUD AGAINST HEBEI QUANEN, JM EAGLE, AND MR. WANG)

87. Battenfeld US incorporates paragraphs 1-48 as though fully set forth herein.

88. Defendants and their representatives, including Mr. Wang, Mr. An, and Mr. Liao, repeatedly represented to Battenfeld US that Hebei Quanen would have the infrastructure, capacity and know-how to install and operate the extrusion equipment sold by Battenfeld US.

-21-

89.     Defendants, including through their representatives Mr. Wang, Mr. An, and Mr. Liao, repeatedly represented to Battenfeld US that Hebei Quanen had the capacity to, and would, pay Battenfeld US for the extrusion equipment Hebei Quanen ordered and delivered by Battenfeld US.

90.     In fact, Hebei Quanen did not have the capacity, infrastructure, or know-how to receive, install, or operate the extrusion equipment at the Langfang City plant when the extrusion equipment was delivered. Hebei Quanen also did not have the capacity to pay Battenfeld US for the extrusion equipment it received.

91.     Defendants knew that their representations concerning Hebei Quanen's capacity, infrastructure, or know-how to receive, install, or operate the extrusion equipment were false when they made them and/or that these representations were made recklessly without knowing their validity. Hebei Quanen had broken ground on the Langfang City plant in 2012 and Battenfeld US's first shipment of extrusion equipment to Hebei Quanen was in March 2013. Defendants knew at the time the representations were made in the summer and fall of 2012 that the Langfang City plant was not adequate to install and operate the extrusion equipment ordered from Battenfeld US.

92.     Defendants intentionally represented Hebei Quanen had the capacity, infrastructure, or know-how to receive, install, or operate the extrusion equipment at the Langfang City plant in order to induce Battenfeld US to enter into an agreement to design and manufacture $75 million worth of extrusion equipment, but supply it at a 40% discount. Thus, by relying on Mr. Wang and JM Eagle's prior relationship with Battenfeld US, Defendants' intended to induce Battenfeld US to provide functional, high-quality pipe extrusion equipment to

-22-

a brand new Chinese company at steeply discounted prices, thereby permitting Mr. Wang and JM Eagle to enter the Chinese market with little capital investment.

93. Defendants intentionally, and repeatedly, represented to Battenfeld US that Hebei Quanen would pay for the extrusion equipment ordered for the Langfang City plant, that it would commission the extrusion lines and make final payments to Battenfeld US until the May 27 Agreement and after, but those statements were false when they made them and/or the representations were made recklessly without knowing their validity.

94. Battenfeld US reasonably relied on Defendants' representations in fulfilling its obligations under the Purchase Agreements, including investing time and resources in scheduling time for manufacturing the equipment, arranging for delivery of materials and parts supplies, manufacturing, delivering, and installing the extrusion equipment in China.

95. As a result of relying on Defendants' representations, Battenfeld US has suffered damages and will continue to suffer damages.

## PRAYER FOR RELIEF

For these reasons, Battenfeld US respectfully requests that this Court:

a) Enter judgment in favor of Battenfeld US on the First through Sixth Claims for Relief requiring an award of compensatory damages and interest, the amount of which to be determined at trial according to proof;

b) Enter judgment in favor of Battenfeld US on the Third through Fourth Claims for Relief requiring an award of equitable relief including for unjust enrichment or disgorgement of profits, the amount of which to be determined at trial according to proof;

c) In the alternative, enter judgment in favor of Battenfeld US on the Third Claim for Relief enjoining Hebei Quanen from using the extrusion equipment for which it has not paid Battenfeld US in full.

-23-

d)      Enter judgment in favor of Battenfeld US on the Third through Sixth Claims for Relief requiring an award of exemplary and punitive damages and interest, the amount of which to be determined at trial according to proof;

e)      Award attorney's fees and costs as allowed by law; and

f)      Award such other further relief as this Court deems just and proper.

## JURY DEMAND

Battenfeld US demands a trial by jury on all issues so triable by law.

## DESIGNATION OF PLACE OF TRIAL

Battenfeld US designates Wichita, Kansas as the place of trial for this matter.

Dated:  March 30, 2017

<div style="margin-left:40%;">

*/s/ Lynn D. Preheim*_____
Lynn D. Preheim, KS #13300
Stinson Leonard Street LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, KS 67206-6620
Telephone: (316) 265-8800
Facsimile: (316) 265-1349
lynn.preheim@stinson.com

*Attorneys for Defendant American Maplan Corporation, d/b/a battenfeld-cincinnati USA*

Christopher J. Cox, CA #151650 *pro hac vice to be sought*
An Tran, CA #267685 *pro hac vice to be sought*
Jevechius Bernardoni, CA #281892 *pro hac vice to be sought*
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Telephone: 650-802-3029
Facsimile: 650-802-3100
chris.cox@weil.com
an.tran@weil.com
jevechius.bernardonia@weil.com

*Attorneys for Defendant American Maplan Corporation, d/b/a battenfeld-cincinnati USA*

</div>

CORE/0775731.0012/132396826.1