# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

AMERICAN MAPLAN CORPORATION,
d/b/a Battenfeld-Cincinnati USA,

                    Plaintiff,

v.

HEBEI QUANEN HIGH-TECH PIPING CO.,
LTD.; J-M MANUFACTURING COMPANY,
INC.; and WALTER WANG.,

                    Defendants.

**CASE NO.  6:17-cv-01075-JTM-GEB**

## SPECIALLY APPEARING DEFENDANTS WALTER WANG AND J-M MANUFACTURING COMPANY INC.'s MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION

Specially appearing Defendants Walter Wang ("Mr. Wang") and J-M Manufacturing Company, Inc. ("JM Eagle") submit this Memorandum of Law in support of its motion to dismiss the Complaint of American Maplan Corporation d/b/a Battenfeld-Cincinnati USA ("Plaintiff" or "Maplan") pursuant to Rule 12(b)(2), F.R.Civ.P.

## I.    Preliminary Statement

By its Complaint, Plaintiff, Maplan asserts two causes of action for intentional interference with contract and fraud against Mr. Wang, a resident of Los Angeles, California having no contacts with Kansas and JM Eagle, a company headquartered in Los Angeles, with no office, operations or presence in Kansas.  As expressly set forth in the Complaint, Plaintiff's fraud claims are based upon alleged representations by Mr. Wang and other representatives of JM Eagle that (1) defendant Hebei Quanen High-Tech Piping Co. Ltd. ("Quanen") had the infrastructure, capacity and know-how to install extrusion equipment supplied by Plaintiff and

1360697

(2) that Quanen had the ability to pay for such equipment. (See e.g. Complaint ¶¶ 88-90) Similarly, Plaintiff's interference claims are predicated upon alleged actions taken by Mr. Wang and JM Eagle to interfere with Plaintiff's contract for supply of extrusion equipment and certain banking covenants entered into by the Battenfeld-Cincinnati Group of companies headquartered in Germany (the "Battenfeld Group"). (See e.g. Complaint ¶¶ 79-80, 82-83).

The Complaint is devoid of any alleged activity conducted by either Mr. Wang or JM Eagle in Kansas supporting or relating to these claims.  Instead, Plaintiff's own Complaint allegations demonstrate that its tort claims are fundamentally tied to specific meetings and interactions in 2012 between Mr. Wang and Mr. Liao on the one hand and representatives of the Battenfeld Group on the other hand wherein Plaintiff contends that Mr. Wang and JM Eagle misrepresented the capacity and ability of Quanen to properly install and pay for extrusion equipment. (Complaint at ¶¶ 13-17, 20-22).   Leaving aside the obvious disputes over the content of their meetings, the accompanying declarations of Mr. Wang ("Wang Decl.") and Mr. Liao ("Liao Decl.") make clear that these same meetings and subsequent meetings between Mr. Wang, Mr. Liao and representatives of the Battenfeld Group occurred in Los Angeles, not Kansas.  Equally significantly, Plaintiff's own Complaint and more particularly, these accompanying declarations further demonstrate that the decision-makers for the Plaintiff in regard to all aspects of the supply, installation and payment for the subject extrusion equipment resided with German parent of the Battenfeld Group, BC Extrusion Holding GmbH ("BC Extrusion"), not in Kansas.  The fact that the US affiliate Plaintiff operates in Kansas cannot overcome the pervasive location of all the pertinent contacts in Los Angeles, California.  In all of these circumstances, the dismissal of these claims for lack of jurisdiction in Kansas is fully warranted.

**<u>No General Jurisdiction Exists</u>**

Personal jurisdiction may be either general or specific. General jurisdiction is established where the commercial contacts by defendant approximate physical presence in the state. For an individual, the paradigm forum is the "individual's domicile" and for a company it is "an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 924 (2011). Here, as set forth in the Declaration of Walter Wang, there are no contacts or presence which establish either Mr. Wang or JM Eagle as "at home" in Kansas:

- Mr. Wang is a resident of Los Angeles;

- Mr. Wang never travelled to Kansas in connection with the facts underlying this lawsuit, or <u>ever</u>;

- Mr. Wang does not own any property in Kansas;

- Mr. Wang does not employ anyone in Kansas;

- JM Eagle is headquartered in Los Angeles and incorporated in Delaware;

- JM Eagle does not have a local office in Kansas nor employees in Kansas;

- JM Eagle has no property, facilities or local offices in Kansas;

- JM Eagle has no mailing address or agent for process in Kansas;

- JM Eagle has no sales agents which travel regularly to Kansas;

- JM Eagle has no advertising campaign in Kansas. (Wang Decl. at ¶¶3-6)

Thus, Plaintiff cannot establish general jurisdiction over Mr. Wang or JM Eagle in Kansas.

**No Specific Jurisdiction Exists**

Specific jurisdiction requires a showing that defendants purposely availed themselves of the privilege of conducting business in the forum state.  Where, as here, intentional torts are alleged, the plaintiff must affirmatively establish that its alleged injuries (in this case, nonpayment of $4 million out of a total invoices of $38 million, and disruption of bank covenant arrangements made through the Battenfeld Group's parent entities in Germany and Sweden (Complaint at ¶¶ 36, 41-3, 47) somehow "arose out of" the Defendants' contacts with "the forum jurisdiction" (i.e. Kansas) and further that Kansas was the "focal point" of the alleged tortious misconduct by Defendants.  *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir 1995).

The record from Plaintiff's own Complaint allegations and the accompanying declarations demonstrate that these requirements cannot remotely be met.  Plaintiff's own Complaint repeatedly confirms that the tort claims arose from (1) alleged representations regarding Quanen's ability to install the subject extrusion equipment and pay invoices for same made by Mr. Wang and Mr. Liao to representatives of the Battenfeld Group at multiple specific meetings conducted in the period from January 19, 2012 through August 24, 2012 (Complaint at ¶¶ 3, 12-18, 20-21) and then subsequently in the "Fall of 2012" (*Id* at ¶22).  The Complaint further alleges that events exclusively occurring at the Quanen plant in China showed that Quanen allegedly did not have the capacity or knowhow to install the extrusion equipment (Complaint at ¶¶ 28-31) and that Mr. Wang allegedly directed that invoices owed by Quanen not be paid thereby allegedly interfering with bank covenants arranged by Plaintiff's German and Swiss based parent and affiliate entities (Complaint at ¶¶ 42-43, 47).

