# UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

AMERICAN MAPLAN CORPORATION, D/B/A
BATTENFELD-CINCINNATI USA,

               Plaintiff,

     v.

HEBEI QUANEN HIGH-TECH PIPING CO., LTD.;
J-M MANUFACTURING COMPANY, INC.; and
WALTER WANG,

               Defendants.

CASE NO. 6:17-cv-01075-JTM-GEB

---

## PLAINTIFF AMERICAN MAPLAN CORPORATION, D/B/A BATTENFELD-CINCINNATI USA'S OPPOSITION TO DEFENDANTS WALTER WANG AND J-M MANUFACTURING COMPANY INC.'S MOTION TO DISMISS

Plaintiff American Maplan Corporation, d/b/a battenfeld-cincinnati USA ("Battenfeld US" or "Plaintiff") submits this opposition to defendants Walter Wang ("Mr. Wang") and J-M Manufacturing Company, Inc.'s ("JM Eagle" and, together with Mr. Wang, "Defendants") Motion to Dismiss for Lack of Jurisdiction, ECF Nos. 27-28 (the "Motion").

## I.    INTRODUCTION

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction cannot stand and should be denied.  JM Eagle and Mr. Wang were intimately involved in the events giving rise to this dispute.  Indeed, these Defendants participated in the due diligence, contract negotiations, project implementation, and decisions to cause Hebei Quanen to refuse to commission or pay for the equipment delivered by Battenfeld US, which harmed Battenfeld US in Kansas and led directly and inexorably to this lawsuit.  Notably, the agreements at issue in this dispute—which JM Eagle and Mr. Wang negotiated directly with Battenfeld US—include a Kansas consent-to-jurisdiction

provision.   As entities that are "closely related" both to the transactions at issue and to co-defendant Hebei Quanen High Tech Piping Company Ltd. ("Hebei Quanen"), the Kansas consent-to-jurisdiction provision is equally binding on JM Eagle and Mr. Wang.

Moreover, Defendants do not (and cannot) dispute that (1) JM Eagle and Mr. Wang participated in all of the negotiations with Battenfeld US—including face-to-face meetings and email and letter correspondence—leading to their affiliate Hebei Quanen's purchase of extrusion equipment from Battenfeld US; (2) JM Eagle's engineering team did all of the preliminary work evaluating extrusion pipe equipment vendors for the China project because co-defendant and affiliate Hebei Quanen had not yet been formed; (3) Mr. Wang and the JM Eagle engineering team were in regular contact with Battenfeld US's CEO from 2011 through 2015 related to the Hebei Quanen pipe manufacturing project; and (4) over eleven JM Eagle employees were "directly involved in analyzing, negotiating, and addressing [alleged] problems" with the extrusion equipment for the Hebei Quanen project.   These facts cannot be disputed because ***they were affirmatively stated by Defendants themselves in the sworn declarations*** filed in support of the Motion.   *See* ECF Nos. 28-2 and 28-3.   Indeed, by Hebei Quanen's own admission, JM Eagle introduced Hebei Quanen to Battenfeld US.

The Complaint is also brimming with alleged—and, for purposes of this Motion, unrebutted—allegations of tortious conduct by JM Eagle and Mr. Wang targeted to Battenfeld US in Kansas.   Under these facts, exercise of personal jurisdiction over Defendants in this forum clearly comports with due process.   Defendants' Motion should be denied.

2

## II.   DEFENDANTS' SIGNIFICANT CONTACTS WITH BATTENFELD US IN KANSAS

### A.   JM Eagle and Mr. Wang Have Been Doing Business With Battenfeld US, a Kansas Corporation, for Over Two Decades

Plaintiff Battenfeld US is a leading manufacturer of plastic extruders and complete extrusion lines, including extrusion systems for the manufacture of polyvinyl chloride ("PVC") and polyethylene ("PE") pipe.   ECF No. 1 ("Complaint").   It is uncontested that since its founding in 1977, Battenfeld US has been a Kansas corporation based in McPherson, Kansas. Declaration of Paul Godwin ("Godwin Decl.") ¶ 3.   Battenfeld US maintains its business records in Kansas, and many of Battenfeld US's potential witnesses are Kansas residents.   *Id.* ¶ 4. Contrary to Defendants' repeated assertions, while Battenfeld US is part of the battenfeld-cincinnati corporate family, Battenfeld US did not have a German corporate parent at any time during any actions of the parties relevant to this lawsuit.   *Id.* ¶ 5.   Indeed, during the negotiation, execution, and performance under the Hebei Quanen Purchase Agreements, Battenfeld US was not a subsidiary of BC Extrusion Holding GmbH ("BC Extrusion Holding"), and BC Extrusion Holding did not control Battenfeld US's day-to-day operations or business and marketing decisions.   *Id.*   Instead, Battenfeld US is a self-standing operations company with its own sales force, engineering team, production facilities, and profits and liabilities.   *Id.* ¶ 6.

Defendant JM Eagle, a manufacturer of PVC and PE pipe with 22 manufacturing plants in 15 states throughout North America, is one of Battenfeld US's oldest clients dating back to 1995.   *See* June 29, 2017 Declaration of Kaider Liao, ECF No. 28-2 ("Liao Decl.") ¶ 5 ("[f]rom approximately 1995 on, JM Eagle has purchased . . . [pipe extrusion] equipment through [Battenfeld US]").[1]   Since 1995, Battenfeld US has installed extrusion equipment in each of JM

---

[1] Many of the alleged "facts" in the Liao and Wang Declarations are demonstrably false, as further described in the Godwin Declaration.   But in addition to being false, many of Mr. Wang

Eagle's 22 manufacturing plants.  Godwin Decl. ¶ 7.  In connection with these projects across the United States, JM Eagle has submitted over 3,000 purchase orders to Battenfeld US for the delivery of approximately $65 million in pipe extrusion equipment.  *Id.*  Many of those purchase orders—like the Purchase Agreements at issue in this litigation—were subject to Battenfeld US's standard terms and conditions, which include a provision by which JM Eagle "***agree[d] to be subject to and accept jurisdiction in the Kansas federal and state courts to resolve all disputes***."  *See, e.g.*, Godwin Decl. ¶ 7, Ex. A (samples of purchase agreements between JM Eagle and Battenfeld US) (emphasis added); Complaint ¶ 23.

### B.   Defendants Were Intimately Involved In Hebei Quanen's Purchase of Extrusion Equipment From Battenfeld US

The undisputed facts show that Defendants were instrumental in vetting and selecting Battenfeld US as the extrusion equipment provider for the Hebei Quanen project.  As evidenced by their own declarations, in 2011-2012, Mr. Wang and JM Eagle decided to expand JM Eagle's

---

and Mr. Liao's factual allegations are inadmissible and should be ignored by the Court as they are not based on personal knowledge.  *See Maverick Paper Co. v. Omaha Paper Co.*, 18 F. Supp. 2d 1232, 1235 (D. Kan. 1998).  Indeed, the declarations of both Mr. Liao and Mr. Wang are wrought with statements about Battenfeld US's internal workings, of which they have no personal knowledge.  *See, e.g.*, Liao Decl. ¶ 5 ("it is my understanding that all significant corporate decisions for the Group are made or approved by the German parent of the Group, BC Extrusion Holding . . . and its CEO"); *id.* ¶ 6 ("it is my understanding that critical components in this extrusion equipment are made by the Battenfeld Group at its German manufacturing plants . . . . [I]t is also my understanding that, wherever the extruders are actually made (Germany, the United States, China or elsewhere), the core technology for extrusion equipment comes from the Battenfeld Group's German manufacturing plants."); *id.* ¶ 11 ("Based upon my observation of the interactions at this meeting, it was clear to me that Mr. Arnold was the leader and final decision maker for the Battenfeld Group (including Maplan)"); *id.* ¶ 12 ("it was my understanding that the Battenfeld Group team involved with managing the supply of the extrusion equipment for the China project were significantly staffed by personnel from BC Extrusion in Germany, not Maplan in Kansas"); ECF No. 28-3 (Declaration of Walter Wang ("<u>Wang Decl.</u>")) ¶ 8 ("I know from my business dealings with the Group over many years that the core technology and certain components of the extrusion equipment purchased by JM Eagle come from the Group's German-based manufacturing plants, most particularly BC Extrusion."); *id.* ¶ 16 ("Based upon the interactions between the representatives at this meeting, it was clear to me that Mr. Arnold was the decision maker for the Battenfeld Group team and his approval was required for any deal.").

