IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AMERICAN MAPLAN CORP., *doing business
as* battenfeld-cincinnati USA,

 Plaintiff,


 vs.                                    Case No. 17-1075-JTM


HEBEI QUANEN HIGH-TECH PIPING CO.,
LTD, *et al.*,

 Defendants.


MEMORANDUM AND ORDER

 Plaintiff American Maplan Corporation, doing business as battenfeld-cincinnati USA

(Battenfeld US) entered into an agreement with Hebei Quanen High-Tech Piping Co. under

which Battenfeld US would manufacture extrusion equipment for Quanen to use at its

plants in China for making plastic pipe. Quanen is a subsidiary of J-M Manufacturing

Company, which has operated as JM-Eagle. Walter Wang is the President and CEO of

Eagle.

 The plaintiff alleges Quanen failed to pay for equipment delivered pursuant to the

agreement, and brings claims for breach of contract, breach of the implied covenant of good

faith and fair dealing, conversion, unjust enrichment, and fraud. In addition, the plaintiff

alleges that Wang and Eagle were directly involved in the negotiations leading to the

transaction, with Quanen being formed as a corporation only after the nature of the

transaction was shaped by Battenfeld and Eagle. Plaintiff alleges that Wang and Eagle intentionally interfered with their contractual relations with Quanen, and fraudulently induced them to enter into the contract by misrepresenting Quanen's ability to perform.

The matter is before the court on defendants' motions to dismiss. Quanen argues that Maplan's allegations fail to state a claim for relief. In addition, it argues the fraud claim is time barred, and fails to allege fraud with particularity. Defendants Wang and Eagle seek dismissal for an asserted lack of personal jurisdiction. The court has reviewed the pleadings and other materials in the action, and finds that the motions to dismiss should be denied.

**Quanen's Motion to Dismiss**

A plaintiff satisfies the requirements of Fed.R.Civ.P. 8 by presenting a plausible claim for relief, something which goes beyond mere conclusions or the "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2009). In determining whether plaintiff has presented a plausible claim for relief, the court accepts as true all well-pleaded facts presented in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A plausible claim is one sets forth facts which create "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Plausibility is "context-specific task that requires the court to draw on its judicial experience and common sense." *Id.* at 679.

**A. Plaintiff's Allegations**

The viability of Maplan's contract and tort claims must take account of the

allegations raised in its complaint. According to the plaintiff, Battenfeld US has manufactured plastic extruders and extrusion lines, including extrusion systems for the production of PVC and PE pipe, since 1995. Battenfeld US makes equipment for some of the world's largest pipe producers, including Eagle.

In 2011, Walter Wang told Battenfeld US he planned to expand Eagle's operation into the Chinese market by forming a new affiliated company in Langfang, China, and he wanted Battenfeld US to supply extrusion equipment for the affiliate. Eagle gave Battenfeld US information on the new affiliate (including the type of pipe it planned to manufacture, and output rates and efficiencies it desired for the requested extrusion equipment) to allow Battenfeld US to formulate price quotations and equipment specifications.

Battenfeld's CEO, Kurt Waldhauer, met with Wang on January 19, 2012. Wang said that the new affiliate would have the requisite infrastructure, capacity, and know-how to operate pipe extrusion equipment, and assured Battenfeld that Hebei Quanen would pay for the equipment. Wang and Eagle knew Battenfeld would have to incur millions of dollars in production and operating costs to make the equipment. Wang represented that he and Eagle would back Hebei Quanen. Battenfeld relied on these representations.

On January 24, 2012, Waldhauer emailed a proposed delivery schedule to Wang. Because of the long lead time necessary to manufacture this equipment, in April 2012, Wang and Waldhauer agreed that Battenfeld should begin preparations to manufacture the equipment. Wang represented that Battenfeld US's delivery of the extrusion equipment to China on a tight schedule was critical for his China expansion.

By June 19, 2012, Jürgen Arnold, a member of Battenfeld US's Board of Directors, alerted Wang that Battenfeld US had already started investing the substantial costs, time, and effort needed to prepare to manufacture the equipment, including reserving time in Battenfeld US's production schedules and negotiating with suppliers.

Eagle and Wang caused Hebei Quanen to be incorporated on or about July 23, 2012 as the Chinese affiliate of Eagle. Franco An has been the President of Hebei Quanen since it was formed.

The complaint alleges that Hebei Quanen is the alter ego of Wang, that it operates under his direction and control, and that he incorporated the affiliate as a vehicle to carry out his personal business for his own personal advantage to such an extent that Hebei Quanen has no separate interests of its own. Plaintiff claims Hebei Quanen was grossly under-capitalized and was financed entirely by Wang or Eagle (of which Wang is the President and CEO). The complaint alleges that Hebei Quanen failed to observe corporate formalities and was used as a facade for Wang's own business activities. For all effective purposes, Wang and Hebei Quanen are one and the same because that is the perception that Wang seeks to create in the minds of third parties, including Battenfeld US. The complaint alleges that recognition of Hebei Quanen as a distinct legal entity would result in injustice to Battenfeld US.

On August 24, 2012, Battenfeld US and representatives of Eagle and Hebei Quanen, including Wang, Kaider Liao (Eagle's Director of Engineering), and Franco An met to negotiate the terms of Battenfeld US's sale of extrusion equipment to Hebei Quanen.

During the meeting Wang, Liao, and An told Battenfeld US that Hebei Quanen could operate the equipment and that it would have the clients to generate the money to pay Battenfeld US.

Wang and Liao referenced the history between Battenfeld US and Eagle to make Battenfeld US comfortable with the large outlay of time, resources, and financial risk needed to enter into a significant contract with a new foreign company like Hebei Quanen. As a further inducement, Wang, Liao, and An promised that Hebei Quanen would place very significant orders with Battenfeld US.

Based on these representations, Battenfeld US agreed to provide a 40% discount from the list price on Hebei Quanen's purchase of equipment, in return for Hebei Quanen ordering at least $75 million (list price) worth of equipment from Battenfeld US and from Battenfeld US's affiliate in China.

On January 15, 2013, Battenfeld US confirmed a Framework Agreement with Hebei Quanen and Eagle, which provided various price increases above the 40% discount if the volume of sales did not reach $75 million by December 31, 2015.

