**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **AMERICAN MAPLAN CORPORATION,** d/b/a Battenfeld-Cincinnati USA,<br><br>       **Plaintiff,**<br><br>  **v.**<br><br>**HEBEI QUANEN HIGH-TECH PIPING CO., LTD.; J-M MANUFACTURING COMPANY, INC.; and WALTER WANG,**<br><br>       **Defendants.** | **CASE NO.  6:17-cv-01075-JTM-GEB** |

**HEBEI QUANEN HIGH-TECH PIPING CO., LTD.,**

       **Counterclaim Plaintiff,**

  **v.**

**AMERICAN MAPLAN CORPORATION,** d/b/a Battenfeld-Cincinnati USA,

       **Counterclaim Defendant.**

**HEBEI QUANEN HIGH-TECH PIPING CO., LTD.,**

       **Third-Party Plaintiff,**

  **v.**

**BC EXTRUSION HOLDING GmbH, BATTENFELD-CINCINNATI GERMANY GmbH, and GEROLD SCHLEY,**

       **Third-Party Claim Defendants.**

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM OF
DEFENDANT/COUNTERCLAIM PLAINTIFF
HEBEI QUANEN HIGH-TECH PIPING CO., LTD.**

**TO**

**COMPLAINT OF PLAINTIFF AMERICAN MAPLAN CORPORATION D/B/A
BATTENFELD-CINCINNATI USA**

**AND**

**THIRD-PARTY CLAIM OF THIRD-PARTY PLAINTIFF
HEBEI QUANEN HIGH-TECH PIPING CO., LTD.**

**AGAINST**

**THIRD-PARTY CLAIM DEFENDANTS BC EXTRUSION HOLDING GmbH,
BATTENFELD-CINCINNATI GERMANY GmbH, and GEROLD SCHLEY**

**AND**

**<u>DEMAND FOR JURY TRIAL</u>**

Defendant Hebei Quanen High-Tech Piping Co., Ltd. ("Quanen"), as and for its answer
and affirmative defenses to the complaint (the "Complaint") of plaintiff American Maplan
Corporation d/b/a Battenfeld-Cincinnati USA ("Maplan"), alleges and states as follows:

**"NATURE OF THE CASE"**

1.      Quanen denies the allegations of paragraph 1 of the Complaint.

**"JURISDICTION AND VENUE"**

2.      Quanen admits that Maplan transmitted written offer letters covering the sale of
the equipment at issue, that those offer letters contained a section entitled "Terms and Conditions
Governing All Sales," and that Quanen issued purchase orders corresponding to some of the
offer letters.  Quanen refers the Court to those documents for an accurate account of their terms.
Except as so expressly admitted, Quanen denies the allegations of paragraph 2 of the Complaint.

3.      Quanen denies the allegations of paragraph 3 of the Complaint.

4.      Paragraph 4 of the Complaint consists of jurisdictional allegations to which no response is required.  To the extent a response is required Quanen admits the allegations of paragraph 4.

5.      Paragraph 5 of the Complaint consists of venue allegations to which no response is required.  To the extent a response is required Quanen denies the allegations of paragraph 5.

6.      Quanen acknowledges Maplan's request for trial in Wichita, Kansas in paragraph 6 of the Complaint. Quanen also requests Wichita as the place of trial.

**"PARTIES"**

7.      Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Complaint; therefore, Quanen denies same.

8.      Quanen admits the allegations of paragraph 8 of the Complaint.

9.      Quanen admits the allegations of paragraph 9 of the Complaint.

10.      Quanen admits the allegations of paragraph 10 of the Complaint.

**"FACTS"**

11.      Quanen admits that Maplan has done business with co-defendant J-M Manufacturing Co., Inc. ("JM Eagle") and states that Maplan has done business with JM Eagle for many years.  Except as so expressly admitted, Quanen denies the allegations of paragraph 11 of the Complaint.

12.      Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint; therefore, Quanen denies same.

13.      Quanen admits that there was a meeting on or about January 19, 2012 between Kurt Waldhauer and co-defendant Walter Wang.  Except as so expressly admitted, Quanen denies the allegations of paragraph 13 of the Complaint.

14.     Quanen denies the allegations of paragraph 14 of the Complaint.

15.     Quanen admits that Mr. Waldhauer sent an email to Mr. Wang on or about January 24, 2012, but denies the characterization of the contents of that email, and refers the Court to the email for an accurate account of its contents.

16.     Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint; therefore, Quanen denies same.

17.     Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint; therefore, Quanen denies same.

18.     Quanen admits that it was incorporated in or about July 23, 2012 in China and that Franco An has been President of Quanen since that time.  Except as so expressly admitted, Quanen denies the allegations of paragraph 18 of the Complaint.

19.     Quanen denies the allegations of paragraph 19 of the Complaint.

20.     Quanen admits that there was a meeting on August 24, 2012 involving representatives of JM Eagle, Quanen and Maplan, as well as a representative of Maplan affiliate and third-party claim defendant BC Extrusion Holding GmbH ("BC Extrusion") and that the purpose of the meeting was to negotiate the terms of Maplan's sale of extrusion equipment to Quanen.  Except as so expressly admitted, Quanen denies the allegations of paragraph 20 of the Complaint.

21.     Quanen states that, at the August 24, 2012 meeting, BC Extrusion agreed to provide a 40% discount from the list price on Quanen's purchase of extrusion equipment in return for at least $75 million of orders from Quanen.  Except as so expressly stated, Quanen denies the allegations of paragraph 21 of the Complaint.

22.     Quanen states that there were continued discussions about the extrusion equipment among JM Eagle, Quanen and Maplan (as well as BC Extrusion and other Maplan affiliates) throughout the Fall of 2012, including some on-site meetings in China.  Except as so expressly stated, Quanen denies the allegations of paragraph 22 of the Complaint.

23.     Quanen admits that Maplan transmitted written offer letters covering the sale of the equipment at issue, that some of those offer letters were transmitted in September 2012 and that those offer letters contained a section entitled "Terms and Conditions Governing All Sales." Quanen refers the Court to those documents for an accurate account of their terms.  Except as so expressly admitted, Quanen denies the allegations of paragraph 23 of the Complaint.

24.     Quanen admits that it submitted purchase orders corresponding to some of the offer letters transmitted by Maplan.  Quanen refers the Court to those documents for an accurate account of their terms.  Except as so expressly admitted, Quanen denies the allegations of paragraph 24 of the Complaint.

25.     Quanen admits that it submitted purchase orders corresponding to some of the offer letters transmitted by Maplan.  Quanen refers the Court to those documents for an accurate account of their terms.  Quanen admits that it agreed to pay for the subject equipment by paying 30% with each purchase order, 50% upon delivery and the remaining 20% after commissioning and acceptance.  Except as so expressly admitted, Quanen denies the allegations of paragraph 25 of the Complaint.

26.     Quanen states that it paid approximately $34 million for the equipment at issue. Except as so expressly stated, Quanen denies the allegations of paragraph 26 of the Complaint.

27.     Quanen admits the allegations of paragraph 27 of the Complaint.

28.     Quanen denies the allegations of paragraph 28 of the Complaint.

29.     Quanen denies the allegations of paragraph 29 of the Complaint.

30.     Quanen denies the allegations of paragraph 30 of the Complaint.

31.     Quanen denies the allegations of paragraph 31 of the Complaint.

32.     Quanen denies the allegations of paragraph 32 of the Complaint.

33.     Quanen denies the allegations of paragraph 33 of the Complaint.

34.     Quanen denies the allegations of paragraph 34 of the Complaint.

35.     Quanen denies the allegations of paragraph 35 of the Complaint.

36.     Quanen denies any refusal to pay for the subject equipment other than as fully justified by the defective quality of the equipment.  Except as so expressly admitted, Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Complaint; therefore, Quanen denies same.