Predictably, these allegations omit to mention that each and every one of the meetings between Plaintiff and Wang relied upon for their tort claims occurred in Los Angeles, not Kansas. Wang Decl. ¶¶ 10, 15, 17; Liao Decl. ¶¶ 9-11, 19.  As attested to by Mr. Wang and Mr. Liao, neither these meetings <u>nor</u> any other meetings involving interaction with the Battenfeld Group about the supply of extrusion equipment to China ever occurred in Kansas. Wang Decl. ¶ 20; Liao Decl. at ¶ 9.  To the contrary, the Battenfeld Group consistently directed its contacts to recover on the invoices and to address extensive problems with the extrusion equipment supplied by them <u>to Los Angeles</u>.  Wang Decl. ¶¶ 10, 15, 17, 18, Exh. G; Liao Decl. ¶¶ 9, 10, 15. Similarly, Plaintiffs own Complaint and correspondence directed by the Battenfeld Group to Los Angeles concedes that the purported financial harm from the alleged tortious interference with the Quanen contract and the Battenfeld Group's bank covenants was felt by Plaintiff's parent company in Germany, and by the Swedish "ultimate parent" of the multi-national conglomerate of which Plaintiff is a member; <u>not</u> in Kansas.  Complaint ¶ 47; Wang Decl. ¶¶ 22, 24, Exh. D.

Finally, jurisdiction in Kansas is unreasonable and does not comport with "established notions of fair play and substantial justice."  It would be unfair and unreasonable to hail Mr. Wang and JM Eagle into court in Kansas where none of the activities or alleged wrongs in this case occurred.  All of the meetings involving Mr. Wang, Mr. Liao and Battenfeld Group representatives relied upon by Plaintiff took place at JM Eagle's headquarters in Los Angeles, with none in Kansas.  The documents relevant to these same contacts forming the basis of Plaintiff's tort claims reside in Los Angeles.  Liao Decl. ¶ 7.  Similarly, the multiple JM Eagle executives and employees involved in the same key interactions with the Battenfeld Group representatives also reside in Los Angeles.  Liao Decl. ¶ 19.  There is no justification for

imposing the massive burden on Mr. Wang and JM Eagle of litigating in Kansas, when they have no prior contacts with the state.

Defendants respectfully submit that this motion to dismiss should be granted in its entirety.

## II.   <u>Statement of Facts</u>

### A.   <u>Mr. Wang and JM Eagle Have No General Jurisdiction Contacts With Kansas</u>

While JM Eagle has manufacturing plants in several states, it does not, nor has it ever had, a manufacturing plant or facility in Kansas. JM Eagle has only one U.S. regional office outside of California, which office is in New Jersey. JM Eagle does not maintain any permanent operations, does not have bank accounts, nor pay any taxes for any operations in Kansas.  There is only one trade show in Kansas within the last five years to which JM Eagle sent a representative, the Kansas Rural Water Show. JM Eagle employs hundreds of workers, but has no employees in Kansas.  Wang Decl. ¶¶ 2-4.

While JM Eagle pipe is distributed in every state in the country, including Kansas (and throughout the world), the distribution of pipe to Kansas represents less than 1% of JM Eagle's piping sales in the United States.  Wang Decl. ¶ 4.  None of the pipe manufactured in China by Quanen was ever distributed in Kansas.  JM Eagle has no advertising campaign in Kansas. JM Eagle does not have a sales campaign directed to Kansas residents.  JM Eagle has no employee distributor for sales who is resident in Kansas. Wang Decl. ¶¶ 3-5.

JM Eagle does not own any property, leaseholds or facilities in Kansas. JM Eagle is not registered to do business in Kansas and maintains no office, mailing address, nor does it maintain an agent for service of process in Kansas. Wang Decl. ¶ 5.

1360697

Similarly, Mr. Wang has no contacts with Kansas.  Mr. Wang is a resident of California. He does not own any property in Kansas. Mr. Wang has never filed taxes in Kansas.  Mr. Wang does not travel to Kansas on business or for any other reason and does not recall ever having set foot in Kansas.  Wang Decl. ¶ 6.

**B.**     **All of the Meetings And Interactions Between Defendants and Plaintiff Relied Upon For the Tort Claims Took Place In Los Angeles, And No Meetings Took Place In Kansas.**

In approximately 2011-2012, Mr. Wang considered expanding JM Eagle's pipe manufacturing business to the Chinese market. It was decided that the first plant would be in Langfang, Hebei Province. A separate company from JM Eagle doing business in China as Hebei Quanen High-Tech Piping Co., Ltd. ("Quanen"), also a defendant in this case, was subsequently formed in July 2012 to handle this pipe manufacturing project in China.  Wang Decl. at ¶ 7.

As further set forth by Mr. Wang in his Declaration, one of the most important decisions in planning a major new pipe manufacturing plant is choosing the vendor to supply the complex and expensive extrusion equipment used to make plastic pipe.  Wang Decl. ¶ 8.  The Battenfeld-Cincinnati Group of affiliated companies (the "Battenfeld Group" or the "Group") is headquartered in Germany and manufactures and sells extrusion equipment. JM Eagle has been purchasing extrusion equipment from the German parent company of the Battenfeld Group known as BC Extrusion Holding GmbH ("BC Extrusion") for over 30 years.  Wang Decl. ¶8. Although the Battenfeld Group has an affiliate company in the United States operating as American Maplan Corp., doing business as Battenfeld-Cincinnati, US ("Maplan"), as well as an affiliate in China operating as Battenfeld-Cincinnati (Foshan) Extrusion Systems Ltd ("BC China"), the core technology and critical components of the extrusion equipment purchased by

JM Eagle come from the Battenfeld Group's German-based manufacturing plants, most particularly BC Extrusion.  Wang Decl. ¶ 8; Liao Decl. ¶ 6.