operations into the Chinese market.  Wang Decl. ¶ 7; Liao Decl. ¶ 7 (describing "JM Eagle's plan to build . . . plants in China").  While JM Eagle elected to incorporate a separate company "to handle this pipe manufacturing project in China," that company (Hebei Quanen) was not formed until July 2012.  Wang Decl. ¶ 7; Liao Decl. ¶ 8.  Thus, because Hebei Quanen did not yet exist and "did not have an engineering team," the JM Eagle engineering team analyzed the Chinese market, made recommendations about the kind and volume of pipe and equipment necessary to manufacture that pipe, and evaluated vendors.  Liao Decl. ¶ 8.  In fact, JM Eagle and Mr. Wang were in communication with Battenfeld US regarding the proposed China expansion and the potential for Battenfeld US to provide extrusion equipment for this project far in advance of Hebei Quanen's formation.  Wang Decl., Exs. A-C.  It is beyond dispute that JM Eagle and Mr. Wang engaged in substantive negotiations with Battenfeld US months before forming Hebei Quanen:

- On January 19, 2012, Mr. Wang met with the then-CEO of Battenfeld US, Kurt Waldhauer, and the then-CEO of an affiliate of Battenfeld US "to discuss preliminary arrangements for the China project, including the proposed extrusion equipment needed for the project."  Wang Decl. ¶ 10; *see also* Liao Decl. ¶ 9.

- On January 24, 2012, Mr. Waldhauer sent an email communication to Mr. Wang confirming the contours of the January 19, 2012 discussion, including a proposed delivery schedule for the equipment.  Mr. Wang responded to Mr. Waldhauer in Kansas on the same date, saying "after we have made our final decision we will certainly give you a formal quotation request."  Wang Decl. ¶ 11, Ex. A.

In April 2012 (*i.e.*, **before** Hebei Quanen's July 2012 formation), Defendants already instructed Battenfeld US to start manufacturing equipment for the Hebei Quanen project.  Wang Decl., Ex. B (April 12, 2012 email to Mr. Wang noting that Battenfeld US and Mr. Wang "have committed to each other to start the process of manufacturing for the China lines").

After forming Hebei Quanen in July 2012, JM Eagle introduced Battenfeld US and Hebei Quanen.  *See, e.g.*, ECF No. 20 at 2 ("JM Eagle introduced [Hebei Quanen] to the [battenfeld-

CORE/0775731.0012/134312980.1

cincinnati] Group" including Battenfeld US); *see also* Declaration of Christopher J. Cox filed simultaneously herewith ("Cox Decl."), Ex. A (Hebei Quanen's First Amended Complaint in the California action) ¶ 13 (same); Cox Decl., Ex. B (Hebei Quanen's Response to BC Extrusion Holding's Motion to Quash in the California action) at 1 (same).   But even after incorporating Hebei Quanen and introducing Hebei Quanen to Battenfeld US, these Defendants continued to play a significant role in the negotiation for Battenfeld US's sale of extrusion equipment to Hebei Quanen.  For example, and as conceded in Defendants' own supporting declarations:

- On August 24, 2012, Mr. Wang, Mr. Liao (JM Eagle's Director of Engineering), Michael Wu (JM Eagle's Assistant Director of Engineering) and Franco An (the President of the newly-formed Hebei Quanen) met with Mr. Waldhauer, Grant Flaharty (the then-CFO of Battenfeld US), and the then-CEO BC Extrusion Holding to discuss volume discounts that Battenfeld US could offer for the Hebei Quanen project.  Wang Decl. ¶¶ 16-17; *see also* Liao Decl. ¶ 10.

Pursuant to the negotiations involving JM Eagle, Mr. Wang, and Battenfeld US, between November 2012 and March 2013, Hebei Quanen submitted more than fifty Purchase Agreements to Battenfeld US.  Complaint ¶ 24.  These Purchase Agreements included and were governed by Terms and Conditions that are identical to and contain the same Kansas consent-to-jurisdiction provision that governed many of the more than 3,000 purchase orders that JM Eagle had previously submitted to Battenfeld US.  *Compare* Godwin Decl., Ex. B (Hebei Quanen sample Purchase Agreement) *with* Godwin Decl., Ex. A (samples of JM Eagle purchase agreements).

Even after Hebei Quanen ordered the extrusion equipment from Battenfeld US, Defendants remained involved in the transactions between Hebei Quanen and Battenfeld US:

- On May 30, 2013, Mr. Wang met with Battenfeld US executives, in Mr. Wang's words, "to discuss the [Hebei] Quanen project."  Wang Decl. ¶ 18.

- On December 20, 2013, Mr. Wang met with Battenfeld US executives, again in Mr. Wang's words, "to discuss the [Hebei] Quanen project."  Wang Decl. ¶ 19.

- Throughout the life of the project, JM Eagle employees sent countless emails to Battenfeld US employees (who resided at all relevant times in Kanas) to discuss

project implementation, payment issues, and product troubleshooting. *See, e.g.,* Liao Decl. ¶ 13 (the JM Eagle engineering team "was in regular communications with the Battenfeld Group," including Battenfeld US, regarding "a wide range of logistical matters."); *id.* ¶ 16 ("In the period from late 2013 to the end of 2016, I was in frequent communication with both the Quanen plant and Battenfeld Group personnel . . . ."); *see also* Godwin Decl. ¶¶ 9 and 14, Exs. C-F (Mr. Liao, Mr. Wang, and other JM Eagle employees were in regular contact with Kansas-resident Battenfeld US employees, including principally the then-CEO Kurt Waldhauer, concerning the Hebei Quanen project).

- JM Eagle's Vice President of Production, Chuck Clark, prepared a report ("Clark Report"), describing the "collaborative efforts" between the parties and attaching multiple email chains between Mr. Clark (a JM Eagle employee) and numerous Battenfeld US employees in Kansas, including Mr. Waldhauer, Paul Godwin, Jerry Severns, and Mike Wallen. *See* Godwin Decl. ¶ 14, Ex. G (Clark Report and attachments thereto).

- And finally, as exhaustively detailed in the Complaint, JM Eagle and Mr. Wang tortuously interfered with the Purchase Agreements, including by directing Hebei Quanen to decline to commission many of the extrusion lines, reject further delivery of equipment, and refuse to pay outstanding amounts due to Battenfeld US. Complaint ¶¶ 30, 32, 36, 39-41, and 45.

### C. Defendants' Intentional Actions Caused Harm to Battenfeld US in Kansas

As a direct result of JM Eagle and Mr. Wang's fraudulent representations to Battenfeld US and intentional interference with Battenfeld US's contractual relationships with Hebei Quanen, Battenfeld US suffered significant financial harm in Kansas.

JM Eagle and Mr. Wang were aware that Hebei Quanen's failure to make the contractually agreed upon payments to Battenfeld US threatened the battenfeld-cincinnati corporate family's covenants with creditors, for which Battenfeld US was jointly liable (the "Bank Covenants"). Complaint ¶¶ 36, 42-43. Nevertheless, and with the intent to force the battenfeld-cincinnati corporate family to breach the Bank Covenants and/or into insolvency, JM Eagle and Mr. Wang directed Hebei Quanen to decline to commission many of the extrusion lines, reject further delivery of equipment, and refuse to pay outstanding amounts due to Battenfeld US. Complaint ¶¶ 30, 32, 36, 39-41, and 45.