Battenfeld US, Eagle, and Hebei Quanen continued to discuss the needed equipment through the Fall of 2012, including, in some instances, during on-site meetings in China. Throughout these meetings, An, Liao, and Wang reiterated that Hebei Quanen, although a new company, had the backing of Eagle and Wang, and, therefore, would have the infrastructure, capacity, and know-how to use the equipment and Hebei Quanen would have the ability to pay Battenfeld US.

5

Wang and Eagle effectively sought to have Battenfeld US underwrite their China expansion because the large discounts on extrusion equipment furthered Wang's own interest in using Battenfeld US to help capitalize his planned China expansion at vastly reduced cost. As a result, Hebei Quanen received equipment with relatively little capital investment by Wang.

On September 27, 2012, Battenfeld US provided the Terms and Conditions that would govern the sales of the equipment. The Terms and Conditions, which were substantially the same as those agreed to by Wang and Eagle for years, were to govern "all sales," and provided for interest at the rate of 1.5% monthly (18% per annum) on all amounts not paid by Hebei Quanen.

The Terms and Conditions provided that all objects delivered by Battenfeld US would remain its property until it was paid all sums due for any legal reason, even if the payments for particularly designated items have been made, and that the reservation of ownership would count as security for the balance due. The January 15 Framework Agreement contained a similar provision.

Between November 2012 and March 2013, Hebei Quanen submitted more than fifty Purchase Orders to Battenfeld US for the delivery and installation of pipe extrusion equipment. These Purchase Orders totaled approximately $22 million, after applying the 40% volume discount off the list price. These Purchase Orders were subject to the Terms and Conditions.

The Purchase Orders and the January 15 Framework Agreement generally required

a 30% down payment at the time a Purchase Order was placed, 50% payment upon delivery of the products to Hebei Quanen, and the final 20% payment after acceptance.

The complaint alleges that Hebei Quanen has made partial payments under the Purchase Agreements for the extrusion equipment, but has refused to pay millions of dollars still outstanding under the Purchase Agreements.

On March 31, 2013, Battenfeld US (through its affiliate Battenfeld US China) began delivering and installing equipment at the Langfang City plant. However, according to the complaint, Hebei Quanen did not have the capacity, infrastructure, or know-how to receive, install, or operate the equipment.

According to the complaint, the plant was too small to operate the equipment. That is, while the equipment itself was installed in the plant, the facility could not process the hot, uncured pipe as it exited the extrusion line so that it could be sufficiently cooled or cut. Hebei Quanen erected a tent to cover the extruded pipe, but the tent could—and did—brush against the hot, uncured pipe, damaging the pipe.

Hebei Quanen, Eagle, and Wang then entered into a plan to withhold payments or otherwise cause Hebei Quanen to avoid its good faith obligations to perform under the Purchase Agreements and allow Wang to avoid further capital contributions at Battenfeld US's expense.

Thus, Hebei Quanen refused to provide a proper commissioning plan for acceptance of the PE and PVC lines and, as a result, Battenfeld US could not start the commissioning process for delivered extrusion lines until June 2015. In addition, Hebei Quanen and Eagle

7

repeatedly cancelled or rescheduled commissioning visits (often at the last minute) to avoid Hebei Quanen's payment obligations. This refusal, at Wang's and Eagle's direction, to commission many of the delivered extrusion lines, wrongfully delayed payment of the final 20% balance due.

The plaintiff also alleges that Hebei Quanen lacked the client base and cash flow to meet the payment schedule. Thus, Hebei Quanen (allegedly at the direction of Wang and Eagle) refused to accept equipment delivery by refusing access to its plant, causing Battenfeld US to incur improper storage costs. Hebei Quanen also made numerous meritless reports of defective equipment. The complaint alleges that all equipment was within industry standards. To the extent Hebei Quanen identified any issues with the extrusion equipment, Battenfeld US worked diligently, professionally, and successfully to rectify all such issues.

Although Hebei Quanen has refused to make full payment for the extrusion lines, it has been using at least some of the equipment to produce PVC and PE pipe, operating the still-uncommissioned extrusion lines in excess of 4,600 hours to date. Under the Purchase Agreements, that equipment is owned by Battenfeld US, and Battenfeld US has not authorized Hebei Quanen to use it for commercial purposes.

For the extrusion equipment that Hebei Quanen did not commission or otherwise begin using, it improperly stored such equipment over the last several years, which completely destroyed its value, thus making return of the equipment impossible because Battenfeld US can no longer sell it for any value.

8

Hebei Quanen's actions have caused substantial injury to Battenfeld US and other members of the battenfeld-cincinnati corporate family. This strain led the CEO of BC Extrusion Holding GmbH ("BC Extrusion Holding"), the company responsible for managing the financial risk for the corporate family, to plead with Wang to direct Hebei Quanen to make its required payments because the situation was threatening their covenants with creditors.

Battenfeld US was jointly liable for default under the credit support agreements with its affiliated companies. Thus, a default by any of the battenfeld-cincinnati group of companies exposed Battenfeld US to liability. Nonetheless, Hebei Quanen, at the direction of Wang, continued to withhold payment, notwithstanding repeated written promises to remit payment for the extrusion equipment.

After all of these efforts to obtain payment failed, but still relying on the good faith of defendants, representatives from Battenfeld US, BC Extrusion Holding, Hebei Quanen, and Wang agreed on a written global business resolution and go-forward plan on May 27, 2015.

In this Agreement, Hebei Quanen recommitted to the original payment terms whereby Battenfeld US would provide a 40% list price discount to Hebei Quanen in exchange for $75 million worth of extrusion equipment orders. The parties also agreed on a framework to resolve any technical complaints and set extrusion equipment commissioning schedules in the Langfang City plant.

The complaint alleges that, by leveraging the financial distress caused by the

9

defendants' bad faith conduct, Wang was able to extract additional commitments from Battenfeld US to agree on a new 40% list price discount and "a special ONE TIME only discount of an additional 30%" on orders for plants Eagle owned and operated in the United States.

The complaint alleges that defendants had no intention of performing their obligations under the May 27 Agreement. Despite its promises, Hebei Quanen still cancelled, obstructed, and delayed technical delivery and commissioning of the extrusion equipment. Battenfeld US delivered or offered to deliver to Hebei Quanen's Langfang City plant on all of its obligations under the original Purchase Orders and the May 27 Agreement. Nevertheless, Hebei Quanen—at the direction of Eagle and Wang—still refused to pay Battenfeld US.