37.     Quanen admits that there is a written agreement titled Agreement Summary dated May 27, 2015 which bears the signatures of representatives of Quanen, Maplan and BC Extrusion and that set extrusion equipment commissioning schedules (schedules that were never met).  Quanen refers the Court to the Agreement Summary for an accurate account of its terms. Except as so expressly admitted, Quanen denies the allegations of paragraph 37 of the Complaint.

38.     Quanen denies the allegations of paragraph 38 of the Complaint.

39.     Quanen denies the allegations of paragraph 39 of the Complaint.

40.     Quanen denies the allegations of paragraph 40 of the Complaint.

41.     Quanen denies the allegations of paragraph 41 of the Complaint.

42.     Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Complaint; therefore, Quanen denies same.

43.     Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Complaint; therefore, Quanen denies same.

44.     Quanen denies the allegations of paragraph 44 of the Complaint.

45.     Quanen denies the allegations of paragraph 45 of the Complaint.

46.     Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 of the Complaint; therefore, Quanen denies same.

47.     Quanen lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Complaint; therefore, Quanen denies same.

48.     Quanen denies the allegations of paragraph 48 of the Complaint.

## FIRST CLAIM FOR RELIEF

49.     Paragraph 49 of the Complaint does not require a specific response as it only incorporates previous paragraphs of the Complaint.  To the extent a specific response is required Quanen incorporates its responses to the incorporated paragraphs.

50.     Quanen admits it had a contractual relationship with Maplan covering the subject equipment.  Except as so expressly admitted, Quanen denies the allegations of paragraph 50 of the Complaint.

51.     Quanen admits that it submitted purchase orders corresponding to some of the offer letters transmitted by Maplan.  Quanen refers the Court to those documents for an accurate account of their terms.  Except as so expressly admitted, Quanen denies the allegations of paragraph 51 of the Complaint.

52.     Quanen denies the allegations of paragraph 52 of the Complaint.

53.     Quanen denies the allegations of paragraph 53 of the Complaint.

54.     Quanen denies the allegations of paragraph 54 of the Complaint.

55.     Quanen denies the allegations of paragraph 55 of the Complaint.

56.     Quanen denies the allegations of paragraph 56 of the Complaint.

57.     Quanen denies the allegations of paragraph 57 of the Complaint.

58.     Quanen denies the allegations of paragraph 58 of the Complaint.

## SECOND CLAIM FOR RELIEF

59.     Paragraph 59 of the Complaint does not require a specific response as it only incorporates previous paragraphs of the Complaint.  To the extent a specific response is required Quanen incorporates its responses to the incorporated paragraphs.

60.     Quanen denies the allegations of paragraph 60 of the Complaint.

61.     Quanen states that it agreed to pay Maplan for equipment that met all applicable warranties, that was not defective in design or manufacture, that conformed to Quanen's needs as conveyed to Maplan and that was fully commissioned and accepted.  Except as so expressly stated, Quanen denies the allegations of paragraph 61 of the Complaint.

62.     Quanen denies the allegations of paragraph 62 of the Complaint.

63.     Quanen denies the allegations of paragraph 63 of the Complaint.

64.     Quanen denies the allegations of paragraph 64 of the Complaint.

## THIRD CLAIM FOR RELIEF

65.     Paragraph 65 of the Complaint does not require a specific response as it only incorporates previous paragraphs of the Complaint.  To the extent a specific response is required Quanen incorporates its responses to the incorporated paragraphs.

66.     Quanen denies the allegations of paragraph 66 of the Complaint.

67.     Quanen denies the allegations of paragraph 67 of the Complaint.

68.     Quanen denies the allegations of paragraph 68 of the Complaint.

69.     Quanen denies the allegations of paragraph 69 of the Complaint.

70.     Quanen denies the allegations of paragraph 70 of the Complaint.

71.     Quanen denies the allegations of paragraph 71 of the Complaint.

**FOURTH CLAIM FOR RELIEF**

72.     Paragraph 72 of the Complaint does not require a specific response as it only incorporates previous paragraphs of the Complaint.  To the extent a specific response is required Quanen incorporates its responses to the incorporated paragraphs.

73.     Quanen denies the allegations of paragraph 73 of the Complaint.

74.     Quanen denies the allegations of paragraph 74 of the Complaint.

75.     Quanen denies the allegations of paragraph 75 of the Complaint.

76.     Quanen denies the allegations of paragraph 76 of the Complaint.

77.     Quanen denies the allegations of paragraph 77 of the Complaint.

**FIFTH CLAIM FOR RELIEF**

78.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

79.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

80.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

81.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

82.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

83.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

84.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

85.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

86.     This paragraph is part of a claim not alleged against Quanen.  Therefore no response by Quanen is necessary.

## SIXTH CLAIM FOR RELIEF

87.     Paragraph 87 of the Complaint does not require a specific response as it only incorporates previous paragraphs of the Complaint.  To the extent a specific response is required Quanen incorporates its responses to the incorporated paragraphs.

88.     Quanen denies the allegations of paragraph 88 of the Complaint.

89.     Quanen denies the allegations of paragraph 89 of the Complaint.

90.     Quanen denies the allegations of paragraph 90 of the Complaint.

91.     Quanen denies the allegations of paragraph 91 of the Complaint.

92.     Quanen denies the allegations of paragraph 92 of the Complaint.

93.     Quanen denies the allegations of paragraph 93 of the Complaint.

94.     Quanen denies the allegations of paragraph 94 of the Complaint.

95.     Quanen denies the allegations of paragraph 95 of the Complaint.

## PRAYER FOR RELIEF

Quanen prays for Maplan to take nothing from its purported claims, for costs of this action, and for other relief that the Court deems just and equitable.

**AFFIRMATIVE DEFENSES**

Quanen asserts and alleges the following affirmative defenses:  Quanen reserves the right to assert additional defenses as they become evident through discovery or investigation, in accordance with the Federal Rules of Civil Procedure and/or subsequent court order.

1.      Maplan's Complaint fails to state a claim on which relief may be granted.

2.      The tort claims for relief (conversion and fraud) are not independent of the alleged contract and are therefore barred if the contract claim is viable.

3.      The unjust enrichment claim for relief is not independent of the contract claim and is therefore barred if the contract claim is viable.

4.      The claims for relief in the Complaint are barred by the applicable statutes of limitations, including without limitation K.S.A. 60-513(a)(2) (conversion), K.S.A. 60-512(1) and K.S.A. 60-513(a)(3) (fraud).

5.      The Complaint is barred by the doctrine of laches in that Maplan delayed in asserting the subject claims to the detriment of Quanen.

6.      As to any alleged failure by Quanen to perform any of its obligations, covenants or promises under any contract, Quanen's performance was frustrated or excused by the actions of Maplan and/or its affiliates.

7.      The alleged subject contract is void and unenforceable based on the fraudulent or negligent misrepresentations made by Maplan to Quanen, which are described below in paragraphs 84–102 of Quanen's Counterclaim and Third-Party Claim.

8.      Under the alleged subject contract, the sums allegedly due are due only after final acceptance and, because of multiple defects in the equipment there has been no final acceptance of many of the subject extrusion lines.

9.      Maplan's claims for relief, and each of them, are barred by Maplan's unclean hands.

10.      By reason of its conduct, Maplan is estopped to assert any right to relief against Quanen, including the relief sought in Maplan's claims herein.

11.      To the extent any allegations of breach or wrongdoing in the Complaint are true (which Quanen denies), the claims for relief are barred or limited because the damages alleged in the Complaint were proximately caused by Maplan, by others affiliated with Maplan and/or by other third parties.  The aforesaid conduct by Maplan and/or these third parties contributed to or caused any damages Maplan may have suffered.

12.      To the extent any allegations of breach or wrongdoing in the Complaint are true (which Quanen denies), Maplan's claims are subject to offset as to claims that Quanen has against Maplan and its affiliated companies as set forth in the counterclaim and third-party complaint included herewith.

13.      Maplan has not alleged sufficient facts to rise to the level of conduct required for punitive damages and any award of such damages would be improper.