In early 2012, the Battenfeld Group learned of JM Eagle's plans to expand into China, and executives from both the Battenfeld Group parent company, BC Extrusion, and Maplan quickly sought the opportunity to supply the large amount of extrusion equipment that the Quanen plant would require.  Wang Decl. ¶ 9.  Commencing in January 2012, the German-based CEO of BC Extrusion, Juergen Arnold and the CEO of Maplan Kurt Waldhauer repeatedly traveled to meet with Mr. Wang and other JM Eagle executives in Los Angeles with Mr. Arnold taking the lead in pursuing discussions and negotiations of this China supply deal on behalf of the Battenfeld Group. Wang Decl. ¶ 10, 15, 17, 19.  Neither Mr. Wang nor any representative of JM Eagle ever travelled to Kansas in connection with this deal for supply of extrusion equipment to China.  Wang Decl. ¶ 20; Liao Decl. ¶ 9.

Specifically, on January 19, 2012, Mr. Arnold and Mr. Waldhauer travelled to Los Angeles to meet with Mr. Wang to discuss preliminary arrangements for the China project, including the proposed extrusion equipment needed for the project.  Mr. Arnold led the discussions in this meeting on behalf of the Battenfeld Group and was in charge of decision making.  Wang Decl. ¶ 10.

In April 2012, the ground-breaking for the first planned pipe producing plant commenced in Langfang, Hebei Province in China. At the time of this groundbreaking in Langfang, Mr. Arnold, the CEO of BC Extrusion in Germany sent Mr. Wang an email congratulating him on the opening and also addressing the schedule for proposed shipping of extrusion equipment to China previously discussed with Mr. Arnold and Mr. Waldhauer in January 2012. Wang. Decl. ¶ 12, Exh. B.

On or about June 20, 2012, Mr. Arnold again wrote to Mr. Wang in Los Angeles representing that the BC Extrusion CEO was (1) overseeing the "capacity planning" for the China project, (2) had travelled to China in the previous week to review the processes and preparation for the China project, and (3) was requesting a meeting in Los Angeles or China to discuss the project and "assur[ing] [Mr. Wang] that we are ready to provide the technology, service and value you deserve and need." Wang Decl. ¶ 14; Exh. C.  On July 23, 2012, Mr. Arnold again travelled to Los Angeles to meet with Mr. Wang to discuss overall preparations by the Battenfeld Group for the China project. Wang Decl. ¶ 15.

### C.   The Key Meeting Consummating The Deal Terms For Plaintiff's Supply of Extrusion Equipment Also Occurred In Los Angeles.

The key meeting with Mr. Arnold to finalize the major terms of the financial arrangements for the supply of extrusion equipment by the Battenfeld Group took place on August 24, 2012 at the headquarters of JM Eagle in Los Angeles.  Wang Decl. ¶ 17.  Mr. Arnold travelled from Germany to Los Angeles to be at the meeting, along with Kurt Waldhauer and Grant Flaharty from Maplan.  Wang Decl. ¶ 16; Liao Decl. ¶ 10.  Mr. Wang, Kaider Liao (JM Eagle's Director of Engineering), and Franco An, the President of newly-formed Quanen attended.  Wang Decl. ¶¶ 16-17; Liao Decl. ¶ 10-11.  Mr. Arnold was the decision maker for the Battenfeld Group team and his approval was required for any deal.  *Id.*  Mr. Arnold agreed that the Battenfeld Group could handle $75 million of purchases in return for a 40% discount, and Mr. Arnold shook Mr. Wang's hand to seal the deal at this Los Angeles meeting. Wang Decl. ¶ 17; Liao Decl. ¶ 11.

The above-referenced meetings and discussions are the same meetings identified in the Complaint as forming the basis for the tort claims against the Defendants.  Complaint ¶¶ 12-18, 20, 22.  Though not mentioned in the Complaint, these meetings all occurred in Los Angeles and

1360697

in fact, there were no meetings or interactions in Kansas between Plaintiff's representatives and

Mr. Wang and Mr. Liao related to the China project in this period at all.  Wang Decl. ¶ 20; Liao

Decl. ¶¶ 10-11.

> ### D.    Battenfeld Group Continues to Travel to Los Angeles and China To Implement the Supply of Extrusion Equipment.

In the months following the August 24, 2012 meeting, representatives of the engineering

teams from JM Eagle and Quanen conferred with the Battenfeld Group team, many of whom

were in Germany, about the kinds of equipment that would be purchased, delivery times and

other logistical issues.  Liao Decl. ¶ 13.  A team from BC Extrusion's German affiliate,

Battenfeld-Cincinnati Germany GmbH, travelled to Los Angeles in December 2012 to go over

technical details regarding the extrusion equipment that was being sold to Quanen.  Liao Decl. ¶

15.

Mr. Arnold from the Battenfeld Group parent in Germany and Mr. Waldhauer from

Maplan continued to make repeated trips to Los Angeles to discuss the China project and the

preparations by the Battenfeld Group to supply the extrusion equipment prior to the specified

ship date.  Liao Decl. ¶ 13. Specifically, in May 2013, Mr. Arnold travelled to Los Angeles along

with executives from Maplan to attend a gala event on May 29, 2013 honoring Mr. Wang. Wang

Decl. ¶ 18.  In December 2013, Mr. Arnold and Maplan executives again travelled to Los

Angeles to meet with Mr. Wang to discuss the Quanen project.  Wang Decl. ¶ 19; Liao Decl. ¶

15.

Conversely, neither Mr. Wang nor any representative of JM Eagle travelled to Kansas to

meet with Maplan regarding the China project.  Wang Decl. ¶ 20; Liao Decl. ¶ 19.  The only

meetings regarding Battenfeld Group's sale of extrusion equipment to Quanen for the China

project took place in Los Angeles or China, not Kansas.  Wang Decl. ¶ 20.

E.   **Battenfeld Group's Technical Team Is Assembled In Germany And China, And Controlled By Germany**

As set forth in the Declaration of Kaider Liao, JM Eagle's Director of Engineering, after initial plans were made for the supply of extrusion equipment to China, the Battenfeld Group assembled a Management Team and a Project Implementation Team for the China project. Notably, <u>seven of the nine</u> members of the Management Team were from the Battenfeld Group in Germany, <u>not</u> Kansas.  Liao Decl. ¶ 12.