7

In an effort to avoid the battenfeld-cincinnati corporate family's default on the Bank Covenants, while waiting for payments due from Hebei Quanen, Battenfeld US began to divert cash away from priorities like manufacturing processes and paying suppliers for raw materials to satisfy the Bank Covenants. Godwin Decl. ¶ 15. Battenfeld US's suppliers then began refusing to deliver goods and demanding prepayments for future orders. *Id.* Battenfeld US's tight liquidity position and reduced access to raw materials, in turn, led to delayed shipments to customers and lost customer orders. *Id.* Battenfeld US experienced this harm in Kansas, the place of Battenfeld US's incorporation and business operations. *Id.* ¶ 3.

Unable to satisfy both the Bank Covenants, because of Hebei Quanen's refusal to come current on its obligations, and Battenfeld US's obligations to suppliers and other customers, the battenfeld-cincinnati corporate family ultimately did neither. *Id.* ¶ 16. After the entire battenfeld-cincinnati corporate family defaulted on the Bank Covenants, Battenfeld US suffered a liquidity crisis—it was forced to seriously delay payments to suppliers, which further deteriorated Battenfeld US's financial position in Kansas and caused Battenfeld US a significant loss of sales. *Id.*; *see also* Complaint ¶ 46. This harm resulted from Defendants' conduct directed toward Battenfeld US in Kansas.

JM Eagle's and Walter Wang's Kansas-directed activities unequivocally support exercise of jurisdiction in this forum. Defendants admitted that they were intimately involved in the negotiation, implementation, and fallout of the transactions giving rise to this Complaint; they knowingly directed their activities at Kansas residents; and they undoubtedly caused harm in Kansas to a Kansas corporation. Due process requires nothing more for the exercise of personal jurisdiction to be reasonable.

CORE/0775731.0012/134312980.1

### III.   PLAINTIFF NEED ONLY SHOW THAT DEFENDANTS ESTABLISHED "MINIMUM CONTACTS" IN KANSAS

The constitutional touchstone of due process is "whether the defendant purposely established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). It "is critical to due process analysis . . . that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The Tenth Circuit has endorsed a three-part test to determine whether nonresident defendant's contacts with the forum state are strong enough to justify an exercise of personal jurisdiction:  (1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) the quality and nature of the defendant's contacts must be such that it is reasonable, in the context of our federal system of government, to require the defendant to appear in the forum state.  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008); *Marcus Food Co. v. Family Foods of Tallahassee, Inc.*, 729 F. Supp. 753, 757-58 (D. Kan. 1990).

While the plaintiff bears the burden of establishing minimum contacts, at this stage of the litigation, "the plaintiff's burden is light," and may be satisfied by a prima facie indication of jurisdiction.  *AST Sports Science, Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008); *see also Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (stating that "in the preliminary stages of litigation . . . [the] burden [of showing personal jurisdiction] is 'light.'").  "Well-pled facts, as opposed to conclusory allegations, are accepted as

CORE/0775731.0012/134312980.1

true if uncontroverted by the defendants' affidavits." *Orion Ethanol, Inc. v. Evans*, Case No. 08-1180-JTM, 2009 U.S. Dist. LEXIS 65557, at *5 (D. Kan. July 29, 2009) (J. Thomas Marten, presiding).

Once a plaintiff satisfies its minimum contacts burden, "the burden shifts to the defendant to demonstrate that exercising personal jurisdiction would nonetheless 'offend traditional notions of fair play and substantial justice.'" *Newsome v. Gallacher*, 722 F.3d 1257, 1271 (10th Cir. 2013) (quoting *Dudnikov*, 514 F.3d at 1080). The defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. The reasonableness analysis involves five factors: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Newsome*, 722 F.3d at 1271. Once "minimum contacts" exist, a court rarely finds that other considerations would render the exercise of jurisdiction unreasonable. *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009) (observing that "[s]uch cases are rare.").

The Kansas long-arm statute extends the personal jurisdiction analysis to the full extent of the United States Constitution and, therefore, this Court typically bypasses analysis of the Kansas long-arm statute in favor of the "minimum contacts" analysis. *See* Kan. Stat. Ann. § 60-308(b)(1)(L); *see also Diaz-Oropeza v. Riverside Red X, Inc.*, Case No. 11-2012-JTM, 2011 U.S. Dist. LEXIS 68681, at *7 (D. Kan. June 27, 2011) (J. Thomas Marten, presiding); *Oxion, Inc. v. O3 Zone Co.*, Case No. 06-1385-JTM, 2007 U.S. Dist. LEXIS 54480, at *5-6 (D. Kan. July 25, 2007) (J. Thomas Marten, presiding).

As discussed more fully below, the quality and nature of Defendants' conduct with Battenfeld US in Kansas far surpasses the minimum requirements necessary to satisfy due process.

## IV.   DEFENDANTS CONSENTED TO JURISDICTION IN KANSAS AS "CLOSELY RELATED" ENTITIES TO HEBEI QUANEN AND THE PURCHASE AGREEMENTS

The other defendant in this case, Hebei Quanen, does not contest personal jurisdiction in Kansas—nor can it.   *See* ECF Nos.19-20.   It is undisputed that, pursuant to the Purchase Agreements at issue, Hebei Quanen "agree[d] to be subject to and accept jurisdiction in the Kansas federal and state courts to resolve all disputes."   Complaint ¶ 2; *see also* Godwin Decl., Ex. B (sample Purchase Agreement).   Likewise, under well-established jurisprudence, JM Eagle and Mr. Wang are ***also*** subject to the same consent-to-jurisdiction provision because they are "closely related" entities/persons to Hebei Quanen and the Purchase Agreements.

It is black letter law that a party can consent to personal jurisdiction by contract prior to litigation.   *See National Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964) ("[I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court."); *Electronic Realty Assocs., L.P. v. Vaughan Real Estate*, 897 F. Supp. 521, 522 (D. Kan. 1995).   Moreover, "the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause."   *Recurrent Capital Bridge Fund I, LLC v. ISR Systems and Sensors Corp.*, 875 F. Supp. 2d 297, 306 (S.D.N.Y. 2012) (citing, *inter alia*, *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983), *overruled on other grounds by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989)).

Indeed, "[a] non-party to a contract may be subject to its forum selection clause ***if the non-party is so 'closely related' to either the parties to the contract or the contract dispute itself*** that enforcement of the clause against the non-party is foreseeable."   *Id.* at 307 (emphasis

added).  Numerous federal circuits have approved of the "closely related" analysis pursuant to which a court may exercise personal jurisdiction over "closely related" non-signatories to forum selection and consent-to-jurisdiction provisions.  *See, e.g.*, *Cent. Transp. Servs. v. Cole*, No. 13-1295, 2013 U.S. Dist. LEXIS 161384, at *11 (D. Kan. Nov. 13, 2013) (discussing application of forum selection clauses to "closely related" non-signatory entities); *see also TAAG Linhas Aereas de Angola v. Transam. Airlines, Inc.*, 915 F.2d 1351 (9th Cir. 1990); *Marano Enters. of Kansas v. Z-Teca Rests., L.P.*, 254 F.3d 753 (8th Cir. 2001); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206 (7th Cir. 1993); *Bonny v. Society of Lloyd's*, 3 F.3d 156 (7th Cir. 1993); *Radian Guar., Inc. v. Bolen*, 18 F. Supp. 3d 635, 645-48 (E.D. Pa. 2014).

Here, there can be no doubt that JM Eagle and Mr. Wang are so "closely related," both to the Purchase Agreements at issue and Hebei Quanen, that enforcement of the consent-to-jurisdiction clause in the Purchase Agreements against JM Eagle and Mr. Wang is eminently foreseeable.  *See Recurrent Capital*, 875 F. Supp. 2d at 307.  Indeed, the declarations submitted by Defendants themselves establish these close relationships.