During the following months, Battenfeld US and BC Extrusion Holding repeatedly followed up with Hebei Quanen and Eagle in an effort to secure Hebei Quanen's overdue payments. In response to those efforts, Hebei Quanen and Eagle personnel repeatedly advised Battenfeld US and BC Extrusion Holding that Wang would not authorize payment by Hebei Quanen.

The complaint alleges that Wang refused in bad faith to allow Hebei Quanen to satisfy its obligations to Battenfeld US because he wanted to ruin Battenfeld US and the entire battenfeld-cincinnati corporate family's credit rating and business value for his own benefit.

On March 7, 2007, the battenfeld-cincinnati corporate family had entered into a

contractual relationship with West LB, Germany, as lead arranger of a credit consortium, which included Battenfeld US as a guarantor with joint liability. These Bank Covenants included EBITDA, cash flow, capital expenditure, and EBITDA/interest ratios as key performance indicators.

The Bank Covenants were structured such that Battenfeld US's default would adversely impact the entire battenfeld-cincinnati corporate family. In other words, the cross default provisions of the Bank Covenants provided that the insolvency of any entity within the battenfeld-cincinnati corporate family would cause the entire credit facility to default and give the credit consortium the right to credit the Bank Covenants.

Wang and Eagle knew how consequential the Langfang City project was for Battenfeld US. Indeed, the approximately $22 million worth of equipment (after a 40% discount from the list price) ordered by Hebei Quanen represented a significant percentage of Battenfeld US's overall business during 2013 and 2014. Wang and Eagle leveraged the payment obligations under this very large contract to ruin the value of Battenfeld US and the entire battenfeld-cincinnati corporate family.

In addition, according to the complaint, Wang knew of this, and purposefully instructed Hebei Quanen to withhold payments or otherwise not comply with its good faith obligations toward Battenfeld US.

Once Battenfeld US and the battenfeld-cincinnati corporate family defaulted and the credit consortium cancelled the Bank Covenants, Battenfeld US and the other battenfeld-cincinnati entities were denied access to credit markets and were forced to operate on a

cash-on-hand basis with its suppliers, causing Battenfeld US to lose millions of dollars in sales.

Before these events, Shogun Sweden Holding AB, Sweden (the ultimate parent of the battenfeld-cincinnati corporate family) had planned to sell the family for tens of millions of Euros. After the defendants' actions, Shogun sold the family for 1 Euro to a trustee corporation in December 2015, in a distressed state.

In or around May 2016, Wang and Eagle inquired into buying the battenfeld-cincinnati corporate family at a rock-bottom, deflated price. The complaint alleges that defendants sought a massive discount on the outstanding amounts under the Purchase Agreements, the January 15 Framework Agreement, and the May 27 Agreement, because such amounts could be written off by Eagle and Wang after the purchase.

In June 2016 the trustee sold the battenfeld-cincinnati corporate family to an investor.

**B. Conclusions of Law**

Quanen argues that the plaintiff's contract claim is deficient because the complaint fails to explicitly attach or recite the terms of the relevant contracts (Dkt. 20, at 11-12), and because it fails to directly allege that it accepted the equipment, thereby triggering any responsibility for paying additional sums due.

The court finds that the complaint is not defective merely because it does not explicitly set out all the contracts at issue. To be sure, some courts have so held. *See Filmore*

*East BS Finance Subsid. v. Capmark Bank*, 2013 WL 1294519, *13 (S.D.N.Y. 2013). These cases which have directly imposed such a requirement appear limited to the Southern District of New York.

Otherwise, in the cases cited by Quanen, the failure to specify contract language is important because the complaint itself is utterly generic as to the assertion of a breach, *see Swan Media Group v. Staub*, 841 F.Supp.2d 804, 807 (complaint alleged "Defendant, by refusing to comply with its obligations, has breached the Agreement"), or because the particular duty asserted by the plaintiff is not apparent from the face of the contract. *See Maib v. FDIC*, 771 F.Supp.2d 14, 18 (D.D.C. 2011) (complaint did not "specify what portion [the defendant] breached" by failing to issue distributions on request, but ultimately dismissing contract claim not for failure to attach the contract but because the contention of a duty "is contradicted by the plain language on the face of the contract documents").

This court had rejected any blanket requirement that contractual provisions be attached to a complaint. *See Dreitz v. Linn Operating, Inc.*, 2015 WL 1130983, *1 (D. Kan. Mar. 12, 2015) (Rule 8 does "not require a plaintiff to quote the contract terms word for word or to attach a copy of the contract"); *Lacey v. Ocwen Loan Servicing*, 2014 WL 2885471, *4 (D. Kan. June 25, 2014). Here, the complaint specifically references the January 15, 2013 Framework Agreement, and the May 27, 2015 Agreement, as well as some 50 Purchase Agreements arising as equipment was sent.

The complaint's assertion of a breach of contract by failure to pay for the submission of equipment is plausible. Quanen's additional argument is more properly advanced after

discovery. According to the defendant, "since the suggestion is that Quanen never accepted the equipment, it would appear that there was in fact no breach" because the duty to pay only arose after acceptance. (Dkt. 20, at 13). But the complaint alleges that Quanen improperly "refused to accept delivery" and that it did so in "bad faith." (Dkt. 1, ¶ 32). The court cannot say at this time that the allegation of bad faith is implausible, and defendant supplies no authority for the proposition that it could, consistent with any duty of good faith and fair dealing, refuse to accept conforming goods delivered by Battenfeld US.

With respect to the claim for breach of the duty of good faith and fair dealing in particular, Quanen correctly notes that under Kansas law, such a duty arises in conjunction with existing contract language. *See Cargill Meat Sols. Corp. v. Premium Beef Feeders*, 168 F. Supp. 3d 1334, 1345 (D. Kan. 2016) (duty of good faith is "derivative in nature, meaning that it does not create new contract terms but grows out of existing ones"). The defendant therefore argues that because Battenfeld US has "not plausibly alleged a breach of contract, its claim for breach of an implied covenant in any such contract also fails." (Dkt. 20, at 15).

The defendant's argument is thus explicitly contingent upon acceptance of its breach of contract argument. As the court finds that Battenfeld US's contract claim should proceed, it consequently denies Quanen's argument as to the breach of duty. Here, the complaint alleges that Quanen deliberately rejected or refused to commission equipment in order to avoid payment, delayed making requirement payments, and used equipment to produce pipe without making payment to Battenfeld US. The defendant's motion to dismiss is denied.