14.      Any award of punitive damages against Quanen in this action would be barred as violative of the due process, equal protection and excessive fines clauses of the United States Constitution and by the provisions of K.S.A. 60-3702.

### COUNTERCLAIM AND THIRD-PARTY CLAIM OF DEFENDANT/COUNTERCLAIM PLAINTIFF AND THIRD-PARTY PLAINTIFF HEBEI QUANEN HIGH-TECH PIPING CO., LTD.

As and for its counterclaim against counterclaim defendant Maplan and third-party defendants BC Extrusion and Battenfeld-Cincinnati Germany GmbH ("Battenfeld Germany"), defendant/counterclaim plaintiff and third-party plaintiff Quanen alleges and states as follows:

## PARTIES

1.      Counterclaim plaintiff/third-party plaintiff Quanen is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business in Langfang City, Hebei Province, China.  Quanen manufactures and sells high-grade plastic pipe, including PE pipe and PVC pipe, to customers in China for infrastructure projects and other large projects.

2.      Counterclaim defendant Maplan is a Kansas corporation with its principal place of business in McPherson, KS.  Maplan is part of a group of companies that calls itself battenfeld-cincinnati (the "Battenfeld Group" or the "Group").  The Group and its companies design and manufacture extrusion equipment for use in making large-diameter plastic pipes.  Officers and other personnel from Maplan were part of the Project Management Team and the Project Implementation Team within the Battenfeld Group for the sale, delivery, installation, assembly and commissioning of the extrusion equipment sold to Quanen that is the subject of this action and were also involved in attempting (unsuccessfully) to remediate the multiple defects in the equipment after its delivery to Quanen's plant.

3.      Third-party defendant BC Extrusion is a corporation duly organized and existing under the laws of Germany or one of the German states with its principal place of business in Bad Oeynhausen, Germany.  At all relevant times, BC Extrusion provided strategic direction to the other companies in the Group and was the risk manager for the entire Group.  BC Extrusion's approval was necessary for all large projects, including the sale of extrusion equipment to Quanen that is the subject of this action (which was one of the largest transactions in the Group's history).  Officers and other personnel from BC Extrusion were part of the Management Team within the Group for the sale, delivery, installation, assembly and commissioning of the extrusion equipment sold to Quanen that is the subject of this action and were also involved in

attempting (unsuccessfully) to remediate the multiple defects in the equipment after its delivery to Quanen's Langfang plant.

4.      Third-party defendant Battenfeld Germany is also a corporation duly organized and existing under the laws of Germany or one of the German states with its principal place of business in Bad Oeynhausen, Germany.  Battenfeld Germany is a wholly-owned subsidiary of BC Extrusion.  It is also a member of the Battenfeld Group.  At all relevant times, Battenfeld Germany was an operations company that designed and manufactured extrusion equipment. Officers and other personnel from Battenfeld Germany were part of the Project Management Team and the Project Implementation Team for the sale, delivery, installation, assembly and commissioning of the extrusion equipment sold to Quanen that is the subject of this action and were also involved in attempting (unsuccessfully) to remediate the multiple defects in the equipment.

5.      Third-party defendant Gerold Schley ("Mr. Schley") was at all relevant times the President and CEO of BC Extrusion.  He assumed that position on January 1, 2015.

6.      The Group also has an affiliate in China (although it is not a party to this action). The affiliate in China is Battenfeld-Cincinnati (Foshan) Extrusion Systems, Ltd. ("Battenfeld China"), a corporation duly organized and existing under the laws of the People's Republic of China with its principal place of business in Foshan, Guangdong Province, China.

7.      Upon information and belief, BC Extrusion, Battenfeld Germany, Battenfeld China and Maplan are alter egos of one another.  On the corporate website, the companies present themselves as a single organization—"battenfeld-cincinnati." http://www.battenfeld-cincinnati.com/en/company/ (last accessed December 9, 2017 at 3:19 p.m.) The website says that this organization "has a global workforce of about 700 employees" and makes no distinction

among the various companies (including BC Extrusion, Battenfeld Germany and Maplan) that comprise the organization.  Although Maplan and Battenfeld China were the nominal sellers of the equipment at issue to Quanen, BC Extrusion typically referred to itself as the seller of the equipment and also referred to itself as the entity to which the purchase price was owed.  Upon information and belief, each company was under-capitalized.  Further, as the Complaint herein makes clear, a default by any of the companies in the organization would impact every other company in the organization, suggesting that none of the companies had any independent financial viability.  The individual companies that are part of battenfeld-cincinnati present themselves to the world as a unified, single organization, falling back on the alleged corporate separateness of the organization's constituents only when necessary to deflect litigation.  For all effective purposes, BC Extrusion, Battenfeld Germany and Maplan are one and the same because that is the perception that they and their ultimate corporate owner, Nimbus Holding, Inc., seek to create in the minds of third parties, including Quanen.  Recognition of BC Extrusion, Battenfeld Germany or Maplan as a distinct corporate entity would result in injustice to Quanen and adherence to the corporate fiction among these three companies would sanction their attempt to escape their legal obligations to Quanen.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction of the counterclaim herein pursuant to 28 U.S.C. 1332(a)(2) because the controversy involves a foreign corporation and a citizen of a state and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

9.     This Court has subject matter jurisdiction of the counterclaim and the third-party claim herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims in the

action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     This Court has personal jurisdiction over BC Extrusion, Battenfeld Germany and Mr. Schley because BC Extrusion, Battenfeld Germany and Mr. Schley had extensive interactions with Maplan in Kansas in connection with the sale, delivery, installation, assembly and commissioning of the extrusion equipment sold to Quanen that is the subject of this action and in connection with the unsuccessful attempts to remediate the multiple defects in the equipment.

11.     This Court also has personal jurisdiction over BC Extrusion, Battenfeld Germany and Mr. Schley under the "closely related" doctrine of federal case law in that BC Extrusion, Battenfeld Germany and Mr. Schley are closely related to Maplan, which expressly consented to jurisdiction in Kansas.

12.     Also, there is personal jurisdiction over BC Extrusion and Battenfeld Germany because, as earlier alleged, they are mere alter egos of Maplan.

13.     Venue is proper in Kansas pursuant to 28 U.S.C. § 1391, in that a substantial part of the events or omission giving rise to the claims occurred in Kansas.

## UNDERLYING FACTS

14.     Quanen was formed in July 2012 in China with the goal of building large and sophisticated pipe-making plants in the People's Republic of China, capable of making large, high-quality PE and PVC plastic pipe.  To that end, Quanen carefully vetted vendors who could supply it with the extrusion equipment and related systems needed to make such pipe.  The Battenfeld Group, including representatives of counterclaim defendant Maplan and third-party defendants BC Extrusion and Battenfeld Germany, represented to Quanen that they were leaders

in extrusion technology and that they could and would design and manufacture for Quanen the

extrusion equipment that Quanen needed based on the specifications provided by Quanen.

Relying on these representations, Quanen paid the Battenfeld Group (specifically Maplan and

Battenfeld China) tens of millions of dollars for this equipment.  Yet the extrusion lines and

related systems that the Group designed and manufactured for Quanen suffered from numerous

defects and were entirely inadequate.  The Group initially failed to acknowledge these many

defects.  Their belated attempts to correct these defects failed to accomplish their purpose.  The

result is that the extrusion lines at the Quanen plant are still plagued with problems, require

frequent shutdowns, pose risks to worker safety and have generated substantial additional costs

to Quanen.  The lines are also not capable of producing pipe in the volumes and at the speeds

promised by the Group.  Quanen has experienced significant loss of business and severe

impairment of relationships with key customers.  Quanen therefore brings this lawsuit to obtain

fair compensation for these wrongful acts.

15.     Quanen required sophisticated extrusion equipment in order to manufacture the

PVC and PE pipes that it would sell to its customers in China.  Extrusion is a manufacturing

process in which raw thermo-plastic is melted and formed into a profile.  Quanen's customers

needed pipe of certain diameters and a range of other specifications.  Quanen's business plan was

to produce a broad range of PVC and PE pipe in significant quantities.  To achieve that goal,

Quanen needed to purchase numerous lines of extrusion machinery.