As a further key example of the major participation of BC Extrusion in Germany in the project, Henning Stieglitz, the Chief Technical Officer of BC Extrusion, played a key role in technical discussions with Mr. Liao and his engineering team.  Liao Decl. ¶ 14.  Mr. Stieglitz, in Germany, was the final authority for the Battenfeld Group, including Maplan, for all technical and engineering matters.  Liao Decl. ¶ 14.  In December 2012, Mr. Stieglitz and Mr. Arnold (the CEO of BC Extrusion) came from Germany to Los Angeles for meetings about Quanen's project in China, and in particular the technical aspects and logistics involved.  Liao Decl. ¶¶ 15-16.

F.   **All Of The Meetings And Discussions To Address The Significant Problems With The Extrusion Equipment Supplied By The Battenfeld Group Occurred in Los Angeles or China- Not Kansas.**

The deliveries of the extrusion lines in China from the Battenfeld Group began in the Spring of 2013. The extrusion equipment was supplied from Maplan (using both German technology and parts) and from Battenfeld Group's China affiliate, Battenfeld Cincinnati (Foshan) Extrusion Systems, Ltd. Wang Decl. ¶ 21.  There were defects in the extrusion equipment from the receipt of the equipment in China until the present.  Wang Decl. ¶ 22, 26, Exh. F; Liao Decl. ¶ 16, 17.  Despite these problems with the equipment supplied by the Battenfeld Group in China, the CEO of Battenfeld Group in Germany directed correspondence to

1360697

JM Eagle and Mr. Wang in Los Angeles regarding late payment on invoices directed to Quanen. Wang Decl. ¶ 22-24; Exhs. D, G.

By 2014, due to ongoing defects with the equipment delivered from the Battenfeld Group for the China project, and the departure of Mr. Arnold as CEO of the Battenfeld Group, the relationship with the Group had been damaged.  In order to address this situation, the interim CEO of BC Extrusion located in Germany, Michael von Cappeln wrote to Mr. Wang in Los Angeles on August 13, 2014 Wang Decl. ¶ 23, Exh. E.  In this email, Mr. von Cappeln, stated that the incidents that led to the "degradation" in the relationship with the "BC Group" are "not worth ruining a long-term trustful cooperation." In this regard, Mr. von Cappeln on behalf of the Group in Germany states his "definite will to solve those issues that stand in the way and hinder our future business relation." He further represents on behalf of the Group in Germany that "[y]ou gave us the chance to execute one of the largest contracts in our history and I stand in to confirm our full support and willingness to deliver the performance you are used to in the past." Wang Decl. ¶ 23, Exh. E.

Despite Mr. von Cappeln's assurances in his August 13, 2014 email, the serious defects in both the PE and PVC lines supplied by the Battenfeld Group persisted throughout 2014 and to date. Wang Decl. ¶ 26; Liao Decl. ¶ 16.  On March 31, 2016 the President of Quanen, Franco An emailed Gerold Schley, the CEO of BC Extrusion in Germany describing the extensive problems with the extrusion equipment supplied by the Battenfeld Group and the consequential losses and damages sustained by Quanen in China.  Wang Decl. ¶ 24, Exh. F. Significantly, despite these extensive defects, this email notes that Quanen had paid over $34 million of the total invoices directed to Quanen by the Battenfeld Group in the amount of $38 million.  *Id.*

Consistent with Battenfeld Group's continuous pattern of contacts with Los Angeles, in response to Mr. An's letter, Mr. Schley directed his responsive April 5, 2016 correspondence from BC Extrusion in Germany to Mr. Wang in Los Angeles.  Wang Decl. ¶ 24, Exh. F.  Once again, Mr. Schley's letter, sent on the letterhead of BC Extrusion in Germany, confirmed that BC Extrusion, not Maplan, was the ultimate decision maker and leader for the Battenfeld Group affiliates in all aspects regarding the supply of extrusion equipment in China.  *Id.*  In addition, Mr. Schley's email confirmed that only an amount of $4 million was in dispute by Quanen out of all of the $38 million in invoices directed to Quanen. Wang Decl. ¶ 24, Exh. F.  To this date, the extrusion equipment delivered to Quanen from the Battenfeld Group is still not functioning as expected and has failed repeatedly.  Wang Decl. ¶ 26.

## III.   Question Presented

1.     Whether Supreme Court and Tenth Circuit case law dictate that this Court lacks personal jurisdiction over Defendants Walter Wang and JM Eagle.

## IV.   Argument

### A.     The Court Should Dismiss The Complaint Against Mr. Wang and JM Eagle For Lack of Personal Jurisdiction

Mr. Wang and JM Eagle lack sufficient contacts with Kansas to justify the exercise of either general or specific jurisdiction.  In a motion challenging personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff, as the party seeking to invoke the jurisdiction of the federal court, has the burden of establishing that jurisdiction exists. *Grynberg v. Ivanhow Energy, Inc.*, 490 Fed.Appx. 86, 90 (10th Cir. 2012).  Here, the Plaintiff cannot meet this burden.  When analyzing jurisdictional issues, the Court may consider evidence presented in affidavits and other evidence to assist in that determination. "In determining if it has personal jurisdiction over the defendants, the Court may consider affidavits and other

documentary evidence submitted by the parties." *Vestring v. Halla*, 920 F.Supp.2d 1189 (D. Kan. 2013).

In a diversity action, "personal jurisdiction over a nonresident defendant is determined by the law of the forum state." *Caldwell-Baker Co. v. S. Ill. Railcar Co.*, 225 F.Supp.2d 1243, 1259 (D. Kan. 2002). "The proper inquiry is, therefore, whether the exercise of jurisdiction is sanctioned by the long-arm statute of the forum state and comports with due process requirements of the Constitution." *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1304-5 (10th Cir. 1994). The Kansas long-arm statute extends the personal jurisdiction analysis to the extent of the United States Constitution; thus, this court may proceed to the due process analysis. *Id*. at 1305.