Kaider Liao, the Director of Engineering at JM Eagle, declared under penalty of perjury that the entire JM Eagle engineering team was involved in "***JM Eagle's plan***" to expand into China, including by analyzing the Chinese market, making recommendations about the kind and volume of pipe and equipment necessary to manufacture that pipe, and vendor evaluation.  Liao Decl. ¶¶ 7-8.  In fact, according to Mr. Liao, JM Eagle had to conduct all of the due diligence work because Hebei Quanen "was not formed until July 2012 and did not have an engineering team until after this date."  *Id.* ¶ 8.  Once Hebei Quanen was formed, JM Eagle introduced Hebei Quanen to Battenfeld US.  ECF No. 20 at 2.  After that introduction, JM Eagle and Mr. Wang

continued to play an instrumental role in negotiating the pricing framework and content of the Purchase Agreements, including by attending multiple meetings with Battenfeld US.  Liao Decl. ¶¶ 9-11.

JM Eagle's participation in the transactions at issue did not end with negotiation of the pricing framework and entry into the Purchase Agreements.  As acknowledged by Mr. Liao, after August 24, 2012, the JM Eagle engineering team "was in regular communications with the Battenfeld Group," including Battenfeld US, regarding "a wide range of logistical matters."  *Id.* ¶ 13; *id.* ¶ 16 ("In the period from late 2013 to the end of 2016, I was in frequent communication with both the Quanen plant and Battenfeld Group personnel . . . .").  And, allegedly when "the situation became so severe," "JM Eagle staff with particular expertise" visited Hebei Quanen's plant in China and prepared a report about the purported problems, which JM Eagle then sent to the battenfeld-cincinnati corporate family.  *Id.* ¶ 17.  JM Eagle's participation was so extensive that Mr. Liao declared that at least "11 personnel employed at JM Eagle" would have to travel to Kansas if this case proceeds in this forum because those employees "were directly involved in analyzing, negotiating, and addressing problems with the extrusion equipment supplied for the China project."  *Id.* ¶ 19.

Mr. Wang's declaration similarly establishes the closeness of both JM Eagle and Mr. Wang personally to Hebei Quanen and this dispute.  Mr. Wang is the President and CEO of JM Eagle.  Wang Decl. ¶ 1; Cox Decl., Ex. C (Mr. Wang's Declaration filed in the California action (the "Wang California Decl.")) ¶ 1.  Mr. Wang is also the Chairman of Hebei Quanen. Cox Decl., Ex. C (Wang California Decl.) ¶ 1 ("I am the Chairman of . . . Hebei Quanen High-Tech Piping Co., Ltd.").  According to Mr. Wang's sworn statement, "[i]n approximately 2011-2012, I had been considering an expansion of JM Eagle's pipe manufacturing to China . . . .

A separate company from JM Eagle doing business in China as [Hebei Quanen] . . . was subsequently formed in July 2012 to handle this pipe manufacturing project in China." Wang Decl. ¶ 7.  Mr. Wang's declaration describes at least four in-person meetings between Mr. Wang and the CEO of Battenfeld US, Kurt Waldhauer, among others, with the alleged purpose of negotiating the sale of pipe extrusion equipment to Hebei Quanen. *See id.* ¶¶ 10, 16, and 18-19. And Mr. Wang, personally and on behalf of JM Eagle, responded to communications from Battenfeld US's CEO concerning equipment sales negotiations and purported product issues. *See, e.g.*, *id.* ¶ 11 and Ex. A.

These admissions by JM Eagle and Mr. Wang establish that Defendants are "closely related" to Hebei Quanen and the Purchase Agreements at issue in this litigation. *Recurrent Capital*, 875 F. Supp. 2d at 307.  In fact, the Complaint includes the unrebutted allegation that Hebei Quanen is the alter ego of Mr. Wang, further demonstrating the closeness of these entities. Complaint ¶ 19.  The consent-to-jurisdiction provision in the Purchase Agreements is also identical to the Kansas consent-to-jurisdiction provision that JM Eagle agreed to in many of the 3,000 plus purchase orders it has submitted to Battenfeld US in their business dealings over the past two decades. *Compare* Godwin Decl., Ex. B (Hebei Quanen sample Purchase Agreement) *with* Godwin Decl., Ex. A (samples of JM Eagle purchase agreements).  The burden of defending this case in Kansas cannot be so high for JM Eagle where it readily and repeatedly consented to jurisdiction here when doing business with Battenfeld US.  Given their self-acknowledged role in and knowledge of the transactions at issue and their obvious close relationship with Hebei Quanen, the enforcement of the consent-to-jurisdiction clause in the Purchase Agreements against Defendants was foreseeable prior to suit. *Id.* at 307-08.

CORE/0775731.0012/134312980.1

## V.   DEFENDANTS HAVE THE REQUISITE "MINIMUM CONTACTS" WITH KANSAS NECESSARY FOR THIS COURT TO EXERCISE PERSONAL JURISDICTION

Because Defendants consented to jurisdiction in this forum, this Court need not conduct the separate "minimum contacts" personal jurisdiction analysis. *Electronic Realty Assocs., L.P.*, 897 F. Supp. 523; *Recurrent Capital*, 875 F. Supp. 2d at 306 (Once a court has found that a party has consented to jurisdiction, a court need not conduct "a separate analysis of the [Constitutional] propriety of exercising personal jurisdiction.") (quotation marks omitted, alteration in original); *Allegiant Mktg. Group, Inc. v. Direct Innovations, LLC*, Case No. CIV-15-40-D, 2015 U.S. Dist. LEXIS 112751, at *9 (W.D. Okla. Aug. 26, 2015) ("When parties consent to personal jurisdiction in a certain forum, there is no need to analyze the forum state's long arm statute or the party's contacts with the forum state.").  Here, even if the Court decides to conduct a separate "minimum contacts" analysis, the uncontested facts also demonstrate that Defendants have sufficient "minimum contacts" with Kansas such that exercise of specific personal jurisdiction over them comports with due process.

### A.   JM Eagle And Mr. Wang Purposefully Directed Their Activities At Kansas

Courts in the Tenth Circuit often analyze the "purposeful direction" prong of the jurisdictional analysis using the so-called *Calder v. Jones* "effects test." 465 U.S. 783 (1984). Under the *Calder* "effects test," the plaintiff must show:  (1) defendant committed an intentional action; (2) that was expressly aimed at the forum state; (3) with knowledge that the brunt of the injury would be felt in the forum state.  *Dudnikov*, 514 F.3d at 1072 (applying the *Calder* "effects" test).

Although the *Calder* "effects test" is not the only way Battenfeld US could show purposeful direction,[2] the test recited in *Dudnikov* is clearly met because Defendants purposefully directed their activities at Kansas with knowledge that the brunt of injury would be felt here by Battenfeld US.

### 1.   JM Eagle and Mr. Wang Engaged in Multiple Intentional Acts Directed at Battenfeld US in Kansas

There can be little doubt that JM Eagle and Mr. Wang engaged in numerous intentional actions.  Indeed, the Motion makes no effort to analyze this element of the *Calder* effects test.  As the Tenth Circuit observed in *Newsome*, the "intentional action element requires little discussion.   The record contains no suggestion that the individual defendants acted unintentionally . . . ."  722 F.3d at 1268.  Briefly, however, the Complaint is replete with unrebutted allegations that JM Eagle and Mr. Wang acted intentionally toward Battenfeld US:

- **Complaint ¶ 3**:  Alleging that JM Eagle and Mr. Wang made fraudulent representations to Battenfeld US representatives located in Kansas, which were intended to induce Battenfeld US to supply extrusion equipment.  Also alleging that Mr. Wang and JM Eagle were aware of the Purchase Agreements, including the consent-to-jurisdiction provision, and purposefully interfered with those Purchase Agreements.