14

The same result is true for Quanen's first argument as to the claim of conversion, which contends that because the contract claim is invalid, "[i]t follows that, like the breach of implied covenant claim, the conversion claim must also be dismissed." (*Id*. at 16-17). Similarly, defendant argues for dismissal of plaintiff's claim for unjust enrichment on the same basis. (*Id*. at 18). These conclusions are entirely dependent on defendant's contract argument. Finding the contract claim plausible, as the court does, is fatal to Quanent's arguments for these claims as well.

Alternatively, Quanen argues that Battenfeld US's conversion claim is time-barred, because it began to accept the equipment on March 31, 2013. Because a claim for conversion must be made within two years, K.S.A. 60-513(a), it argues that this 2017 action is barred by the statute of limitations.

The court will deny the motion to dismiss. As a general matter, a claim for conversion would begin not at the time of first delivery, but at the time Quanen's retention of the equipment became wrongful, which cannot be determined at the present time. *Clark Jewelers v. Satterthwaite*, 662 P.2d 1301, 1305 (Kan. Ct. App. 1983). In addition, any claim that the conversion claim is time-barred is subject to the potential defense by plaintiff that the statute should be tolled until Battenfeld US discovered its injury arising from the conversion. *See* K.S.A. 60-513(b).

Quanen argues that any such defense is precluded because the complaint does not "allege facts that might trigger" § 60-513(b). However, while the cases cited by defendant recognize that the plaintiff has the burden to prove facts justifying a tolling of a statute of

limitations, they do not suggest that the potentially relevant factual allegations must appear in the complaint itself. *See John Q. Hammons Hotels, v. Acorn Window Sys.*, 394 F.3d 607, 610 (8th Cir. 2005) ("a plaintiff claiming the application of the delayed discovery rule has the burden of proving it") (quoting *Estate of Montag v. T H Agric. & Nutrition*, 509 N.W.2d 469, 470 (Iowa 1993)); *Hoover v. Langston Equip. Assocs.*, 958 F.2d 742, 745 (6th Cir. 1992) ("it is not true, when the face of the complaint affirmatively indicates that the time limit for bringing the claim has passed, that plaintiff may escape the statute by saying nothing").

Here, the complaint alleges that the parties entered into a agreement in 2015 which was intended to resolve the issues between the parties. Whether and to what extent any claims for conversion are effectively time-barred is an issue appropriately determined at summary judgment after discovery has occurred.

Quanen next argues the complaint fails to present a valid claim for fraud because the putative representations merely reflected an intention to follow through with the contract. Generally, an assurance of an intent to abide by the terms of a contract will not support a claim for fraud under Kansas law. *See Brown v. Chaffee*, 612 F.2d 497, 503 (10th Cir. 1979) (a plaintiff "cannot turn an action for breach of contract into an action for fraud by merely alleging reliance on representations that the contract would be performed"); *Smith v. Hawkeye-Security Ins.*, 842 F. Supp. 1373, 1375 (D. Kan. 1994) ("[t]he existence of a contractual relationship bars the assertion of tort claims covering the same subject matter governed by the contract"); *Atchison Casting Corporation v. Dofasco, Inc.*, 889 F. Supp. 1445, 1461 (D. Kan. 1995).

However, there remains a "general tort duty to refrain from misrepresentation of material present or preexisting facts," and this "duty is independent of the contract" that the parties may enter into. *Graphic Tech. v. Pitney Bowes, Inc.*, 998 F.Supp. 1174, 1179 (D. Kan. 1998). "To be actionable, a misrepresentation must relate to a pre-existing or present fact; statements or promises about future occurrences are not actionable." *Flight Concepts Ltd. Partnership v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir.1994) (citing *Edwards v. Phillips Petroleum Co.*, 187 Kan. 656, 659, 360 P.2d 23 (1961)). Moreover, a fraud claim is not displaced by a subsequent contract if one party never intended to perform. "When the alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent misrepresentation concerning a present, existing intention to perform, when no such intention existed." *Gerhardt v. Harris*, 261 Kan. 1007, 1013, 934 P.2d 976 (1997).

*Atchison Casting*, one of the cases relied upon by Quanen, holds similarly. As a general matter, Kansas law seeks to "prevent[] parties from turning what are ordinary breach of contract actions into fraud or other tort claims that open the door to more lucrative awards of damages and in effect allow parties to rewrite the terms of their agreement." 889 F.Supp. at 1462. (citing *Heller v. Martin*, 14 Kan.App.2d 48, 54, 782 P.2d 1241, 1245 (1989).

Yet *Atchison Casting* also permitted the buyer of certain steel foundry assets to proceed on its claim it was fraudulently induced to enter into a contract, based on defendant's representation the foundry would be closed. Summary judgment was not

17

warranted, because "plaintiff's claim, that the alleged fraudulent misrepresentation that Dofasco would close the foundry induced plaintiff to enter into the contract, qualifies as an independent tort which states a cause of action under Kansas law." *Id.* (citing *Smith v. MCI Telecom.*, 755 F.Supp. 354, 355 (D. Kan. 1990)). Fraud remains actionable under Kansas law when one falsely represents a present, existing intention to perform. *See K-B Trucking v. Riss Intern.*, 763 F.2d 1148, 1156 (10th Cir. 1985) (quoting *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 596 P.2d 816, 824 (1979)).

Here the complaint directly alleges that defendants represented Quanen had "the infrastructure, capacity, and know-how to install and operate the extrusion equipment,' while actually knowing that Quanen's plant was "not adequate to install and operate the extrusion equipment ordered from Battenfeld US." (Dkt. 1, ¶ 13). These representations were made in early 2012, occurred prior to the written agreements between the parties, and were relied upon by Battenfeld. (*Id.* ¶ 14).

In August of 2012, defendants represented that "Quanen would have the necessary infrastructure, capacity, and know-how to operate the required pipe extrusion equipment and that Hebei Quanen had the prospective client base to generate sales and cash flow needed to pay Battenfeld US for the extrusion equipment that was being delivered." (Id. ¶ 20). These representations were repeated in later meetings. (*Id.* ¶ 22).