16.     Co-defendant JM Eagle, which has some common officers with Quanen, is the

world's largest manufacturer of plastic pipe.  JM Eagle has had a business relationship with

Maplan, BC Extrusion, BC Germany and the entire Battenfeld Group for several decades.  JM

Eagle introduced Quanen to BC Extrusion and Maplan to negotiate the purchase of extrusion equipment for Quanen's plants in China, including its Langfang plant.

17.    As early as 2011, Quanen and the Battenfeld Group (including Maplan, BC Extrusion and Battenfeld Germany) began negotiating for the purchase by Quanen of extrusion equipment and related systems and controls for Quanen's plants in China.  At that time, Quanen supplied Maplan, BC Extrusion and Battenfeld Germany with the specifications and information that those companies needed in order to provide Quanen with quotes for the extrusion equipment and related features that would be adequate to make the PE and PVC pipe that Quanen intended to manufacture for its customers.  This information included the sizes of the PE pipe and PVC pipe that Quanen intended to manufacture to meet the needs of its customers as well as the output rates and efficiencies that Quanen required for the extrusion lines at its plant in order to meet the needs of its customers and to achieve its business goals.

18.    These negotiations culminated in a meeting at JM Eagle's office in Los Angeles on or about August 24, 2012.  The then-CEO of BC Extrusion, Juergen Arnold, along with Kurt Waldhauer, President and CEO of Maplan, and others, attended this meeting on behalf of the Battenfeld Group.  The main issue at that meeting was how much future business Quanen would give the Battenfeld Group for Quanen's Chinese plants (including the Langfang plant) and how much of a discount the Battenfeld Group would give Quanen for these sales.  On information and belief, only BC Extrusion could make this decision for itself and the other Battenfeld Companies. At that meeting, Juergen Arnold, the CEO of BC Extrusion, agreed to extend a 40% discount to Quanen in return for $75 million of total business.  It was Mr. Arnold's handshake that cemented the deal.

19.     In the days after this meeting, the Battenfeld Group formed a Project Management Team and a Project Implementation Team to handle the various aspects of this complex transaction, which was one of the most significant sales in the Group's history.  Representatives from Maplan, BC Extrusion and Battenfeld Germany were on the Project Management Team. Representatives from Battenfeld Germany and Maplan were on the Project Implementation Team.

20.     Subsequent to the August 24, 2012 meeting, the parties—including representatives of Maplan, BC Extrusion and Battenfeld Germany—met in China in early September, 2012.  This meeting consisted mostly of a presentation by Maplan and other representatives of the Group of the kinds of extrusion machinery and ancillary equipment that they proposed to sell to Quanen and that would be best suited to make the PE and PVC pipe that Quanen would need to fulfill the orders of its customers.

21.     As negotiations continued, in or about January through March 2013, Maplan, BC Extrusion and Battenfeld Germany agreed to supply Quanen with 16 lines for the manufacture of PE pipe and 9 lines for the manufacture of PVC pipe.  The agreed-upon price was over $38 million.  Payment terms were 30% down with each Purchase Order, 50% upon delivery and the remaining 20% after commissioning and final acceptance of the equipment by Quanen.  This agreement included a promise by Maplan, BC Extrusion and Battenfeld Germany that they would commission each line to assure that all systems and components met or exceeded the operation requirements of Quanen.  For some of the equipment, Quanen sent its Purchase Orders to Maplan.  For other portions of the equipment (at the instruction of Maplan), Quanen sent its Purchase Orders to Battenfeld China.  It was part of the agreement that the equipment furnished

would be adequate to the specifications provided by Quanen and would produce the kinds of pipe required by Quanen at the output rates Quanen needed.

22.     Throughout these meetings and negotiations, Quanen gave detailed specifications and information to Maplan, BC Extrusion and Battenfeld Germany about the kind of pipe Quanen would need to make to meet the needs of its customers and the outputs and other efficiencies that it would need to achieve in order to operate a viable business.  Maplan, BC Extrusion and Battenfeld Germany repeatedly represented that they could meet and exceed Quanen's requirements in all these areas.

23.     While Quanen advised these companies of the kinds of pipe it needed to fulfill the orders of its customers, the design and manufacture of the extrusion lines were entirely committed to the professional expertise of the Battenfeld Group.  Throughout the period of the negotiations between the parties, representatives of the Battenfeld Group, including representatives and agents of Maplan, BC Extrusion and Battenfeld Germany, repeatedly stated that they would and could competently design and manufacture extrusion lines for the manufacture of PE and PVC pipe that would produce pipe that would meet the specifications provided by Quanen.

24.     Quanen is informed and believes, and thereon alleges, that during the negotiations for the acquisition of the extruders the Battenfeld Group decided that they would manufacture some parts for the subject extrusion lines in the European Union and/or the United States and some parts (the more basic parts) in China.  The parts would then be shipped to Quanen's plant in Langfang for assembly and integration.  The Group requested Quanen to split its Purchase Orders between Maplan and Battenfeld China.  Quanen consented to this request in reliance on the repeated statements by representatives of Maplan, BC Extrusion and Battenfeld Germany

that splitting the design and manufacture of the desired extrusion lines across China, the United States, and Europe would not affect quality and would meet the specifications provided by Quanen.

25.     This was entirely the decision of Maplan, BC Extrusion and Battenfeld Germany but it led to serious problems.  To begin with, because the extrusion lines were never assembled and integrated before shipment, the pre-testing in the manufacturer's plant—which is standard practice for equipment of this kind—was never done.  The various parts were shipped to Langfang for assembly at Quanen's plant.  But the technicians of Maplan, BC Extrusion and Battenfeld Germany had numerous difficulties integrating the parts for the various lines, causing substantial delay.  The problem was exacerbated by the fact that, as the Group later acknowledged, some of the parts made in China as a cost-cutting move malfunctioned or did not work as intended, creating additional delays.

26.     On information and belief, the Battenfeld Group had never before built extrusion lines consisting of parts made at multiple facilities, where they would be unable to test the completed lines at their plant before installation at the customer's facility and where they would have to integrate the various components, manufactured in different countries, at the customer's plant.

27.     With significant participation by Maplan, BC Extrusion and Battenfeld Germany, the Battenfeld Group installed the PE lines first, beginning in 2013.  The PVC lines were shipped beginning in March 2014.  For each line that was assembled and installed, there was a commissioning process—the process by which equipment is tested in the buyer's plant to verify that it meets the buyer's objectives and specifications.

28.     The commissioning process for all the subject lines was plagued with serious problems.  It soon became apparent that there were a host of problems with the design of the PE and the PVC lines and their related equipment, systems and features.  These design flaws included problems with the sizing sleeve, saw design errors, puller design issues, cooling system issues and gearbox leakage, among others.  Instead of acknowledging these problems and taking steps to correct them, Maplan, BC Extrusion and Battenfeld Germany denied that there was a problem, made excuses and were non-responsive.

29.     From 2013 forward, Quanen's representatives tried to work with the technical support teams of Maplan, BC Extrusion and Battenfeld Germany to resolve these issues.  There were calls, emails and numerous face-to-face meetings.  Representatives of Maplan and Battenfeld Germany, as well as BC Extrusion, went to Quanen's Langfang plant to attempt to resolve the issues.  Quanen patiently worked with the support personnel at Maplan and Battenfeld Germany on numerous equipment trials, generating substantial amounts of scrap material and a host of other costs, including labor costs, resulting from the poor equipment design.  But Maplan, BC Extrusion and the Battenfeld Group, even when they acknowledged a problem, were unable to resolve the issues caused by their defective equipment.