For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). As the Supreme Court further explained in *Burger King Corp v. Rudzewicz*, 471 U.S. 462 (1985), "[t]he Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Id*. at 471-72; quoting *International Shoe*, 326 U.S. at 319.

1.      **Plaintiff Cannot Establish That Mr. Wang or JM Eagle Are Subject To General Jurisdiction.**

To establish general jurisdiction, Plaintiff must establish that the commercial contacts by Mr. Wang and JM Eagle "must be of the sort 'that approximate physical presence' in the state." *Grynberg*, 490 Fed.Appx. at 95, quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1243 (10th Cir. 2011). "For an individual, the paradigm forum for the exercise of general jurisdiction is the

14

individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 2017 WL 2621322, at *6 (U.S. 2017) citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). As the Supreme Court recently noted "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *BNSF Ry. Co. v. Tyrrell*, 137 S.Ct. 1549, 1559 (U.S. 2017)(internal citation omitted).

The Tenth Circuit has followed the "high burden" standard for general jurisdiction. *See Grynberg*, 490 Fed.Appx. at 95. In *Grynberg*, the Court declined to exercise general jurisdiction in Colorado over a mine owner, accused of various torts, who had conducted mining business in Colorado for over eight years and had engaged in extensive litigation in Colorado related to this mining business. The court noted four general factors to consider when determining general jurisdiction, subject to the same requirement that "the commercial contacts here must be of the sort that approximate physical presence in the state." *Id*. (citations omitted). The four factors set forth by the court in *Grynberg* are (1) whether the corporation or individual solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation." *Id*.

Neither JM Eagle nor Mr. Wang remotely meet the requirements under *Grynberg*, nor are their "affiliations with Kansas so 'continuous and systematic' as to render [them] essentially at home in the forum State" as required by *Goodyear Dunlop Tires Operations*, 564 U.S. at 919

1360697

### a.   <u>JM Eagle Has No Necessary Contacts With Kansas</u>

With regard to *Grynberg's* first factor related to solicitation of business through a local office or agents: as set forth in the Declaration of Mr. Wang and Mr. Liao, JM Eagle does not solicit business in Kansas through a local office or agents and does not have any employees in Kansas.  It does not have a Kansas office.  Wang Decl. ¶¶ 5.

With regard to *Grynberg's* second factor, relating to whether the corporation sends agents into the state on a regular basis to solicit business: JM Eagle does not regularly send agents into Kansas to solicit business, rather, Mr. Wang recalls a single trade fair in the last five years to which JM Eagle may have sent a representative.  Wang Decl. ¶ 3-5.  JM Eagle has no agent that is resident in Kansas.  *Id*.

With regard to *Grynberg's* third factor, related to the extent to which the company holds itself out as doing business in the forum state through advertisements, listings, or bank accounts: JM Eagle does not have an advertising campaign in Kansas, and maintains no bank accounts, and pays no taxes in Kansas.  *Id*.

With regard to *Grynberg's* fourth factor, relating to the volume of business conducted in the state by the corporation, JM Eagle does not conduct significant business in Kansas as contemplated by the court in *Grynberg*.  Indeed, while JM Eagle pipe is distributed in all fifty states and around the world, Kansas pipe sales amount to less than 1% of JM Eagle's pipe sales in the United States.  Wang Decl. ¶ 4.

### b.   <u>Mr. Wang Has No Contacts At All With Kansas</u>

Mr. Wang has never lived in Kansas, does not pay taxes in Kansas, nor has he travelled to Kansas.  He does not conduct any business in Kansas, and he does not own property or leaseholds in Kansas.  In short, he has no connection to Kansas.  For Mr. Wang personally there

is simply no basis to consider him personally subject to general jurisdiction in Kansas.  Wang Decl. ¶ 6.

Only in an "exceptional case" are a corporate defendant's operations in another forum "so substantial and of such a nature as to render the corporation at home in that State." *DaimlerAG v. Vauman*, 571 U.S. at __, n.19 (2014) (slip op., at 20, n. 19); *Goodyear*, 564 U.S. at 924.  There is simply no basis to exert general jurisdiction over Mr. Wang or JM Eagle in Kansas.

## 2.   Plaintiff Cannot Establish That Mr. Wang or JM Eagle Are Subject to Specific Jurisdiction.

Specific jurisdiction requires that the lawsuit must "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Daimler*, 571 U.S., at __(slip op., at 18); *see also Burger King Corp.*, 471 U.S. at 472; *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  In other words, there must be "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State…." *Goodyear*, 564 U.S. at 919.  In the Tenth Circuit, courts commonly analyze this standard in the torts context using the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984).  Under the *Calder* test, purposeful direction is established if three requirements are met: (1) defendant commits an "intentional action;" (2) that is "expressly aimed at the forum state;" (3) with "knowledge that the brunt of the injury would be felt in the forum state."  *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008).  Even if the purposeful direction tests are met, which it is not in this action, the plaintiff still must show that its injuries "arose out of" defendants' contacts with the forum, and the court must still ensure that the exercise of jurisdiction does not "offend notions of fair play and substantial justice" under *International Shoe*.  *Id*. at 1080.

The Tenth Circuit takes a more restrictive approach to the "expressly aimed" *Calder* factor, holding that "the forum state itself must be the 'focal point of the tort.'" *Id*. citing *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir.1995) (internal quotations omitted). *Emphasis added.* In identifying the "focal point", the courts must examine the parties "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Far West Capital, Inc*., 46 F.3d at 1079. Here, neither Mr. Wang nor JM Eagle availed themselves of the benefits of Kansas law.