- **Complaint ¶ 12**:  Alleging that Mr. Wang informed Battenfeld US that he was planning to expand JM Eagle's operation into the Chinese market and that he was interested in having Battenfeld US supply the extrusion equipment.  Also alleging that JM Eagle provided Battenfeld US with information necessary for Battenfeld US to provide price quotations and equipment specifications.

---

[2] As observed by then-Circuit Judge Neil Gorsuch, the *Calder* effects test is not the only analysis by which this Court may find purposeful direction.  *Id*. ("[W]e do not imagine that *Calder* necessarily describes the only way to satisfy the purposeful direction test . . . .").  Indeed, this Court has consistently analyzed Rule 12(b)(2) motions in tort cases—like this one—without reference to the *Calder* effects test.  *See, e.g. Propane Res. Supply & Mktg., L.L.C. v. G.J. Creel & Sons, Inc.*, Case No. 12-2758-JTM, 2013 U.S. Dist. LEXIS 51338 (D. Kan. Apr. 10, 2013) (J. Thomas Marten, presiding) (finding personal jurisdiction in a case involving tortious interference with contract and fraud claims, among others, without reference to any elements of the *Calder* "effects test"); *Orion Ethanol, Inc.*, 2009 U.S. Dist. LEXIS 65557 (J. Thomas Marten, presiding) (same, in case involving a claim for tortious interference with business expectancy).

16

- **Complaint ¶ 16**:  Alleging that in April 2012, Mr. Wang and the CEO of Battenfeld US agreed that Battenfeld US should begin preparations to manufacture extrusion equipment for the China expansion.

- **Complaint ¶ 22**:  Alleging that JM Eagle and Mr. Wang sought to have Battenfeld US underwrite the China expansion through large discounts on extrusion equipment, thereby using Battenfeld US to capitalize the China expansion at vastly reduced cost.

- **Complaint ¶ 30**:  Alleging that JM Eagle and Mr. Wang directed Hebei Quanen to refuse to commission many of the delivered extrusion lines, thereby wrongfully delaying payment of the final 20% balance due after acceptance.

- **Complaint ¶ 32**:  Alleging that JM Eagle and Mr. Wang directed Hebei Quanen to refuse to accept delivery of some of the extrusion equipment by refusing access to Hebei Quanen's plant, causing Battenfeld US to incur improper storage costs and further delaying Hebei Quanen's payments under the Purchase Agreements.

- **Complaint ¶¶ 36, 39-40, and 45**:  Alleging that Mr. Wang and JM Eagle directed Hebei Quanen to continue to withhold payment to Battenfeld US despite Mr. Wang, JM Eagle, and Hebei Quanen's knowledge that continued failure to pay would subject Battenfeld US and the entire battenfeld-cincinnati corporate family to ruinous financial consequences.

- **Complaint ¶ 41**:  Alleging that Mr. Wang refused to allow Hebei Quanen to satisfy its obligations to Battenfeld US because he intended to ruin Battenfeld US and the entire battenfeld-cincinnati corporate family's credit rating and business value for his own benefit.

In addition to the unrefuted allegations in the Complaint, both Mr. Wang and Mr. Liao acknowledge sending multiple communications to Battenfeld US employees located in Kansas. *See* Wang Decl. ¶ 11 and Ex. A (acknowledging and attaching an email that Mr. Wang sent to Mr. Waldhauer, the CEO of Battenfeld US in Kansas on January 24, 2012); Liao Decl. ¶¶ 13-14, 16 (acknowledging that Mr. Liao and the JM Eagle engineering team had "regular communications" or "frequent communication" with the battenfeld-cincinnati corporate family and that "representatives of [Battenfeld US] were included in these discussions.") and Ex. A. Battenfeld US representatives were not only "included" in practically every communication, but rather the CEO of Battenfeld US Kurt Waldhauer (who worked and resided in Kansas) was the

primary point of contact. *See* Godwin Decl. ¶¶ 9, 14. Indeed, as mentioned in the Liao Declaration, JM Eagle's Vice President of Production, Chuck Clark prepared the Clark Report, which attached numerous email chains between Mr. Clark and multiple Kansas-resident Battenfeld US employees, including Mr. Waldhauer, Paul Godwin, Jerry Severns, and Mike Wallen. Godwin Decl., ¶ 14, Ex. G (Clark Report attachments); *see also* Liao Decl. ¶ 17. The Godwin Declaration also attaches representative communications demonstrating that Mr. Liao, Mr. Wang, and other JM Eagle employees were in regular contact with Kansas-resident Battenfeld US employees, including principally the then-CEO Kurt Waldhauer, concerning the Hebei Quanen project. *See* Godwin Decl. ¶ 9, Exs. C-F.

### 2. Defendants' Intentional Actions Were Expressly Aimed at Kansas

Defendants' intentional conduct must also be "expressly aimed" at Kansas. *Calder*, 465 U.S. at 789. But the "express aiming" test does not require physical contacts in Kansas. *See Burger King*, 471 U.S. at 476. As observed by the United States Supreme Court,

> it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. ***So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there***.

*Id.* (emphasis added). Thus, the "express aiming" test focuses on a defendant's intentions (*i.e.*, where was the "focal point" of the defendant's purposeful efforts). *Dudnikov*, 514 F.3d at 1075. By analogy to a bank shot in basketball, the Tenth Circuit has found "express aiming" where the intentional act involved sending a letter from Connecticut to California with the intended end of cancelling a transaction in Colorado. *Id.* at 1075-76 (stating defendants' "'express aim' . . . can be said to have reached into Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket"

and "neither the lack of defendants' physical presence in Colorado nor the fact that they used a California-based entity to effectuate this purpose diminish this fact.").

Here, focusing on Defendants' conduct, the undisputed facts establish that Defendants expressly aimed their intentional conduct at Kansas residents.  JM Eagle and Mr. Wang reached out to, vetted, negotiated with, and ultimately picked Battenfeld US to be the supplier of extrusion equipment to Hebei Quanen.  Wang Decl. ¶¶ 9-17; Liao ¶¶ 7-11.  Further, Mr. Liao's Declaration admits that JM Eagle and Mr. Wang were in almost constant contact with the CEO of Battenfeld US in Kansas.  *See* Liao Decl. ¶¶ 13-14, 16 (acknowledging that Mr. Liao and the entire JM Eagle engineering team had "regular communications" or "frequent communication" with the battenfeld-cincinnati corporate family and that "representatives of [Battenfeld US] were included in these discussions.").

After Battenfeld US began delivering the extrusion equipment to Hebei Quanen, JM Eagle and Mr. Wang then directed Hebei Quanen to decline commissioning many of the extrusion lines, reject further delivery of equipment, and refuse to pay outstanding amounts due to Battenfeld US.  Complaint ¶¶ 30, 32, 36, 39-41, and 45.  The Complaint also alleges that JM Eagle and Mr. Wang knew that continued failure to pay Battenfeld US would force Battenfeld US and the entire battenfeld-cincinnati corporate family into insolvency and/or to breach the Bank Covenants but, nevertheless, Defendants continued to direct Hebei Quanen not to pay Battenfeld US because they intended to force Battenfeld US into insolvency and/or to breach the Bank Covenants.  *Id.* ¶ 41.  The tortious conduct that Defendants directed towards Battenfeld US demonstrates that Defendants expressly aimed their conduct at a Kansas company.  *See Far W. Capital v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995) (noting that a court should consider "the contacts created by the out-of-state defendant in committing the alleged tort").