The complaint alleges that defendants made false representation as to the present capacity of Quanen to meet the requirements of the contract:

90. In fact, Hebei Quanen did not have the capacity, infrastructure, or

know-how to receive, install, or operate the extrusion equipment at the Langfang City plant when the extrusion equipment was delivered. Hebei Quanen also did not have the capacity to pay Battenfeld US for the extrusion equipment it received.

91. Defendants knew that their representations concerning Hebei Quanen's capacity, infrastructure, or know-how to receive, install, or operate the extrusion equipment were false when they made them and/or that these representations were made recklessly without knowing their validity. Hebei Quanen had broken ground on the Langfang City plant in 2012 and Battenfeld US's first shipment of extrusion equipment to Hebei Quanen was in March 2013. Defendants knew at the time the representations were made in the summer and fall of 2012 that the Langfang City plant was not adequate to install and operate the extrusion equipment ordered from Battenfeld US.

(*Id.*)

The complaint adequately sets out a claim of fraud by reference to material misstatements as to present or preexisting conditions, made to induce plaintiff to enter into the sale of extrusion equipment, and is not subject to dismissal at the present time.

The court also finds that the complaint adequately sets forth allegations of fraud under Fed.R.Civ.P. 9(b). A complaint alleging fraud must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Industr.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting *Lawrence Nat'l Bank v. Edmonds* (*In re Edmonds*), 924 F.2d 176, 180 (10th Cir.1991). "Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997).

However, the present case is far different from that presented in *Koch*, where the court noted that the complaint completely failed as to every part of the "who, what, when,

where and how:

> Here, the broad allegation in paragraph twenty-two of the Plaintiffs' Amended Complaint ... set forth none of the specific and required allegations. The statement that the alleged misrepresentations were made "during 1982 and continuing to the present time" does not alert the Defendants to a sufficiently precise time frame to satisfy Rule 9(b). Furthermore, paragraph twenty-two fails to mention at all the place at which any misrepresentations were made. In addition, this paragraph specifies nothing about the content of the alleged misrepresentations, instead reciting a general statement that the Defendants "fail[ed] to disclose the existence, location, ownership, condition and true value of [KII] assets and property." Finally, paragraph twenty-two failed to identify any specific Defendant who made these alleged fraudulent misrepresentations or omissions, a particularly important requirement in this case because of the number of individual defendants involved.

203 F.3d at 1236-37.

The complaint in the present action alleges misrepresentations by "Mr. Wang, Mr. An, and Mr. Liao" to "Battenfeld US representatives," including Mr. Waldhauer, that these representations occurred during the course of meetings on January 19, and August 24, 2012, that representations were communicated to Battenfield representatives "located in Kansas," and subsequently "during on-site meetings in China." (Dkt. ¶¶ 13, 20, 22). The content of those representations has been previously noted by the court. The court accordingly denies Quanen's motion to dismiss.

**Motion by Defendants Wang and Eagle**

Walter Wang and Eagle have moved to dismiss the tort claims against them on the

20

ground that the court lacks jurisdiction over them. Defendant Quanen, which entered into a series of transactions with Battenfeld memorialized in numerous Purchase Orders which specifies that Kansas is the proper forum for resolving disputes, has not challenged the court's jurisdiction.

For purposes of resolving the motion to dismiss filed by Wang and Eagle, the court will summarize the relevant contentions. As noted earlier, Battenfeld US is a manufacturer of extrusion equipment used in the production of PVC and PE pipe. The Kansas corporation, formed in 1977, is based in McPherson, Kansas, and maintains its business records in Kansas. Many of the potential witnesses for the plaintiff are located in Kansas.[1]

Eagle is headquartered in Los Angeles, and is one of the world's leading manufacturers of plastic pipe. Walter Wang is Eagle's President and CEO. Eagle has no employees or assets in Kansas.

While Battenfeld US is a member of a larger corporate family, during the course of the events leading to this litigation it acted as a self-standing corporation, with its own sales force, engineering team, production facilities, and profits and liabilities. At some point subsequent to the events giving rise to this lawsuit, Battenfeld US became a subsidiary of a German corporation. However, Battenfeld US was not a subsidiary of, or subject to the control of, BC Extrusion Holding GmbH during the relevant events.

---

[1]These facts are derived from the complaint and the affidavits submitted by the parties, including those by Kaider Liao, Walter Wang, and Paul Godwin. Where the affidavits are in conflict, the court — for purposes of resolving the motion to dismiss — adopts the contentions of the plaintiff.

Eagle manufactures PVC and PE pipe at 22 plants in 15 states throughout North America. With dealings beginning in 1995, Eagle is one of Battenfeld US's oldest clients. During that time, Battenfeld US has installed approximately $65 million worth of equipment, in each of Eagle's plants. Those orders are evidenced in some 3,000 purchase orders, many of which (like the later Quanen purchase orders) included Battenfeld US's standard terms and conditions with the provision under which the buyer "agree[d] to be subject to and accept jurisdiction in the Kansas federal and state courts to resolve all disputes."

In order to expand their operations in China, Eagle and Wang actively participated in selecting and negotiating with Battenfeld US for the extrusion equipment to be sent to Quanen. Because Quanen had not been incorporated yet and had no engineering team of its own, Eagle's engineers analyzed the Chinese market, made recommendations about the kind and volume of pipe and equipment necessary to manufacture that pipe, and evaluated vendors. As noted in the affidavit filed by Kaider Liao, his team of engineers actively "evaluated [the] vendors" for the project "because of our longstanding experience acquiring large scale extrusion equipment."

Eagle and Mr. Wang communicated with Battenfeld US about the proposal well in advance of Quanen's formation in July of 2012. In January of that year, Wang met Waldhauer (Battenfeld US's CEO) and with the then-CEO of an affiliate of Battenfeld US "to discuss preliminary arrangements for the China project, including the proposed extrusion equipment needed for the project."

22

A few days later, Waldhauer followed up this meeting, sending an email from Kansas to Wang, setting out a proposed delivery schedule. Wang responded the same day, writing: "after we have made our final decision we will certainly give you a formal quotation request."

After it formed Quanen, Eagle introduced its subsidiary to the battenfeld-cincinnati corporate group, including Battenfeld US. However, even after Quanen's formation, defendants Eagle and Wang continued to participate in the transaction.