30.     The problems persisted well into 2015.  Accordingly, representatives of Quanen, BC Extrusion and Battenfeld Germany met in China in May 2015 to attempt to set a schedule for the remediation and repair of the extrusion lines so that they could be commissioned and then finally accepted by Quanen.  The result of this meeting was a written agreement memorialized in an Agreement Summary dated May 27, 2015.  Quanen, Maplan and BC Extrusion were parties to this agreement.  The Agreement Summary committed Maplan and BC Extrusion to make the necessary repairs and remediation so that the PE lines and the PVC lines could be commissioned

by certain set dates in the future.  Third-party defendant Gerold Schley signed the Agreement

Summary on behalf of BC Extrusion.

31.     Maplan and BC Extrusion failed to honor these commitments and failed to repair

or otherwise remediate the defective equipment.

32.     By their conduct from 2013 through and including May 2015 (and thereafter) in

assuring Quanen that they had the capacity, ability and know-how to repair or replace the

extrusion lines and bring them up to meet the requirements and specifications they had promised

to meet, and that they could and would do so, each of Maplan, BC Extrusion, and Battenfeld

Germany affirmatively induced Quanen not to take legal action but to give these companies and

their technical staffs additional time to make repairs—repairs that were never successfully

completed.  When he became President and CEO of BC Extrusion in or about January 2015, Mr.

Schley adopted the same tactic, repeatedly assuring Quanen that Maplan, BC Extrusion, and

Battenfeld Germany had the capacity, ability and know-how to repair or replace the defective

equipment so as to meet the output rates, efficiencies, and other specifications required by

Quanen.  Mr. Schley's statements induced Quanen not to take legal action but to give Maplan,

BC Extrusion, and Battenfeld Germany more time to make good on their promises.

33.     To this day, the PE lines remain plagued with problems that frequently require

workarounds and that often cause shut-downs and other delays, generating substantial additional

costs for Quanen, posing safety concerns at the plant and jeopardizing its relationship with its

customers.

34.     The PVC lines have posed an even more serious set of issues.  These nine lines

suffer from numerous design problems.  There is a design flaw with the screw and barrel system.

There is a design flaw with the saw design. The vacuum tank inlet filter cannot be replaced

without stopping the line.  The sizing sleeves make it impossible to produce pipe in the required

sizes.  Quanen is still doing a significant amount of work (work that Maplan, BC Extrusion and

Battenfeld Germany should have done) to modify the tooling and downstream equipment in

order to make the lines functional.

  35. There is also a serious design problem with the co-extrusion design for PVC lines

1 and 4.  There is significant doubt that these defective lines can ever be made operational so as

to approach the promised output of more than 2 metric tons per hour.  The lower output speeds

continue to create a significant risk of production of off-spec product.

  36. The defective equipment supplied by Maplan, BC Extrusion and Battenfeld

Germany companies has caused enormous disruption in Quanen's business relationships.  As just

one example, one of Quanen's largest customers is the Chinese government's "South-to-North

Water Diversion Project."  The Chinese government ordered 13,123 meters of 1200 mm

diameter PVC pipe for that project.  Quanen produced the pipe on one of the Battenfeld Group's

extrusion lines.  When the pipe was given pressure tests on the jobsite, the pipe exploded on two

occasions (May 18, 2015 and July 23, 2015), almost injuring the nearby workers.  The cross-

section of the broken pipe reflected poor polymerization because of faulty machine design by

Maplan, BC Extrusion and Battenfeld Germany.  The customer rejected all of the pipe, causing

considerable additional cost to Quanen in excess of $1.5 million.  The cost arose from the fact

that, in order to keep its business commitment to the customer, Quanen had to ship higher-cost

DN1200 PE pipe to replace the failed DN1200 PVC products.  This situation also severely

damaged Quanen's business relationship with this important customer.

  37. Because of these numerous design flaws, Quanen has been unable to fulfill

customer orders, has incurred substantial additional costs, has experienced numerous shut-downs

in the production process and has faced other serious delays in production and difficulties in producing pipe according to customer specifications.  Its reputation in the marketplace has also been seriously affected.

38.     Maplan, BC Extrusion and Battenfeld Germany have now acknowledged that they designed and manufactured the subject extrusion machinery according to United States testing standards instead of China's GB testing standards.  On information and belief, this was likely a major cause of the performance problem of the equipment, since (as Maplan, BC Extrusion and Battenfeld Germany well knew at all times) the equipment was intended for use in a Chinese plant to fabricate pipe for Chinese customers.

## FIRST CLAIM FOR RELIEF

## (BREACH OF CONTRACT—AGREEMENT FOR SALE, DELIVERY AND COMMISSIONING OF EXTRUSION LINES)

## (AGAINST MAPLAN, BC EXTRUSION AND BATTENFELD GERMANY)

39.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 38, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

40.     Quanen had a contractual relationship with Maplan, BC Extrusion and Battenfeld Germany under which Maplan, BC Extrusion and Battenfeld Germany, along with Battenfeld China, would design, manufacture and deliver to Quanen's plant in China 16 lines for the manufacture of PE pipe and 9 lines for the manufacture of PVC pipe according to the specifications provided by Quanen.  This agreement included a promise by Maplan, BC Extrusion and Battenfeld Germany that they would commission each line to assure that all systems and components met or exceeded the operational requirements of Quanen.  The agreed-upon price was over $38 million.  Payment terms were 30% down with each Purchase Order, 50% upon delivery and the remaining 20% after commissioning and final acceptance of the

equipment by Quanen.  It was part of the agreement that the equipment furnished would be adequate to the specifications provided by Quanen and would produce the kinds of pipe required by Quanen at the output rates Quanen needed. The agreement further provided that BC Extrusion, Battenfeld Germany and Maplan would repair or replace any defective equipment.

41.     Quanen performed all of its obligations, covenants and promises under this contract except to the extent its performance was frustrated or excused by the actions of Maplan, BC Extrusion and/or Battenfeld Germany.

42.     Maplan, BC Extrusion and Battenfeld Germany breached this contract by, *inter alia,* inadequately designing, manufacturing and assembling the subject equipment; delivering equipment that, because of numerous design flaws, did not meet the specifications that Maplan, BC Extrusion and Battenfeld Germany had promised the equipment would conform to; repeatedly failing to bring the equipment into conformity with the aforesaid specifications even after repeatedly promising that their technical personnel would remediate the numerous problems; failing to repair or replace defective goods; and failing to commission the lines to assure that all systems and components met or exceeded Quanen's operational requirements.

43.     As a result of these breaches, Quanen has suffered and is continuing to suffer damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

## (BREACH OF CONTRACT—MAY 27, 2015 AGREEMENT)

## (AGAINST MAPLAN AND BC EXTRUSION)

44.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 43, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

45.     On or about May 27, 2015, in China, Quanen entered into an agreement with Maplan and BC Extrusion, memorialized in a writing titled Agreement Summary, under which Maplan and BC Extrusion promised to repair the subject extrusion lines and to commission the lines to assure that all systems and components met or exceeded Quanen's operational requirements.  This was after approximately two years (in the case of the PE lines) and one year (in the case of the PVC lines) in which Quanen experienced multiple problems with the lines and during which Maplan, BC Extrusion and Battenfeld Germany (along with Battenfeld China) made repeated, but unfulfilled, assurances that they could and would repair the lines so they would meet the agreed-upon specifications and be adequate to Quanen's needs.

46.     Quanen performed all of its obligations, covenants and promises under this contract except to the extent its performance was frustrated or excused by the actions of Maplan, BC Extrusion and/or Battenfeld Germany.

47.     Maplan and BC Extrusion breached this agreement by, *inter alia,* failing to make the promised repairs, failing to bring the extrusion lines into conformance with the agreed-upon specifications and failing to commission the lines.

48.     As a result of these breaches, Quanen has suffered and is continuing to suffer damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

### (STRICT LIABILITY)

### (AGAINST MAPLAN, BC EXTRUSION AND BATTENFELD GERMANY)

49.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 48, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

50.     As alleged herein, Maplan, BC Extrusion and Battenfeld Germany designed, manufactured and installed the extrusion lines acquired by Quanen.