### a. The Alleged Conduct Was Not "Expressly Aimed" At Kansas Nor Was Kansas The "Focal Point" Of The Alleged Conduct.

In the Tenth Circuit, the plaintiff bears the burden of demonstrating not only that the alleged tortious conduct was "expressly aimed" at Kansas, but that Kansas was the "focal point" of the alleged conduct. *See Far West Capital*, 46 F.3d at 1080. In *Far West Capital*, the plaintiff's state of incorporation (Utah), and that the financial effects of the alleged wrong would be felt in Utah, were not sufficient to overcome the fact that the contract negotiations took place in Nevada and the focal point of the actual course of dealing was Nevada. *Far West Capital*, 46 F.3d at 1079-80. Therefore, there were insufficient contacts under *Calder* to establish jurisdiction in Utah. *Id*. *Far West Capital* also addressed intentional interference with contract allegations, much like the allegation at issue here, and concluded that plaintiff's location in the forum state, even when the effects of the alleged interference were felt in the forum state, and when defendant had directed a letter that was part of the alleged interference to the forum state, were insufficient to establish jurisdiction. *Id*. Here, the connection to the forum state Kansas is even further attenuated.

As set forth above, the parties' course of dealing reveals that the Battenfeld Group's efforts were directed towards Los Angeles and China, and those efforts were coordinated

primarily from Germany.  Wang Decl. ¶¶ 7-18, 23-25.  The meetings at which Defendants'

alleged misrepresentations were made all took place in Los Angeles, and it was the CEO of the

Plaintiff's German parent, not the Plaintiff in Kansas, who consistently had exercised the power

to approve or deny the deal, and "shook hands" on the deal in Los Angeles.  *Id*. at ¶ 17.  This was

the same German based CEO who marketed and consummated the deal, who constantly flew to

Los Angeles to negotiate the deal and then kept travelling to Los Angeles to address difficulties

between Battenfeld Group and Quanen when the extrusion equipment failed to work. Wang

Decl. ¶ 9, 19-20.  None of these meetings were held in Kansas, and the person (Mr. Arnold) and

the company (BC Extrusion) who approved the deal are located in Germany.  Wang Decl. ¶¶ 9,

20.  Kansas was not part of these decisions and meetings, let alone a "focal point" of the alleged

misconduct.

Further, according to correspondence between Battenfeld Group and defendants, the

financial pressure allegedly felt as a result of non-payment of invoices by Quanen and the

consequent default of bank covenants was felt primarily in Germany, not Kansas—indeed, the

CEO of BC Extrusion wrote to Mr. Wang and Mr. Franco about the financial pressures for "our

group" and for "BC".  Wang Decl. ¶ 22, Exh. D.  Plaintiff's Complaint confirms this fact and

reveals that it was actually a Swedish holding company, Shogun Sweden Holding, AB that was

the "ultimate parent" of the Battenfeld Group, and the damages were that it could not sell the

Battenfeld Group at the price it wanted.  Compl. ¶ 47.  Moreover, even if the entire financial

burden were felt in Kansas, which it was not, under *Far West Capital*, that would be insufficient

to satisfy the "focal point" requirement in the Tenth Circuit.  See *Far West Capital*, 46 F.3d at

1079-80.

**b.**     **The Alleged Harm In Kansas Was At Most A "Mere Foreseeability"**

The third prong of the *Calder* effects test, focusing on where the alleged harm was felt by plaintiff, is not satisfied because Plaintiff's allegations suggest at most a "mere foreseeability" that some harm would be felt in Kansas.  *Dudnikov*, 514 F.3d at 1077 ("under *Calder*, the mere foreseeability of causing an injury in the forum state is, standing alone, insufficient"); see also *Trierweiler v. Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1534 (10th Cir. 1996)("the mere foreseeability of causing injury in another state is not a sufficient benchmark for exercising personal jurisdiction")(citations omitted).  Rather, "there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Trierweiler*, 90 F.3d at 1534 (citation omitted).  Here it is the opposite:  Mr. Wang and JM Eagle were not directing their conduct in such a way as to avail themselves of any privilege of doing business in Kansas.  Rather, Plaintiff's German parent company and Plaintiff were directing their efforts directly into California and availed themselves of the benefits of California laws.

As set forth above, Mr. Wang was repeatedly approached at JM Eagle's headquarters in Los Angeles by Maplan's German parent company, BC Extrusion, who expressed a repeated desire to supply extrusion equipment to China in several meetings leading up to the August 24, 2012 where the financial terms for the supply of the extrusion equipment were agreed upon Wang Decl. ¶¶ 10-17, Exh. A.  By way of example, it was the CEO of Plaintiff's German parent Juergen Arnold who wrote to Mr. Wang in June 20, 2012, before any deal had been consummated, stating he was overseeing the "capacity planning" for the China project, that he had recently travelled to China to review processes for the China project, and he asked to meet in Los Angeles or China to discuss the China project.  Wang Decl. ¶ 14, Exh. C.  Mr. Arnold also

wrote directly to Mr. Wang in Los Angeles asserting that BC Extrusion, the parent of Maplan, was taking the lead in late payment of invoices from Quanen.  Wang Decl. ¶ 22, Exh D.  Based upon the direction of all relevant activity only towards Los Angeles and China by a German-led group of companies, any harm in Kansas was "merely foreseeable" and thus this element of *Calder* is not satisfied.  *Dudnikov*, 514 F.3d at 1077.

Plaintiff Maplan was, at most, just one U.S. affiliate of a German led international conglomerate consistently directing its contacts to Los Angeles and China in connection with the supply to, and payment for extrusion equipment in China.  Moreover, Maplan is only one of the Battenfeld affiliates suing Quanen for unpaid invoices, the other being Battenfeld Group's China affiliate.  Wang Decl. ¶ 27.  In this context, any damage in Kansas was "merely foreseeable".  Moreover, the failure by Quanen to pay a small percentage of the invoices for this equipment ($4 million out of $38 million in invoices) was effected by Quanen in China with the impact felt by the Battenfeld Group parent entities in Germany and Sweden.  See Complaint ¶¶ 36, 42-47.  This attenuated foreseeability of damages in Kansas standing alone is not sufficient to support jurisdiction over a California company and a California resident who negotiated a deal in California with a German led conglomerate for equipment supplies to a Chinese company.  Any connection to Kansas is merely "fortuitous."  *Far West Capital*, 46 F.3d at 1079-80.