Rather than focus on the standards imposed in the Tenth Circuit, Defendants' Motion instead, and inexplicably, focuses on JM Eagle and Mr. Wang's location in California and their purported lack of physical presence in Kansas.  Motion at 18-19.  However, "[s]uch focus . . . does not tell the whole story."  *Dudnikov*, 514 F.3d at 1075.  The fact that JM Eagle and Mr. Wang are located in California and/or New Jersey does not undermine the conclusion that Defendants' conduct was aimed at and intended to (and did) harm Battenfeld US in Kansas.  Just as in *Dudnikov*, "neither the lack of defendants' physical presence in [Kansas] nor the fact that they used a [China]-based entity to effectuate this purpose diminish" the fact that their intentions were to impact Battenfeld US's business operations in Kansas.  *Dudnikov*, 514 F.3d at 1076.  Thus, "crediting the complaint as true as [the Court] must at this stage of the litigation," the Complaint conclusively demonstrates an intent for Defendants' "extra-forum conduct to reach and affect [Battenfeld US's] business operations in" Kansas.  *Id.* at 1073, 1076.

### 3.  Defendants Acted with Knowledge that the Brunt of the Injury Would Be Felt in Kansas

As in *Dudnikov*, here "the question of where the brunt or bulk of the harm need take place makes little difference, as there is no meaningful dispute that [Battenfeld US's] injury was suffered entirely in" Kansas.  *Dudnikov*, 514 F.3d at 1077.  Defendants do not dispute that (1) Battenfeld US is a Kansas corporation with a principal place of business in Kansas or that (2) Defendants were aware of the Kansas jurisdiction provision in the Purchase Agreements; as such, Defendants knew that the brunt of the injury from Defendants' tortious conduct would occur in Kansas.[3]

---

[3] Defendants contend that the brunt of injury was actually felt by the battenfeld-cincinnati "parent entities in Germany and Sweden."  Motion at 21.  But the harm Defendants caused to the broader battenfeld-cincinnati corporate family in other jurisdictions (although that harm is, in fact, considerable) is immaterial to this jurisdictional analysis.  The *Dudnikov* case cited by Defendants analyzed "***plaintiffs' injury***," not any generalized harm to third parties.  *See*

Further, because it had extended itself financially for Hebei Quanen, which refuses to pay its debts or act in good faith, as a direct result of Defendants' actions, Battenfeld US's suppliers began refusing to deliver goods and demanding prepayments for future orders.  Godwin Decl. ¶ 15.  Battenfeld US's tight liquidity position and reduced access to raw materials, in turn, led to delayed shipments to customers and lost customer orders.  *Id.*  After the entire battenfeld-cincinnati corporate family defaulted on the Bank Covenants, Battenfeld US suffered a liquidity crisis—it was forced to seriously delay payments to suppliers, which further deteriorated Battenfeld US's financial position in Kansas and caused Battenfeld US a significant loss of sales. *Id.* ¶ 16; *see also* Complaint ¶ 46.  Battenfeld US experienced this harm in Kansas, the place of Battenfeld US's incorporation and business operations.  Godwin Decl. ¶ 3.

Neither was the harm caused by Defendants merely foreseeable.  While the "mere foreseeability" of causing an injury in Kansas may be insufficient to support jurisdiction, by satisfying the first two prongs of the *Calder* effects test, Battenfeld US has established that Defendants "acted with more than foresight (or knowledge) that effects would be felt in" Kansas. *Dudnikov*, 514 F.3d at 1077; *see also Newsome*, 722 F.3d at 1269 (finding that "at the pleading phase" "it is a fair inference" that defendants knew the brunt of injury to plaintiff would occur in Oklahoma because the plaintiff's business operated in Oklahoma).

Kansas's long-arm statute provides further support that personal jurisdiction lies in Kansas.  This Court recognized in *Oxion* that analysis of the Kansas long-arm statute can "lend insight into [the] jurisdictional premise" of a case.  *Oxion, Inc.*, 2007 U.S. Dist. LEXIS 54480, at *6.  Kansas statute section 60-308(b)(1)(B) creates long-arm jurisdiction over any person who

---

*Dudnikov*, 514 F.3d at 1077 (emphasis added).  The plaintiff in this case is Battenfeld US, and its harm was felt in Kansas.  Whether or not there is also harm felt in Germany or other battenfeld-cincinnati affiliates elsewhere does not undermine the fact that there is personal jurisdiction over Defendants in Kansas because of their intentional acts causing harm in Kansas.

commits a tortious act in Kansas.  *See* Kan. Stat. Ann. § 60-308(b)(1)(B); *see also Propane Res. Supply*, 2013 U.S. Dist. LEXIS 51338, at *9.  Courts broadly interpret section 60-308(b)(1)(B) to include acts committed outside Kansas which have an injury to the plaintiff in the state.  *Propane Res. Supply*, 2013 U.S. Dist. LEXIS 51338, at *9; *see also Merriman v. Crompton Corp.*, 146 P.3d 162, 186 (Kan. 2006).  Here, JM Eagle and Mr. Wang's out-of-state tortious conduct injured Battenfeld US in Kansas, and Kansas's long-arm statute specifically provides for personal jurisdiction in such circumstances.  *See* Kan. Stat. Ann. § 60-308(b)(1)(B).

> ### 4.    Defendants' (Factually Inaccurate) Allegations Regarding Battenfeld US's and its Affiliates' Purported California Activities Are Irrelevant

Defendants devote much of their Motion reciting the same allegations Hebei Quanen made in the California action regarding the purported involvement of Battenfeld US's German affiliates.[4]  These arguments were found insufficient to confer jurisdiction over the German entities in California.  *See* Cox Decl., Ex. D (California Judgment) at March 27, 2017 Ruling Granting BC Extrusion Holding's Motion to Quash Service of Process at 4 and March 14, 2017 Ruling Granting battenfeld-cincinnati Germany GmbH's Motion to Quash Service of Process at 4).

But Defendants' allegations concerning Battenfeld US's actions are irrelevant to whether *JM Eagle and Mr. Wang purposefully directed their activities at Kansas*.  *See Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014).  As the United States Supreme Court has observed, "it is the

---

[4]  Specifically, Defendants contend that the "Battenfeld Group," directed by the German-headquartered BC Extrusion Holding, "consistently directed its contacts to recover on the invoices and to address extensive problems with the extrusion equipment supplied by them to Los Angeles.  Motion at 5 (emphasis in original); *id.* at 18-19 ("the parties' course of dealing reveals that the Battenfeld Group's efforts were directed towards Los Angeles and China, and those efforts were coordinated primarily from Germany."); *id.* at 20 ("Plaintiff's German parent company and Plaintiff were directing their efforts directly into California . . . ."); *id.* at 21 ("Plaintiff [Battenfeld US] was, at most, just one U.S. affiliate of a German-led international conglomerate consistently directing its contacts to Los Angeles and China . . . .").

22

defendant's conduct that must form the necessary connection with the forum State . . . ."  *Id.*  Accordingly, the conduct of Battenfeld US or its German affiliates is immaterial to this Court's analysis.

### B.   Battenfeld US's Injuries Arise From Defendants' Contacts With Kansas

"Aside from purposeful direction, the specific personal jurisdiction test requires the plaintiff's injuries [to] arise out of defendant's forum-related activities."  *Newsome*, 722 F.3d at 1269 (internal quotation marks omitted).  The Tenth Circuit has observed that there are potentially two tests for the "arising out of" analysis:  the "but-for" test and the "proximate cause" test.  *Id.*  As the *Dudnikov* court observed,

> Under the [but-for] approach, any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction.  The [proximate cause] approach, by contrast . . . calls for courts to examine whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim.

*Dudnikov*, 514 F.3d at 1078.  The Tenth Circuit has not embraced one approach over the other.  *Newsome*, 722 F.3d at 1269.