On August 24, 2012, Wang, Kaider Liao (Eagle's Director of Engineering), Michael Wu (Eagle's Assistant Director of Engineering) and Franco An (Quanen's President) met with Waldhauer, Grant Flaharty (CFO of Battenfeld US), and Juergen Arnold (CEO of BC Extrusion Holding) to discuss volume discounts that Battenfeld US could offer for the Quanen project.

Between November, 2012 and March, 2013, Quanen submitted over 50 Purchase Agreements to Battenfeld US. These Purchase Agreements included the same Kansas consent-to-jurisdiction provision noted earlier.

On May 30, 2013, Wang met with Battenfeld US executives, in Mr. Wang's words, "to discuss the [Hebei] Quanen project." On December 20, 2013, Wang met with Battenfeld US executives, again in Mr. Wang's words, "to discuss the Quanen project."

Throughout this period, Eagle employees sent numerous emails about the project to Battenfeld US employees in Kansas.

Defendants dispute the plaintiff's characterization of these negotiations. They stress

23

that the face-to-face meetings occurred in Los Angeles. They also stress Kaider Liao's statement that in his view Juergen Arnold of the German entity BC Extrusion "took the lead in these meetings." After the August 24, 2012 meeting, "Mr. Arnold shook Mr. Wang's hand."

Liao also emphases that he knew, citing an August 27, 2012 email which listed various employees working on the project, that many of the Battenfeld workers appeared to work for the Battenfeld Group in Germany. In addition, he received an email on October 16, 2015 from Henning Steiglitz, Chief Technical Officer for BC Extrusion, discussing technical issues with the project.

Liao's statement appears of limited value because it indiscriminately describes communications with "the Battenfeld Group" without reference to particular corporate entities, and repeatedly speculates as to the inner workings of the Battenfeld entities, and prefaces various factual claims with statement that such "was my understanding."

To the extent Liao's statement does offer specific examples of communications, it tends to support plaintiff's position. Liao acknowledges the August 27, 2012 communication is an "email from Kurt Waldhauer" — that is, the Kansas CEO of a Kansas corporation. Liao responded to the email by emailing Waldhauer, in Kansas, a few hours later. And the email chain repeatedly identifies Waldhauer as President and CEO of "battenfeld-cincinnati USA" and gives his location and contact information:

> 823 South Bypass
> McPherson, KS 67460
> United States

T +1 (620) 241 5843
F +1 (620) 241 0207

The 2015 email chain by Steiglitz also explicitly references Kurt Waldhauer as "Group Vice President Global Accounts" and gives the same Kansas address.

Otherwise, Liao's statement shows the extensive nature of Eagle's participation in the Quanen venture. In addition to the heavy involvement by Eagle before Quanen was formed, even afterwards Eagle's engineers had "numerous ongoing discussions" and was in "regular communications" with Battenfeld.

Eagle staff, including Vice President of Production Chuck Clark, flew to China to address the issues arising from the venture. Clark later prepared a report discussing the the "collaborative efforts" between the parties (including Eagle) and attaching multiple email chains between himself and numerous Battenfeld US employees in Kansas, including Mr. Waldhauer, Paul Godwin, Jerry Severns, and Mike Wallen.

Wang's statement is similar to Liao's. He emphasizes that the face-to-face meetings occurred in Los Angeles, and included Juergen Arnold from Germany. Like Liao, Wang contends that Arnold took the lead in the negotiations. However, the January 24, 2014 email cited in Wang's statement which confirms the results of the meeting, was sent by Waldhauer, not Arnold. And as in his emails to Liao, the chain explicitly indicates that Waldhauer was working from McPherson, Kansas.

And Wang responded the same day, to Waldhauer in Kansas, personally thanking Waldhauer, and writing that he would discuss the proposals with his team, and once a

final decision was made, would "give you a formal quotation request."

The other email communications sent by Arnold to Wang also fail to conclusively support the contention that defendants believed that Quanen would be contracting with BC Extrusion Holding Company in Germany, rather than Battenfeld US in Kansas. For example, the April 12, 2012 email from Arnold celebrates the recent ground-breaking of the plant at Langfang, China, saluting Wang as "our valued and important customer," and expressing the hope for "mutual success" in China.

But with respect to the Quanen project, Arnold wrote more specifically:

As Kurt [Waldhauer] has shared, *you and he have committed to each other* to start the manufacturing for the China lines, I am sure he will get back to you shortly with the details of the China project so we can all move forward and have equipment *in your operation* as soon as it is practical for both of us.

The emphasis is added to show two points. First, Arnold indicated that Wang and Eagle's "commitment" was to Waldhauer of Battenfeld US in Kansas, not Arnold in Germany. Second, all the parties understood that while a separate company would later be formed, this was "your project" — Wang's and Eagles'. Arnold concluded with the hope that they would soon be "seeing the first JME [Eagle]/battenfeld-cincinnati lines [i.e., Battenfeld US not the German holding company] in operation and producing truly historical pipe."

Wang also cites a June 19, 2012 communication from Arnold. Notably, this letter was not sent directly from Arnold to Wang, but was forwarded by Waldhauer — again explicitly operating from McPherson, Kansas. Arnold's letter referenced "the new JM

26

Eagle" operations in Langfang and Chengdu, and indicted that Waldhauer and Arnold were willing to meet with Wang in Los Angeles, China, "or at a place of your convenience." In addition, Arnold wrote:

> Over the past few days, *I have been in McPherson* [*Kansas*] *discussing very heavily your current and future projects with Kurt*, his management team, and my management team. You and your team are receiving our highest attention and dedication. We are striving to satisfy your needs and requirements.
>
> In addition to the current orders, we also discussed the potential projects in China and started our capacity planning. We have identified opportunities that we are implementing that will improve our execution for these projects. *Kurt has reserved time for you in the production schedules* and we are in strong negotiations with our suppliers to ensure our common success.

(Emphasis added).

Again, the most natural inference from this letter is that the production of the extrusion equipment for Eagle and Wang would occur in Kansas.

As noted earlier, the complaint alleges that Eagle and Wang later tortiously interfered with the Purchase Agreements by instructing Quanen not to commission many of the extrusion lines, reject further delivery of equipment, and refuse to pay outstanding amounts due to Battenfeld US. In addition, they had fraudulently represented the ability of Quanen to perform its part of the transaction. Both of these tortious acts caused Battenfeld US to suffer significant financial harm in Kansas. Eagle and Wang knew Quanen's failure to make the required payments to Battenfeld US threatened the financial position of Battenfeld US and other members of its corporate family.