51.     Prior to designing, manufacturing and installing the extrusion lines, Maplan, BC Extrusion and Battenfeld Germany had many meetings and discussions with Quanen regarding the type of pipes that Quanen intended to produce with the requested extrusion lines. Thus, Maplan, BC Extrusion and Battenfeld Germany knew how the requested extrusion lines would be used by Quanen.

52.     The extrusion lines that Maplan, BC Extrusion and Battenfeld Germany designed, manufactured and installed were defective and unreasonably dangerous. Not only did the pipe produced by the extrusion lines fail to meet Quanen's requirements and specifications, but, due to their size and the amount of pressure that they would be subjected to, they posed a significant risk of injury, as evident by the explosions that occurred during two different pressure tests.

53.     The defect in the extrusion lines existed at the time Maplan, BC Extrusion and Battenfeld Germany designed, manufactured and installed the lines.

54.     The extrusion lines were expected to reach and did reach Quanen's control without substantial change in the condition in which they were designed, manufactured and installed.

55.     The defect in the extrusion lines directly and proximately damaged other property of Quanen's, namely, the pipe that the extrusion lines produced, by rendering such property defective.

56.     As a direct and proximate result of the extrusion lines rendering Quanen's other property defective, Quanen had to replace such property, which cost Quanen over $1.5 million.

## FOURTH CLAIM FOR RELIEF

## (NEGLIGENCE)

## (AGAINST MAPLAN, BC EXTRUSION AND BATTENFELD GERMANY)

57.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 56, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

58.     JM Eagle, whose President and CEO is Quanen's Chairman, has a long-standing business relationship with the Battenfeld Group, including BC Extrusion, Battenfeld Germany and Maplan. As such, JM Eagle and, by extension, Quanen, relied upon the Battenfeld Group's superior expertise and knowledge in the design, manufacture, and installation of extrusion equipment. The Battenfeld Group was well aware of Quanen's reliance on the Group's superior expertise and knowledge as a result of the preexisting relationship and prior reliance by JM Eagle. The Battenfeld Group touted that relationship and its superior knowledge and professional expertise, thus creating a duty of care owed by Maplan, BC Extrusion, and Battenfeld Germany to Quanen in the design, manufacture, and installation of extrusion equipment, which existed prior to and separate and apart from Quanen's entering into any agreements for the design, manufacture, and installation of extrusion equipment in China, and on which Quanen relied in entering into such agreements.

59.     As alleged herein, Maplan, BC Extrusion and Battenfeld Germany designed, manufactured and installed the extrusion lines in Quanen's factory in China.

60.     Maplan, BC Extrusion and Battenfeld Germany breached their duty of care to Quanen, and were negligent in their design, manufacture and installation of the extrusion lines in Quanen's factory in China, in that the lines failed to create pipe that met Quanen's requirements and specifications.

61.     Maplan, BC Extrusion and Battenfeld Germany's negligence directly and proximately damaged other property of Quanen's, namely, the pipe that the extrusion lines produced, by rendering such property defective.

62.     As a direct and proximate result of the extrusion lines rendering Quanen's other property defective, Quanen had to replace such property, which cost Quanen over $1.5 million.

## FIFTH CLAIM FOR RELIEF

## (BREACH OF EXPRESS OR IMPLIED WARRANTY

## FOR A PARTICULAR PURPOSE)

## (AGAINST MAPLAN, BC EXTRUSION AND BATTENFELD GERMANY)

63.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 62, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

64.     Quanen acquired the extrusion lines and related equipment and features from Maplan, BC Extrusion and Battenfeld Germany.

65.     At the time Quanen acquired the extrusion lines from the aforesaid companies, they knew or had reason to know that Quanen intended to use the product for a particular purpose.  Executives and personnel from several of the Battenfeld Group's companies, including specifically Maplan, BC Extrusion and Battenfeld Germany, participated in multiple meetings and/or calls over a series of weeks and months to learn of Quanen's needs and plans for its manufacturing facility in China.  These executives and personnel met with Quanen's personnel in Los Angeles and in China to gather information necessary to provide the service and equipment that Quanen needed to meet its goals in its China facility.

66.     At the time of acquisition, Maplan, BC Extrusion and Battenfeld Germany knew or had reason to know that Quanen was relying on their skill and judgment to design, manufacture and install extrusion lines and related features that were suitable for the particular

purposes described by Quanen in its multiple meetings and other contacts with the executives

and personnel from the aforesaid companies.

67.     Quanen justifiably relied on the skill and judgment of Maplan, BC Extrusion and

Battenfeld Germany because those companies held themselves out as leading designers,

manufacturers, servicers and installers of extrusion equipment and related systems.

68.     As alleged herein, the extrusion lines and related systems were and are not

suitable for the particular purpose discussed by and between Quanen and Maplan, BC Extrusion

and Battenfeld Germany.  All of the lines designed, manufactured, and installed by those

companies failed to meet the requirements and specifications as discussed between Quanen and

those companies, as described by Quanen to those companies and as represented by those

companies as necessary to meet Quanen's needs.  Many of the extrusion lines do not produce any

pipe at all, let alone pipe of the quality and/or with the speed and efficiency necessary.

69.     Quanen took reasonable steps to notify Maplan, BC Extrusion and Battenfeld

Germany within a reasonable time that the extrusion lines were not operating properly and were

not suitable for the particular purpose for which they were purchased.  Quanen informed those

companies on multiple occasions of the defective nature of the extrusion lines and provided them

with ample opportunity to repair and otherwise remedy the numerous issues relating to those

defects.  They were unable and unwilling to fix, repair or otherwise remedy the extrusion lines

and related equipment and systems.

70.     As a result the failure by Maplan, BC Extrusion and Battenfeld Germany to

design, manufacture and install extrusion lines and related systems that were fit for the particular

purpose for which Quanen intended to use them and which Maplan, BC Extrusion and Battenfeld

Germany knew well, Quanen has been injured and harmed in an amount to be proven at trial.

71.     The failure by Maplan, BC Extrusion and Battenfeld Germany to design, manufacture and install extrusion lines that were fit for the particular purpose for which Quanen intended to use them was a substantial factor in causing Quanen's harm.

72.     To the extent Maplan, BC Extrusion and Battenfeld attempted to disclaim express or implied warranties and limit damages flowing from breach of those warranties by substituting a limited warranty and a repair and replace remedy, such attempt failed because, under the multi-language and multi-cultural circumstances, the disclaimer was not conspicuous, and the limited remedy of repair and replace failed of its essential purpose.  Their promise and assurances of repair were illusory, and their failure to repair or replace their defective products deprived Quanen of the substantial value of its bargain.

## SIXTH CLAIM FOR RELIEF

## (BREACH OF EXPRESS OR IMPLIED WARRANTY

## OF MERCHANTABILITY)

## (AGAINST MAPLAN, BC EXTRUSION AND BATTENFELD GERMANY)

73.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 72, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

74.     Quanen acquired the extrusion lines and related systems from Maplan, BC Extrusion and Battenfeld Germany.

75.     At the time of purchase, Maplan, BC Extrusion and Battenfeld Germany were in the business of designing, manufacturing, installing and selling extrusion lines and related systems and held themselves out as having special knowledge or skill regarding these goods.

76.     At the time Quanen acquired the extrusion lines, Maplan, BC Extrusion and Battenfeld Germany knew or had reason to know that Quanen intended to use the product for a particular purpose.  Executives and personnel from several of the companies in the Battenfeld

Group, including Maplan, BC Extrusion and Battenfeld Germany, participated in multiple meetings and other contacts over a series of weeks and months to learn of Quanen's needs and plans for its manufacturing facility in China.  These executives and personnel met with Quanen's personnel in Los Angeles and in China to gather information necessary to provide the service and equipment that Quanen needed to meet its goals in its China facility.