### c.   Mr. Wang and JM Eagle Have No Contact With The Forum Giving Rise To Jurisdiction in Kansas.

Even if, arguendo, the purposeful direction tests are met, the plaintiff must show that the Plaintiff's injuries "arise out of defendants' contacts with the forum jurisdiction" *Dudnikov*, 514 F.3d at 108.  In this regard the court must examine the parties' negotiations and actual course of dealing to determine the defendants' forum contacts in actually committing the alleged tort. *Id*.

The court in *Far West* emphasized that in cases of alleged business torts, the Tenth Circuit takes a narrow approach to the *Calder* effects test regardless of where the alleged harm occurred: "Our review of these post-*Calder* decisions indicates that *the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts*." *Far West Capital, Inc*. 46 F.3d at 1079 (emphasis added).  The court in *Far West Capital* further notes that the courts will look to the parties' "prior negotiations and contemplated future consequences" together with the parties' "actual course of dealing" to determine whether the court may exercise jurisdiction.  *Id*. In determining that insufficient contacts with the forum state existed, the court in *Far West Capital* focused specifically on the fact that the most important negotiations took place out of state, and that the underlying contract was to build an out of state power plant to supply an out of state utility.  *Id*. at 1080.  The court in *Far West Capital* also found that the fact that plaintiff suffered financial harm in the forum state was insufficient to establish jurisdiction.  (*Id*. at 1079). As in this case, the plaintiff in Far West Capital alleged harm in the forum state due to purported interference with contract but this was found to be insufficient to establish jurisdiction.  *Id*.

The ruling in *Far West* applies with full and fatal force in the instant case.  Neither Mr. Wang nor JM Eagle availed themselves of the benefits of Kansas law, and had no contact with Kansas in connection with the deal to supply extrusion equipment to China.

Specifically, Plaintiff alleges that Mr. Wang purportedly made false statements to Plaintiff regarding the capacity and capability to install and operate the extrusion equipment at the new Quanen plant in China, and that Quanen had the ability to pay for extrusion equipment. Complaint ¶¶ 88-90.  Plaintiff further alleges that Mr. Wang and JM Eagle interfered with

Plaintiff's contract for supply of extrusion equipment and with banking covenants arranged by Plaintiff's German parent company, BC Extrusion.  Complaint ¶ 82-83.

The fatal issue here for Plaintiff is that none of the meetings expressly relied upon by Plaintiffs as forming the bases of these tort claims (See Complaint ¶¶ 12-18, 20, 22) occurred in Kansas nor involved any decision-makers for the Battenfeld Group in Kansas.  Rather, as set forth in the Wang and Liao declarations, all of the meetings leading up to the key August 24, 2012 meeting where the financial terms were negotiated and all subsequent meetings and correspondence between Wang and the Battenfeld Group to address problems with installation of the equipment and with payment of outstanding invoices relied upon for Plaintiffs tort claims took place in  Los Angeles and China; not in Kansas.  Wang Decl. ¶¶ 9-17.  Similarly, the actual decision-makers controlling the financial terms of the supply deal, the technical aspects of installing the operating equipment and the efforts to recover invoice payments were from the parent entity in Germany, not Kansas.  Wang Decl. ¶¶ 16, 17, 22, Exh. D; Liao Decl. ¶ 12-15, Exhs A-B.  Indeed, Plaintiff's own listing of their Management Team for the China supply project include only 2 representatives from Maplan in Kansas and seven (out of 9 total) from the German parent entity.  Liao Decl. ¶ 12, Exh A.

Thus, exactly as in *Far West Capital*, all of the key negotiations took place out of state, and the agreements at issue were for the supply of extrusion equipment outside of Kansas (to China for pipe production in China).  Moreover, there was also no contract entered into between Mr. Wang or JM Eagle and Plaintiff; Plaintiff's only contract is with Quanen.  These are not sufficient contacts with Kansas under settled Tenth Circuit law.

**B.**     **Subjecting Mr. Wang and JM Eagle To Jurisdiction In Kansas Would Offend Traditional Notions of Fair Play And Substantial Justice**

Even if Plaintiff were able to establish minimum contacts, which it cannot, exercise of jurisdiction would still be improper because such an exercise would offend traditional notions of fair play and substantial justice.  Dragging a company and an individual into a court in a distant state which they have never visited and do not maintain any presence would violate this test.

Because defendants do not have the minimum contacts with Kansas necessary to support jurisdiction, this Court need not proceed to the second step of the jurisdictional inquiry. But jurisdiction is equally precluded under second part of the constitutional test—because exercising jurisdiction over defendants here would "offend[] traditional notions of fair play and substantial justice." *TH Agriculture & Nutrition, LLC v. Ace European Group Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007); *OMI Holdings, Inc. v Royal Ins. Co. of Canada*, 149 F.3d 1086 (10th Cir. 1998). The weaker the plaintiff's showing of minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction. *Trujillo v. Williams*, 465 F.3d 1210, 1221 (10th Cir. 2006).  The reasonableness analysis requires weighing the five following factors: (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient solution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. *Id*.

As this Court found in *Vestring v. Halla*, 920 F.Supp.2d 1189 (D. Kan. 1990), even where personal jurisdiction was otherwise proper over a defendant based upon his minimum contacts with Kansas because a contract was offered directly to plaintiff while in Kansas, the contacts with Kansas were too weak to support jurisdiction under the due process analysis.  *Id*. at 1196-7.  This was in part because, even though the contract was accepted in Kansas (a contract

for raising cattle) the contract had very little to do with Kansas. *Id*. at 1196. This finding by this Court was based on, among other matters, the fact that the cattle at issue were bought and cared for in Texas, payments from plaintiffs came from a company in Missouri, and every alleged breach of contract and tortious act or omission occurred outside of Kansas. *Id*. at 1196-7 Further, all witnesses, excluding plaintiffs, were outside of Kansas, and the same was true for all material documents. *Id*.

Just as was the case in *Vestring*, so here each of the reasonableness factors weighs in favor of Mr. Wang and JM Eagle:

(1) <u>Burden on defendants</u>. The burden on the defendants of litigating in a foreign forum "is of primary concern" and "special significance" in determining the reasonableness of jurisdiction because its consideration "serves to prevent the filing of vexatious claims in a distant forum where the burden of appearing is onerous." *OMI Holdings*, 149 F.3d at 1096. That concern is directly implicated here.