Here, Battenfeld US's injuries arise out of Defendants' Kansas contacts under either the "but-for" or the "proximate cause" approach because Battenfeld US's claimed injuries resulted from the Defendants' forum-related activities.  *Newsome*, 722 F.3d at 1271.  Battenfeld US never would have entered into the Purchase Agreements with Hebei Quanen and provided extrusion equipment to Hebei Quanen at vastly reduced prices absent Defendants' representations to Battenfeld US.  Complaint ¶¶ 3, 12, 16, and 22.  Similarly, Battenfeld US's harm resulted from Defendants' intentional interference with the Purchase Agreements (*i.e.*, Defendants' express direction to Hebei Quanen to decline to commission many of the extrusion lines, reject further delivery of equipment, and refuse to pay outstanding amounts due to Battenfeld US).  *Id.* ¶¶ 30, 32, 36, 39-41, and 45.  Battenfeld US's harm in Kansas was caused by this conduct.

23

C.      **Exercising Jurisdiction Over JM Eagle And Mr. Wang Comports With Traditional Notions Of Fair Play And Substantial Justice**

As discussed above, if the plaintiff carries its minimum contacts burden (as Battenfeld US does), the burden then shifts to the defendant to make a "compelling case" that "exercising jurisdiction would nonetheless 'offend traditional notions of fair play and substantial justice.'" *Newsome*, 722 F.3d at 1271 (quoting *Dudnikov*, 514 F.3d at 1080); *Burger King*, 471 U.S. at 477. Here, Defendants have failed to meet their burden of showing that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice.

1.      **There Is No Burden on JM Eagle and Mr. Wang to Litigate in Kansas**

JM Eagle and Mr. Wang cannot show that the inconvenience of litigating in Kansas is so great so as to constitute a deprivation of due process. *See Brooke Credit Corp. v. Tex. Am. Insurers, Inc.*, Case No. 06-1367-JTM, 2007 U.S. Dist. LEXIS 39871, at *15 (D. Kan. May 30, 2007) (J. Thomas Marten, presiding) (stating "[u]nless the inconvenience is so great on defendant to constitute a deprivation of due process, the burden does not overcome the justification for the exercise of jurisdiction."). The District of Kansas has repeatedly recognized that "[d]efending a suit in a foreign jurisdiction is not as burdensome as in the past." *See, e.g.*, *Am. Builders & Contrs. Supply Co. v. Lyle*, CIVIL ACTION No. 05-2461-CM, 2006 U.S. Dist. LEXIS 88803, at *10 (D. Kan. Dec. 7, 2006) (internal quotation marks and citation omitted); *Brooke Credit Corp.*, 2007 U.S. Dist. LEXIS 39871, at *15 ("It is not constitutionally unreasonable to exercise jurisdiction on defendant when Internet communications, faxes, telecommunications, and relatively inexpensive travel are available."). And large corporations with multiple interstate locations—like JM Eagle—experience less of a burden in litigating outside of their home state. *See Intercon, Inc.*, 205 F.3d at 1249 ("[A]lthough there will certainly

CORE/0775731.0012/134312980.1

be some burden on defendant, it is a large interstate company accustomed to conducting business and litigation in multiple states.").

Here, Defendants cannot seriously contend that it would be so burdensome to litigate in Kansas that it would deprive them of their due process rights.  Indeed, JM Eagle (of which, Mr. Wang is President and CEO) previously entered into more than 3,000 purchase orders with Battenfeld US, many of which include the exact same Kansas consent-to-jurisdiction provision as in the Purchase Agreements in this case, and thus Defendants ***already have consented to personal jurisdiction in Kansas***.  *See* Godwin Decl. ¶ 7, Ex. A.

Additionally, JM Eagle's website demonstrates that it has locations in Nebraska, Colorado, Oklahoma, and Missouri; thus JM Eagle is located in every state that surrounds Kansas.  *See* Cox Decl., Ex. E ("Locations" printout from JM Eagle's website).  As such, JM Eagle, and by extension Mr. Wang, would experience no undue burden litigating in Kansas. *Crisler v. Matthews Richards Healthcare Mgmt., LLC*, Case No. 14-1061-CM, 2014 U.S. Dist. LEXIS 120091, at *8-9 (D. Kan. Aug. 28, 2014) ("Although defendant will have to litigate outside its home forum, Kansas is a neighboring forum to Missouri.  Litigating in neighboring Kansas is not a hardship that places an unreasonable burden on defendant."); *Jake's Fireworks, Inc. v. Sky Thunder, LLC*, Case No. 16-2475-JAR-GLR, 2017 U.S. Dist. LEXIS 88564, at *12 (D. Kan. June 9, 2017) ("Defendants are located in Indiana, within driving distance of Kansas City, Kansas.").  Further, JM Eagle is no stranger to litigation in the Tenth Circuit; JM Eagle has participated in at least four prior cases in the Tenth Circuit, at least two of which resulted in written decisions by the Tenth Circuit Court of Appeals.[5]  As JM Eagle has a demonstrated

---

[5] *See United States v. J-M Mfg. Co.*, Civil Action No. 11-cv-01691-MSK-MJW (D. Colo. 2011); *Zeigler v. J-M Mfg. Co.*, Case No. 10-CV-0014-CVE-FHM (N.D. Okla. 2010); *Battle v. J-M Mfg. Co.*, Case No. 09-CV-106-TCK-FHM (N.D. Okla. 2009); *Raper v. J-M Mfg. Co.*, Civil

ability to litigate in this Circuit, any allegation of burden is vastly overstated.  *Crisler*, 2014 U.S. Dist. LEXIS 120091, at *9 (finding no burden where "Defendant's intervention [in plaintiff's personal-injury claim] demonstrates its ability to litigate in Kansas.").

> ### 2.      Kansas Has a Manifest Interest in Resolving this Dispute Concerning a Kansas Corporation

Defendants completely ignore Kansas's "manifest interest" in providing a forum in which its residents can seek redress for intentional injuries caused by out-of-state actors.  *Intercon, Inc.*, 205 F.3d at 1249; *see also Brooke Credit Corp.*, 2007 U.S. Dist. LEXIS 39871, at *15 ("Kansas has an interest in resolving the matter because [plaintiff] is a Kansas corporation, with Kansas employees"); *Am. Builders & Contrs.*, 2006 U.S. Dist. LEXIS 88803, at *10 ("Kansas has an interest in adjudicating the dispute because a Kansas resident suffered the alleged injury."); *Digital Ally, Inc. v. Util. Assocs.*, Case No. 14-2262-CM, 2014 U.S. Dist. LEXIS 177623, at *15 (D. Kan. Dec. 29, 2014) ("Kansas also has an interest where the contract requires a court to apply Kansas law.") (internal citation omitted).  There is no dispute that Battenfeld US is a Kansas corporation, and it has alleged injuries in Kansas caused by Defendants' intentional conduct.

> ### 3.      Battenfeld US Can Receive Convenient and Effective Relief in Kansas

In their analysis of this factor, Defendants focus on which forum would be most convenient for *Defendants*.  *See* Motion at 26 (stating California "is where Mr. Wang, JM Eagle, the relevant documents and most of the relevant witnesses reside").  That, however, is not the relevant touchstone because this factor analyzes the forum in which *plaintiff*, not defendant, can receive convenient and effective relief.  *See, e.g., Brooke Credit Corp.*, 2007 U.S. Dist. LEXIS

---

Action No. 10-cv-02253-WYD-MEH (D. Colo. 2010); *Nevada v. J-M Mfg. Co.*, 555 Fed. Appx. 782 (10th Cir. 2014); *Battle v. J-M Mfg. Co.*, 483 Fed. Appx. 455 (10th Cir. 2012).

CORE/0775731.0012/134312980.1

39871, at *15-16 ("*litigating in Kansas is advantageous to the plaintiff* because the majority of its witnesses and documents relevant to the issues raised in this matter are located in Kansas") (emphasis added); *see also Digital Ally*, 2014 U.S. Dist. LEXIS 177623, at *16 (finding convenient and effective relief in Kansas where "Plaintiff claims that a number of witnesses and the majority of the evidence resides in Kansas.").