According to the complaint, Battenfeld US's tight liquidity position and reduced

access to raw materials led to delayed shipments to customers and lost customer orders. It experienced this harm in Kansas. Ultimately the battenfeld-cincinnati corporate family defaulted on the Bank Covenants, and Battenfeld US suffered a liquidity crisis. It was forced to seriously delay payments to suppliers, which again deteriorated its financial position in Kansas and caused a significant loss of sales.

The Kansas long-arm statute, K.S.A. § 60–308(b) is construed to permit exercise of jurisdiction to the full extent permitted by due process. *Volt Delta Resources v. Devine*, 241 Kan. 775, 740 P.2d 1089, 1092 (1987). As a result, the"first, statutory, inquiry effectively collapses into the second, constitutional, analysis." *Dudnikov v. Chalk & Vermillion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Due process permits the exercise of personal jurisdiction over a nonresident defendant who has "minimum contacts" such that defending an action in the forum does not "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Such minimum contacts may exist either on the basis of general jurisdiction or (as alleged here) specific jurisdiction, which "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

"For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 1121. Specific jurisdiction exists where the defendants have "purposefully directed" their activities towards forum residents, and the plaintiff's injuries arose from those activities.

*Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir.2013). The Tenth Circuit applies an "effects test" to determine whether a defendant has "purposefully directed" her activities at the forum state so as to subject the defendant to specific personal jurisdiction. *See Dudnikov*, 514 F.3d at 1072 (citing *Calder v. Jones*, 465 U.S. 783, 789–90 (1984). Under this test, purposeful direction occurs when a defendant (1) takes an intentional action, (2) which was expressly aimed at the forum state, (3) while knowing that the brunt of the injury would be felt in the forum state. *Id.*

Although plaintiff argues that defendants Wang and Eagle are subject to specific jurisdiction in Kansas, it also argues the court need not reach the issue, because those defendants should be deemed to have consented to jurisdiction in Kansas, just as their affiliated and closely related corporate entity, Quanen, did.

The court agrees, and finds that the present case presents a sound example for application of the consent to jurisdiction by "closely related" entities.

> A non-party to a contract may be subject to its forum selection clause if the non-party is so "closely related" to either the parties to the contract or the contract dispute itself that enforcement of the clause against the non-party is foreseeable. However, "the phrase 'closely related' is not particularly illuminating," and as such courts have varied in their application of the doctrine. Nonetheless, many courts have used the doctrine to bind non-party, non-signatory corporate officers to contracts entered into by their corporate employer. Regardless of the specific application, the enforcement of the forum selection clause against the non-party must have been foreseeable prior to suit, which implies that the non-signatory must have been otherwise involved in the transaction in some manner.

*Recurrent Capital Bridge Fund I, LLC v. ISR Systems & Sensors Corp.*, 875 F.Supp.2d 297, 307-08 (S.D.N.Y.2012) (footnotes omitted).

The defendants respond by arguing that the closely related doctrine does not apply because the cases cited by plaintiff are from outside the Tenth Circuit, with the exception of *Cent. Transp. Servs. v. Cole*, 2013 WL 6008303, at *4 (D. Kan. Nov. 13, 2013). The defendants argue (Dkt. 48, at 7) that *Cole* actually supports a determination that there is no jurisdiction for Battenfeld's claims in Kansas.[2]

*Cole* provides little direct support for either party's position. In that case, a Kansas company attempted to enforce a non-compete agreement against former employees, Benny and Lori Cole, and advanced trade secret claims against Brady Trucking, the Utah company that later hired the Coles. Invoking the "closely related" doctrine, the plaintiff argued that Brady was bound by the Kansas forum selection clause that accompanied the noncompete agreement.

The court summarized the "closely related" doctrine recognized in *Recurrent Capital*, observed that the Tenth Circuit had not directly addressed the issue, and noted that "[t]here seems to be little discussion, however, of the due process implications of exercising jurisdiction over such non-signatories." 2013 WL 6008303, at *4.

The court ultimately concluded that due process barred the action against Brady Trucking, in a decision closely tied to the facts of that case. The court stressed that Brady

---

[2] *Cole* is not the "sole Kansas" case to discuss the doctrine. (Dkt. 48, at 7). In *Mozingo v. Trend Pers. Servs.*, No. 10-4149-JTM, 2011 WL 3794263 (D.Kan., Aug.25, 2011), which Judge Belot noted in *Cole*, the court also discussed the "closely related" doctrine, and while observing that the Tenth Circuit had not directly addressed the issue, noted the substantial number of decisions from other circuits, which have "held that a non-party may be bound by a forum selection clause if they are 'closely related' to the dispute such that it is 'foreseeable' they will be bound." *Id.* at *6 (citing cases).

only learned of the Coles' noncompete agreement *after* it hired them:

> Assuming that a non-signatory can sometimes be bound by a forum selection clause that it did not agree to, the court nevertheless concludes it would violate due process to exercise personal jurisdiction over Brady in Kansas based solely upon the forum selection clause in the Coles' agreement with CTS. There was no relation or affiliation of any kind between the Coles and Brady when the Coles entered the APA. More than a year after that agreement was signed, Benny contacted Brady and solicited a job. He erroneously represented to Brady that his non-compete restriction with CTS had expired, and he and Brady then entered into an employment agreement. These facts indicate—and CTS has not alleged otherwise—that Brady only become aware of the three-year employment restriction and the forum selection clause after it had entered an employment contract with the Coles.

*Id.* at *5 (footnote omitted). In addition, the court stressed that even after it learned of the noncompete agreement, Brady's ties to Kansas were virtually non-existant, and it took no actions towards Kansas at all:

> The line of customers and business that Brady acquired from CTS by allegedly tortious means was overwhelmingly carried on completely outside the State of Kansas. The business was operated out of a terminal in Bloomington, Illinois, under the management of an Illinois resident. None of the former CTS employees acquired by Brady are alleged to be Kansas residents.

*Id.* at *6.

The decision is therefore plainly distinct from the present action. Here, Eagle had a long history with Battenfeld, knew that Battenfeld operated in Kansas, and knew that Battenfeld commonly required the resolution of disputes in Kansas.