77.     Quanen justifiably relied on the skill and judgment of Maplan, BC Extrusion and Battenfeld Germany as those companies held themselves out as among the leading designers, manufacturers, servicers and installers of extrusion manufacturing equipment and related systems and controls.

78.     After the acquisition of the equipment, Quanen learned that the extrusion lines were not of the same quality as those generally acceptable in the trade.

79.     As alleged herein, all of the lines designed, manufactured and installed by Maplan, BC Extrusion and Battenfeld Germany failed to meet the requirements and specifications as discussed between Quanen and those companies, as described by Quanen to those companies and as represented by those companies as necessary to meet Quanen's needs. These lines have been plagued with problems and do not produce pipe of the quality and/or with the speed and efficiency necessary.

80.     Quanen took reasonable steps to notify Maplan, BC Extrusion and Battenfeld Germany within a reasonable time that the extrusion lines were not operating properly and were not suitable for the particular purpose for which they were purchased but these companies were unable or unwilling to fix, repair or otherwise remedy the extrusion lines and related issues.

81.    As a result of the failure by Maplan, BC Extrusion and Battenfeld Germany to design, manufacture and install extrusion lines that were merchantable, Quanen has been injured and harmed in an amount to be proven at trial.

82.    The above-alleged failure to design, manufacture and install extrusion lines that were merchantable and generally acceptable in the trade was a substantial factor in causing Quanen's harm.

83.    To the extent Maplan, BC Extrusion and Battenfeld attempted to disclaim express or implied warranties and limit damages flowing from breach of those warranties by substituting a limited warranty and a repair and replace remedy, such attempt failed because, under the multi-language and multi-cultural circumstances, the disclaimer was not conspicuous, and the limited remedy of repair and replace failed of its essential purpose.  Their promise and assurances of repair were illusory, and their failure to repair or replace their defective products deprived Quanen of the substantial value of its bargain.

## SEVENTH CLAIM FOR RELIEF

## (INTENTIONAL MISREPRESENTATION)

## (AGAINST MAPLAN, BC EXTRUSION, BATTENFELD GERMANY AND MR. SCHLEY)

84.    Quanen incorporates by reference each of the allegations in paragraphs 1 through 83, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

85.    Beginning in or about July 2011 and continuing through at least May of 2015, representatives of Maplan, BC Extrusion and Battenfeld Germany (including Kurt Waldhauer and Grant Flaharty of Maplan, Juergen Arnold and (after January 1, 2015) Gerold Schley of BC Extrusion and Henning Stieglitz of Battenfeld Germany and subsequently of BC Extrusion) represented to Quanen (through its President Franco An and others) that they and the Battenfeld

Group had the skill and experience necessary to design, manufacture, service and install the extrusion lines and related equipment and systems that they knew or should have known Quanen needed to operate  its pipe-making facility in China.  The parties had multiple meetings and other communications and contacts involving executives and personnel from many of the Battenfeld Group's companies, including Maplan, BC Extrusion and Battenfeld Germany, and Quanen in which it was made clear what the specifications and requirements were for Quanen's pipe-making facility in China.  Maplan, BC Extrusion and Battenfeld Germany represented that they could meet and exceed Quanen's requirements.  These representations were made (among other occasions) by BC Extrusion and Maplan at the meeting in Los Angeles of August 24, 2012 and by BC Extrusion, Maplan and Battenfeld Germany in China in early September 2012.  On both those occasions, these representations were made to Franco An and others at Quanen.  After the delivery of the PE lines in 2013 and the PVC lines in 2014, and after it became clear that the extrusion lines did not perform as promised and were not remotely in conformity with the specifications agreed upon, these representatives continued to assure Quanen that they could and would repair the lines so that they produced pipe of the quality and at the speeds that had been promised.

86.     In fact, none of Maplan, BC Extrusion or Battenfeld Germany had the experience and skill necessary to meet or exceed Quanen's requirements.  On information and belief, none of these companies had ever designed, manufactured, installed or serviced extrusion lines like those required by Quanen in terms of size and efficiency.  In addition, none of these companies had ever built extrusion lines consisting of parts made at multiple facilities, where none of Maplan, BC Extrusion or Battenfeld Germany would be able to test the completed lines at their plants before installation in the customer's facility and where Maplan, BC Extrusion and

Battenfeld Germany would have to integrate the various components, manufactured in different locations, at the customer's plant.  None of Maplan, BC Extrusion or Battenfeld Germany disclosed to Quanen that neither they nor the Group had ever before built lines like those required by Quanen.  Similarly, after delivery of the extrusion lines to Quanen, none of these representatives disclosed that they did not have the knowledge or expertise necessary to bring the equipment into minimally acceptable condition.

87.     Subsequently, in May of 2015 and the months leading up thereto, after Quanen experienced severe difficulties with the extrusion equipment, representatives of each of Maplan, BC Extrusion and Battenfeld Germany represented to Quanen that they could and would repair the equipment so that it operated properly and that they would properly commission the multiple extrusion lines not yet commissioned so that they would be ready to produce good pipe.  These representations were made at Langfang's plant in China and/or in contemporaneous telephone calls and emails by, among others, Kurt Waldhauer and Grant Flaharty of Maplan, Mr. Schley of BC Extrusion and Henning Stieglitz and the engineering staff of Battenfeld Germany.  These representations were made to Franco An and others at Quanen.

88.     On information and belief, the representatives of Maplan, BC Extrusion and Battenfeld Germany knew that these representations were false when they made them and/or that the representations were made recklessly and without regard for their truth.  Because none of Maplan, BC Extrusion or Battenfeld Germany had ever designed, manufactured, installed or serviced extrusion lines and related systems like those they intended to develop for Quanen, they knew that any representation that they or the Group could design, manufacture, install or service such equipment was false or reckless and made without regard for its truth.  They also knew at the time these representations were made that they and the Group would not be able to test the

extrusion lines, as was their customary practice, before installing them in the customer's facility

and without knowing whether or not they would actually perform as required by Quanen.  After

installation of the equipment and the appearance of numerous design flaws and other problems

that made the extrusion lines virtually inoperable, these representatives knew that they did not

have the capability to correct the many problems with these lines so that they would operate as

promised.  On information and belief, in connection with the representations made in May 2015

and the months leading up thereto, Mr. Schley knew that his representations about repairing the

extrusion lines and commissioning them by dates certain were false and/or that the

representations were made recklessly and without regard for their truth.

89.     As alleged herein, Maplan, BC Extrusion, Battenfeld Germany and Mr. Schley

intended that Quanen rely on their representations.  They knew that Quanen would have no way

to test whether the representations were true until the extrusion lines and related systems were

actually installed and operating in Quanen's China facility or (in the case of the representations

in May 2015 and the months leading up thereto) until Maplan, BC Extrusion and Battenfeld

Germany proved unable to commission the lines as promised.

90.     Quanen reasonably relied on the aforesaid representations.  As alleged herein, the

Battenfeld Group and Maplan, BC Extrusion and Battenfeld Germany hold themselves out as

experts in the field of manufacturing, designing, installing and servicing extrusion lines of the

type required by Quanen and represented to Quanen on numerous occasions that the lines were

capable of performing as required by Quanen.  Mr. Schley echoed these representations after he

became President and CEO of BC Extrusion in January 2015.

91.     As a direct and proximate result of these representations and Quanen's reasonable reliance thereon, Quanen has been injured and damaged in a manner and amount to be proven at trial.

92.     Quanen's reliance on these representations was a substantial factor in causing Quanen's harm and injuries.

93.     On information and belief, the above-alleged conduct of Maplan, BC Extrusion, Battenfeld Germany and Mr. Schley was intentional, willful, wanton, and was undertaken with oppression, fraud and malice, and was authorized by a director, officer or managing agent of each company, in that each of Maplan, BC Extrusion, Battenfeld Germany and Mr. Schley knew that its/his representations were false but made them regardless in order to secure a lucrative contract, so as to justify an award of exemplary and punitive damages.