Mr. Wang is a California resident and has never traveled to Kansas. Likewise, JM Eagle is a California company whose employees do not travel to Kansas and it has no office or resident agent in Kansas. Wang Decl. ¶ 3-6. The extensive documents related to all of the meetings and interactions forming the basis of Plaintiff's tort claims against Mr. Wang and JM Eagle are located in Los Angeles (Liao Decl. ¶¶ 18-19). Similarly, the multiple JM Eagle executives and employees directly involved in the same interaction from both a negotiating and technical standpoint are also residents in Los Angeles. *Id.* Therefore, Mr. Wang and numerous other JM Eagle individuals who have never been to Kansas would have to travel to what is a remote location from Los Angeles. To litigate in a distant forum nearly 2000 miles away would be unduly onerous for Mr. Wang and JM Eagle (and its employees and staff).

1360697

(2) <u>The forum state's interest in resolving the dispute</u>. This factor turns on the parties' connections to the forum state and the forum state's interest in applying its own law. *OMI Holdings*, 149 F.3d at 1096.  Only Quanen has signed a choice of law provision implicating Kansas.  Mr. Wang and JM Eagle are not residents of Kansas, and the alleged torts were not committed within Kansas.  Most of the Battenfeld Group resides outside of Kansas, and Battenfeld' s China affiliate is <u>already suing</u> Quanen in China with regard to the same disputed invoices, negating any implication that it wishes to resolve this entire dispute under Kansas law. Wang Decl. ¶ 25.  The Battenfeld Group, including Plaintiff, repeatedly solicited Mr. Wang and JM Eagle in California from Germany and all subsequent meetings concerning the financial terms of the deal, problems with the equipment supplied and payment of invoices occurred in Los Angeles or China, not in Kansas.  Wang Decl. ¶¶ 9-26; Liao Decl. ¶¶ 9-17.

(3) <u>The plaintiff's interest in receiving convenient and effective relief</u>. This factor "hinges on whether the Plaintiff may receive convenient and effective relief in another forum." *OMI Holdings*, 149 F.3d at 1097. The answer is undoubtedly yes. Plaintiff may obtain efficient relief in California, particularly because it is where Mr. Wang, JM Eagle, the relevant documents and most of the relevant witnesses reside.  Additionally, since Plaintiff already filed a lawsuit in China, evidently the Battenfield Group's belief that its allegations can be addressed in a different forum.

(4) <u>The interstate judicial system's interest in obtaining the most efficient resolution of controversies</u>. This factor turns on whether "the forum state is the most efficient place to litigate the dispute," which depends on "the location of witnesses," "where the wrong underlying the lawsuit occurred," "what forum's substantive law governs the case," and "whether jurisdiction is necessary to prevent piecemeal litigation." *OMI Holdings*, 149 F.3d at 1097. All of these

variables point to California. All of the alleged torts as to Mr. Wang and JM Eagle occurred in California or China.  This would also create great inefficiency because JM Eagle personnel (likely at least 11 individuals), who never travel to Kansas would be unnecessarily hailed into Kansas, and Mr. Wang personally would have to travel to Kansas frequently, despite never having been to Kansas.  Plaintiff cannot complain about piecemeal litigation, given that its China affiliate already commenced a separate suit in China against Quanen on the same subject matter earlier this year.  Wang Decl. ¶ 27.

(5) The shared interest of the several states in furthering fundamental substantive social policies. The court's "analysis of this factor focuses on whether the exercise of personal jurisdiction by Kansas affects the substantive social policy interests of other states or foreign nations." *OMI Holdings*, 149 F.3d at 1097-98. Once again, this factor weighs against the exercise of jurisdiction in Kansas.  This is an action by only one member of a multi-national conglomerate which directed all of its contacts towards California and China, and none of the relevant activity occurred in Kansas.

**V.     Conclusion**

Neither Mr. Wang nor JM Eagle have any general jurisdiction contacts with Kansas. From a specific jurisdiction standpoint, the very same meetings and contacts relied upon in Plaintiff's own Complaint for its tort claims against these specially appearing defendants were consistently directed to, and occurred in Los Angeles, and never in Kansas.  Moreover, by Plaintiff's own Complaint, the alleged harm the Battenfeld Group bank covenants allegedly occasioned by the non-payment by Quanen of approximately 10% of the total invoice amount billed by Plaintiff was felt primarily in Europe, not Kansas.  The pervasive involvement of Los Angeles (not Kansas) as the direct focal point of contacts by the Battenfeld Group with these

1360697

defendants requires the dismissal of this action for lack of personal jurisdiction. Moreover, the traditional notions of fair play and substantial justice also strongly mitigate against the exercise of jurisdiction. Accordingly, defendants Mr. Wang and JM Eagle respectfully submit that the dismissal of the Complaint against them is fully warranted.

DATED: June 30, 2017                    ADAMS JONES LAW FIRM, P.A.

                                        By /s/ Monte A. Vines
                                        Monte A. Vines, SC #11044
                                        1635 N. Waterfront Parkway, Suite 200
                                        Wichita, KS 67206
                                        Phone: (316) 265-8591 Fax: (316) 265-9719
                                        mvines@adamsjones.com
                                                       and
                                        Patricia L. Glaser (pro hac pending)
                                        Sean Riley (pro hac pending)
                                        GLASER WEIL FINK HOWARD
                                          AVCHEN & SHAPIRO LLP
                                        10250 Constellation Blvd., 19th Floor
                                        Los Angeles, CA 90067
                                        Phone: (310) 553-3000
                                        Fax: (310) 556-2920
                                        Email: pglaser@glaserweil.com
                                               sriley@glaswerweil.com

                                        *Attorneys for Defendants Walter Wang and*
                                        *J-M Manufacturing Company, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 30, 2017, this pleading was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to those requesting notice and other interested parties via the CM/ECF system; and that a copy of this document was mailed by first class mail, postage prepaid and properly addressed, to all non-CM/ECF participants.

                                        /s/ Monte A. Vines, SC #11044

1360697