Confused about the facts, Defendants variously assert either that "Battenfeld [US]'s China affiliate is <u>already suing</u> [Hebei] Quanen in China" or that "Plaintiff already filed a lawsuit in China . . . ." Motion at 26 (emphasis in original). Regardless of the Defendants' contradictory factual allegations, whether Battenfeld US sued *Hebei Quanen* in China has no bearing on whether Battenfeld US could receive convenient and effective relief against *JM Eagle and Mr. Wang* in Kansas. To be sure, however, Battenfeld US is not a party to any Chinese litigation initiated by battenfeld-cincinnati Extrusion Systems (Foshan) Ltd. (BCC) China ("<u>Battenfeld China</u>") in China. *See* Cox Decl. ¶ 8. And there can be no doubt that forcing a Kansas corporation to sue two California-resident entities (JM Eagle and Mr. Wang) in China would be exceedingly burdensome. *Pro Axess, Inc. v. Orlux Distrib.*, 428 F.3d 1270, 1281 (10th Cir. 2005) (finding that burdens of international travel and foreign legal systems would preclude plaintiff's convenient and effective relief in overseas lawsuit).

### 4. The Interstate Judicial System's Interest in Obtaining the Most Efficient Resolution of Controversies Supports Jurisdiction in Kansas

Key to resolution of the fourth reasonableness factor are (1) the location of witnesses, (2) where the wrong underlying the lawsuit occurred, (3) what forum's substantive law governs the case, and (4) whether jurisdiction is necessary to prevent piecemeal litigation. *OMI Holdings v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1097 (10th Cir. 1998). Each of these elements supports exercising jurisdiction in Kansas.

First, as described in the Godwin Declaration, Battenfeld US's witnesses and business records are located in Kansas.  *See* Godwin Decl. ¶ 4; *Crisler*, 2014 U.S. Dist. LEXIS 120091, at \*10-11 ("Plaintiff's assertion that witnesses and records relevant to the claim" are located in Kansas "is prima facie evidence that Kansas courts might be best suited to efficiently resolve this dispute.").

Second, where (as here) the "injurious effect" of intentional torts occur mostly in the forum, the Tenth Circuit considers "the alleged 'wrong underlying the lawsuit' to have occurred in" the forum given the forum's "interest in providing redress for injuries within its borders . . . ." *Newsome*, 722 F.3d at 1274; *see also Intercon, Inc.*, 205 F.3d at 1249 (finding Oklahoma "the most efficient place to litigate the dispute" even though "witnesses are located both at defendant's principal place of business in Virginia and at plaintiff's business in Oklahoma").

Third, pursuant to the Purchase Agreements' choice-of-law provision and the fact that Battenfeld US's injury occurred in Kansas, Kansas law applies to the claims in this litigation. *See Digital Ally*, 2014 U.S. Dist. LEXIS 177623, at \*17 ("[T]he Employment Agreement states that Kansas law governs."); *Chem-Trol, Inc. v. Christensen*, Case No. 09-2024-EFM, 2009 WL 1044613, at \*5 (D. Kan. Feb. 4, 2009) ("The third consideration weighs in favor of Plaintiff because the alleged injury occurred in Kansas, which suggests that Kansas law would apply."); *Crisler*, 2014 U.S. Dist. LEXIS 120091, at \*11 (finding this factor to "tip in favor of plaintiff" because "Kansas law governs [some] claims").

Fourth, allowing the claims against JM Eagle and Mr. Wang to proceed in Kansas avoids piecemeal litigation because the other defendant, Hebei Quanen, does not dispute jurisdiction in Kansas and, if the Motion is granted, "the claims against [Defendants] would be required to be filed in a different jurisdiction, while the claims against [Hebei Quanen would] remain in

Kansas, risking inconsistent judgments."[6]  *Jake's Fireworks*, 2017 U.S. Dist. LEXIS 88564, at *13.

### 5.    Resolution of This Claim in Kansas Will Not Adversely Affect Another State's Interests

Finally, exercising jurisdiction is Kansas would not offend traditional notions of fair play and substantial justice because "there is no indication that a resolution of this claim in Kansas will have any effect on another state's social policies." *Am. Builders & Contrs.*, 2006 U.S. Dist. LEXIS 88803, at *10-11; *see also Crisler*, 2014 U.S. Dist. LEXIS 120091, at *11 ("There is no reason adjudication of this case in Kansas courts affects or is contrary to the public policy of Missouri."). Here, Defendants' Motion includes no contention regarding how any other state's social policies would be impacted by litigation in Kansas. Motion at 27. Instead, Defendants focus on the domiciles and alleged actions of non-parties to this litigation. And, in fact, California has already declined to exercise jurisdiction over Hebei Quanen's allegations relating to the Purchase Agreements at issue here. *See* Cox Decl., Ex. D. Accordingly, Defendants have failed to establish their burden.

## VI.    AT A MINIMUM, BATTENFELD US SHOULD BE PERMITTED TO CONDUCT JURISDICTIONAL DISCOVERY

If this Court is not inclined deny the Motion on the papers—as Battenfeld US established that it should—Battenfeld US should nevertheless be given the opportunity to conduct jurisdictional discovery. *See Kansas Food Packers, Inc. v. Corpak Inc.*, 192 F.R.D. 707, 708 (D. Kan. 2000) (J. Thomas Marten, presiding) ("When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that

---

[6] Again, despite Defendants' incorrect conjecture that Battenfeld US is somehow engaged in litigation it initiated in China (Motion at 27), Battenfeld US is not a party to any Chinese litigation initiated by Battenfeld China with Hebei Quanen. Cox Decl. ¶ 8.

CORE/0775731.0012/134312980.1

motion.") (quoting *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975)).

This Court has "broad discretion" to order jurisdictional discovery. *Budde*, 511 F.2d at 1035.

## VII.   CONCLUSION

For the reasons stated above, JM Eagle and Mr. Wang's Motion to Dismiss for Lack of Jurisdiction should be denied.

July 28, 2017

<div style="margin-left: 3em;">

*s/ Travis J. Quick*
Lynn D. Preheim KS #13300
Travis J. Quick KS #26967
Stinson Leonard Street LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, KS 67206-6620
Telephone: (316) 265-8800
Facsimile: (316) 265-1349
lynn.preheim@stinson.com
travis.quick@stinson.com

and

Christopher J. Cox, CA #151650, *pro hac vice*
An Tran, CA #267685, *pro hac vice*
Jevechius Bernardoni, CA #281892, *pro hac vice*
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Telephone: 650-802-3029
Facsimile: 650-802-3100
chris.cox@weil.com
an.tran@weil.com
jevechius.bernardoni@weil.com

*Attorneys for Defendant American*
*Maplan Corporation, d/b/a*
*battenfeld-cincinnati*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July, 2017, I caused the above and foregoing to be electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following counsel of record:

Gary L. Ayers, #10345
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
Email:  gayers@foulston.com

and

Frederick D. Friedman, *pro hac vice*
Brian A. Sun, *pro hac vice*
Jenna Vilkin, *pro hac vice*
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Email:  ffriedman@jonesday.com
Email:  basun@jonesday.com
Email:  jvilkin@jonesday.com

*Attorneys for Defendant Hebei Quanen High-Tech Piping Co., Ltd.*

Monte A. Vines, #11044
ADAMS JONES LAW FIRM, P.A.
1635 N. Waterfront Parkway, Suite 2788
Wichita, KS 67206
Email:  mvines@adamsjones.com

and

Sean Riley, *pro hac vice*
Patricia L. Glaser, *pro hac vice*
GLASER WEIL LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Email:  sriley@glaserweil.com
Email:  pglaser@glaserweil.com

*Attorneys for Defendants J-M Manufacturing Company, Inc. and Walter Wang*

s/ *Travis J. Quick*

31