*Cole* simply recognized that the "closely related' doctrine could not supply jurisdiction as to a nonresident employer, where the employer played no role in the formation of an employee's prior noncompete agreement, had no knowledge of the

agreement at the time of hiring, and never directed any actions towards Kansas. Unlike the Utah trucking company in *Cole*, Wang and Eagle were both highly engaged in the venture from the beginning.

The *Cole* court stressed the unusual nature of the plaintiff's attempt to apply the "closely related" doctrine in an employment context, noting that the doctrine "has most often been applied to persons who are third-party beneficiaries of a contract, to corporate officers *or corporate entities affiliated with a signatory*, or to successors-in-interest of a signatory." *Id.* at 4 (emphasis added, citing cases).

Here, Battenfeld seeks a straightforward application of the doctrine as to a corporate entity and its executive officer, whose affiliate expressly consented to Kansas jurisdiction. Both Eagle and Wang were highly involved in the transaction, and indeed the affiliate Quanen was formed only after the venture took form.

Even if the court were to reject plaintiff's "closely related" argument, and independently address the issue of specific jurisdiction in Kansas, the court would deny the motion to dismiss, finding that the alleged facts of the case support the exercise of jurisdiction in Kansas.

The circumstances of the case indicate that defendants intentionally took actions to engage in a large scale commercial transaction to acquire plastic pipeline extrusion equipment from a Kansas corporation. Although some of the negotiations included consultation with a related German corporation, and the German corporation provided the technology which supported the extrusion equipment, a rational fact-finder could conclude

that the actual producer and seller of the equipment was the Kansas-based Battenfeld US.

Similarly, while both Liao and Wang attempt to distinguish between the "core technology" of the computerized software, from the extrusion equipment itself, "wherever the extruders are actually made," the distinction is not controlling. Defendants were not seeking to acquire technology in the abstract, but the extrusion equipment. The communications submitted to the court repeatedly focus on the production and manufacture of the extrusion equipment — which occurred at Battenfeld US. Whatever role the German company played in aiding the negotiations, the communications presented in the case memorialize the transaction as one in which Wang and Battenfeld US "have committed to each other" to manufacture the necessary extrusion equipment.

The actions by Wang and Eagle were intentionally directed at a Kansas resident. The actual communications presented to the court repeatedly indicate that Battenfeld US was located in McPherson, Kansas. In addition, Wang and Eagle had a long and extensive history of working with Battenfeld US, and in many instances these transactions took place with purchase orders explicitly requiring that any disputes would be resolved in Kansas.

Given the evidence and allegations in the case there is a reasonable basis for concluding that Wang and Eagle expressly aimed their activities at Kansas. The communications presented to the court indicate that defendants did not chose the seller of the extrusion equipment at random, but on the basis of their extensive prior history and after a substantial vetting process for vendors. Such history, and such an extensive review process, should and would have alerted defendants to Battenfeld's operation in Kansas.

Finally, in addition to all of this, the defendants knew of the tight schedules and highly leveraged nature of Battenfeld US's production and financing. Assuming the allegations of tortious interference and fraud in the complaint are correct, defendants Wang and Eagle would have known that the focus of Battenfeld's injuries would be felt in Kansas.

In their motion, Wang and Eagle stress the existence of other litigation which has occurred in California and China. They also repeatedly stress that all of their meetings with Battenfeld occurred in California, and that they did not travel to Kansas.

However, "physical presence in the forum is not a prerequisite to jurisdiction." *Walden v. Fiore*, 134 S.Ct. at 1122 (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985)). The evidence noted earlier supports the determination that Eagle and Wang communicated with a Kansas manufacturer for the sale of a large amount of extrusion equipment, that they knew of this Kansas relationship, and that they purposefully directed their actions towards Kansas. The defendants chose a Kansas manufacturer following an extensive vetting of potential vendors. Moreover, according to the complaint, the defendants deliberately used their knowledge of Battenfeld's leveraged financial condition, knowing that plaintiff's injuries would be focused in Kansas. The plaintiff's claims arise directly out of that sale of extrusion equipment, and the court finds no basis for concluding that requiring defendants to appear in Kansas offends traditional notions of fair play and substantial justice.

Similarly, the court finds no basis for concluding that trial of the issue in Kansas would be unfair or unduly burdensome. Wang and Eagle are engaged in business on an

international scale, appear to travel frequently, and have the resources to appear in the forum.

Kansas has a strong interest in resolving the claims asserted by plaintiff, and exercise of jurisdiction here does not adversely affect the interests of any other jurisdiction. As noted earlier, Wang and Eagle were heavily active in both the organization of the transaction with Battenfeld, and with the formation of the Eagle subsidiary Quanen, which subsequently agreed to resolve any of its disputes with Battenfeld in Kansas. Kansas is the only forum where all of plaintiff's claims can be resolved against all defendants, and the court finds that defendant's motion to dismiss for lack of personal jurisdiction should be denied.

The plaintiff (as an alternative to granting defendants' motion) and defendants (as an alternative to denial) suggest allowing jurisdictional discovery. The plaintiff's request is denied as moot. The defendants' is denied under the circumstances of the case. First, the request[3] fails to establish that such discovery can or would be helpfully cabined to jurisdictional matters alone. Second, the allegations and evidence in the case do not indicate that such additional discovery would produce any different result by any subsequent Rule 12 motion.

The plaintiffs bear the burden of establishing personal jurisdiction, *Intercon, Inc. v.*

---

[3]Defendant's request states only that "*a primary area* for discovery will be, *among other matters*, the nature and circumstance of the default by the entire battenfeld-cincinnati corporate family under the bank covenants established in Germany, including the relevance of the $4 million in unpaid invoices owing to Plaintiff to such default." (Dkt. 48, at 25) (emphasis added).

*Bell Atl. Internet Solutions*, Inc., 205 F.3d 1244, 1247 (10th Cir.2000), but at this stage the court construes any reasonable inferences from these facts in favor of the plaintiff. *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir.2006); *Dudnikov*, 514 F.3d at 1070 ("any factual disputes in the parties' affidavits must be resolved in plaintiffs' favor," and "at this stage, plaintiffs need only make a prima facie showing of personal jurisdiction") (citations omitted). Given this standard, the court finds that the matter should proceed without jurisdictional discovery.

IT IS ACCORDINGLY ORDERED this 21st day of November, 2017, that defendants' Motions to Dismiss (Dkt. 19, 27) are hereby denied.


        s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

36