## EIGHTH CLAIM FOR RELIEF

## (NEGLIGENT MISREPRESENTATION)

## (AGAINST MAPLAN, BC EXTRUSION, BATTENFELD GERMANY AND MR. SCHLEY)

94.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 93, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

95.     The Battenfeld Group, including Maplan, BC Extrusion and Battenfeld Germany, represented to Quanen that they had the skill and experience necessary to design, manufacture, service and install the extrusion lines that the Group and Maplan, BC Extrusion and Battenfeld Germany knew or should have known Quanen needed to operate its pipe-making facility in China.  The parties had multiple meetings and other communications and contacts involving executives and personnel from each of Maplan, BC Extrusion and Battenfeld Germany and Quanen in which it was made clear what the specifications and requirements were for Quanen's

pipe-making facility in China.  The Group and Maplan, BC Extrusion and Battenfeld Germany represented that they could meet and exceed Quanen's requirements.  Subsequently, after the PE lines and PVC lines were installed, and to and including the meeting in China in May of 2015 (and continuing thereafter), representatives of each of Maplan, BC Extrusion and Battenfeld Germany represented to Quanen that they could and would repair the defective equipment so that the subject extrusion lines could make good pipe.  In May of 2015, Mr. Schley represented to Mr. An and others at Quanen that the Group's personnel could and would make the necessary repairs and could and would commission the lines as promised.

96.     In fact, none of Maplan, BC Extrusion or Battenfeld Germany had the experience and skill necessary to meet or exceed Quanen's requirements.  On information and belief, none of Maplan, BC Extrusion or Battenfeld Germany had ever built extrusion lines and related systems like those required by Quanen in terms of size and efficiency.  In addition, none of Maplan, BC Extrusion or Battenfeld Germany had ever built extrusion lines consisting of parts made at multiple facilities, where they would be unable to test the completed lines at their plant before installation in the customer's facility and where they would have to integrate the various components, manufactured in different locations, at the customer's plant.  None of Maplan, BC Extrusion or Battenfeld Germany ever disclosed to Quanen that they had never before built lines and related systems like those required by Quanen.  When he became President and CEO of BC Extrusion in January 2015, Mr. Schley also failed to make any such disclosure.

97.     Each of Maplan, BC Extrusion, Battenfeld Germany and Mr. Schley may have honestly believed that these representations were true, but because none of the Group's companies had ever made extrusion lines like those required by Quanen, they had no reasonable grounds for believing these representations were true when they made them.

98.     Each of Maplan, BC Extrusion, Battenfeld Germany and Mr. Schley failed to exercise reasonable care or competence in obtaining or communicating their false representations.

99.     As alleged herein, Quanen was the party for whose benefit and guidance the false representations were supplied; each of Maplan, BC Extrusion, Battenfeld Germany and Mr. Schley intended that Quanen rely on its/his representations and knew that Quanen would have no way to test whether the representations were true.

100.    Quanen reasonably relied on these representations in entering into and was induced by the false representations to enter into the various agreements with Maplan, BC Extrusion, and Battenfeld Germany.  As alleged herein, Maplan, BC Extrusion and Battenfeld Germany hold themselves out as experts in the field of manufacturing, designing, installing and servicing extrusion lines and related systems of the type required by Quanen and each of these companies represented to Quanen on numerous occasions that they were capable of performing as required by Quanen.

101.    As a direct and proximate result of the aforesaid representations and Quanen's reasonable reliance thereon, Quanen has been injured and damaged in a manner and amount to be proven at trial.

102.    Quanen's reliance on the aforesaid representations was a substantial factor in causing Quanen's harm and injuries.

## NINTH CLAIM FOR RELIEF

## (PROMISSORY ESTOPPEL)

## (AGAINST MAPLAN, BC EXTRUSION, BATTENFELD GERMANY AND MR. SCHLEY)

103.    Quanen incorporates by reference each of the allegations in paragraphs 1 through 102, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

104.    From 2013 through and including May 2015 (and thereafter), Maplan, BC Extrusion, and Battenfeld Germany assured Quanen that they had the capacity, ability and know-how to repair or replace the extrusion lines and bring them up to the requirements and specifications of Quanen that they had promised.  After he became President and CEO of BC Extrusion in or about January 2015, Mr. Schley adopted the same tactic, repeatedly assuring Quanen that Maplan, BC Extrusion, and Battenfeld Germany had the capacity, ability and know-how to repair or replace the defective equipment so as to bring it within the promised requirements and specifications.  Maplan, BC Extrusion, Battenfeld Germany, and Mr. Schley intended for and expected that Quanen would rely upon their repeated promises and assurances.

105.    Quanen did in fact reasonably rely upon Maplan, BC Extrusion, Battenfeld Germany, and Mr. Schley's promises and assurances.

106.    As a result of its reliance, Quanen was damaged.  Not only did Quanen refrain from taking immediate legal action or pursuing other possible remedies, but, as Quanen patiently worked with the support personnel at Maplan and Battenfeld Germany on numerous equipment trials, substantial amounts of scrap material were generated and a host of other costs, including labor costs, were incurred.

## TENTH CLAIM FOR RELIEF

## (EQUITABLE CONTRIBUTION)

## (AGAINST BC EXTRUSION AND BATTENFELD GERMANY)

107.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 106, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

108.     Quanen denies liability for any of the damages alleged by Maplan in its Complaint.  If, however, Quanen is adjudged liable to Maplan for any such damages, then as a matter of equity, because any such damages were brought about in whole or in part by the actions of BC Extrusion and/or Battenfeld Germany, BC Extrusion and Battenfeld Germany are liable to Quanen for all or part of any such damages, as may be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

## (COMPARATIVE FAULT)

## (AGAINST BC EXTRUSION AND BATTENFELD GERMANY)

109.     Quanen incorporates by reference each of the allegations in paragraphs 1 through 108, inclusive, of this Counterclaim and Third-Party Complaint as though fully set forth herein.

110.     Quanen denies liability for any of the damages alleged by Maplan in its Complaint.  If, however, Maplan sustains a claim for any such damages, then under K.S.A. 60-258a, because any such damages were brought about in whole or in part by the actions of BC Extrusion and/or Battenfeld Germany, BC Extrusion and Battenfeld Germany are liable for all or part of any such damages, as may be determined at trial, and their liability for damages should be apportioned according to their degree of fault.

## DEMAND FOR JURY TRIAL

Quanen demands trial by jury on all issues so triable by law.

## PRAYER FOR RELIEF

WHEREFORE, Quanen prays for a judgment against defendants in an amount in excess of $75,000, including interest, costs, attorneys' fees to the extent allowed by law; for judgment for punitive damages as allowed by law against Maplan, BC Extrusion, Battenfeld Germany, and Mr. Schley pursuant to the Seventh Claim for Relief; and for such other relief as the Court deems just and equitable.

Dated: December 13, 2017                     RESPECTFULLY SUBMITTED,

                                             /s/ *Gary L. Ayers*
                                             Gary L. Ayers (KS SC# 10345)
                                             **FOULSTON SIEFKIN, LLP**
                                             1551 N. Waterfront Parkway, Suite 100
                                             Wichita, KS  67206-4466
                                             (316) 291-9530
                                             (866) 346-1938 (Facsimile)
                                             gayers@foulston.com

                                                     - and -

                                             /s/ *Frederick D. Friedman*
                                             Frederick D. Friedman (CA SBN 73620)
                                             **JONES DAY**
                                             555 South Flower Street, 50th Floor
                                             Los Angeles, CA  90071
                                             (213) 489-3939
                                             (213) 243-2539 (Facsimile)
                                             ffriedman@jonesday.com

                                             Attorneys for Defendant, Counterclaim
                                             Plaintiff and Third-Party Plaintiff HEBEI
                                             QUANEN HIGH-TECH PIPING CO., LTD.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of December, 2017, I presented the foregoing to the Clerk of the Court by electronic transmission for filing with the Court, which will send notice of electronic filing to all counsel of record.

By: /s/ *Gary L. Ayers*
       Gary L. Ayers