# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

AMERICAN MAPLAN CORPORATION,
  d/b/a Battenfeld-Cincinnati USA,

       Plaintiff,

       vs.                         Case No. 17-1075-JTM

HEIBEI QUANEN HIGH-TECH PIPING CO.,
LTD.; J-M MANUFACTURING COMPANY,
INC.; and WALTER WANG ,

       Defendants.


HEIBEI QUANEN HIGH-TECH PIPING CO.,
LTD.;

       Counterclaim Plaintiff,

       vs.

AMERICAN MAPLAN CORPORATION,
  d/b/a Battenfeld-Cincinnati USA,

       Counterclaim Defendant.


HEIBEI QUANEN HIGH-TECH PIPING CO.,
LTD.;

       Third-Party Plaintiff,

       vs.

BC EXTRUSION HOLDING, GmbH,
BATTENFELD-CINCINNATI GERMANY
GMBH, and GEROLD SCHLEY,

       Third-Party Defendants.


## MEMORANDUM AND ORDER

American Maplan Corporation, doing Business as Battenfeld-Cincinnati USA, makes equipment used to extrude plastic pipe. Beginning in 2012, Maplan entered into an arrangement to supply pipe extrusion machines to Hebei Quanen High-Tech Piping Company, together with the Quanen subsidiary J-M Eagle, for use at Quanen's plants in China. Maplan began to deliver and install the equipment in 2013.

Alleging that they refused to pay for the delivered equipment, Maplan brought the present action against Quanen, Eagle, and their leader Walter Wang on March 30, 2017, raising clams for breach of contract, breach of implied covenant of good faith, conversion, unjust enrichment, intentional interference, and fraud. The defendants moved to dismiss the action for lack of personal jurisdiction. The court denied the motion on November 21, 2017. (Dkt. 50).

Defendants filed their Answer to the Complaint on December 13, 2017 (Dkt. 53), including counterclaims against Maplan, and advancing a third-party complaint against other Battenfeld entities — BC Extrusion Holding GmbH, Battenfeld-Cincinnati Germany GmbH, and Gerold Schley (President and CEO of BC Extrusion). The defendants advance claims for (1) breach of the original contract, (2) breach of a May 27, 2015 agreement intended to resolve issues arising from the installed equipment, (3) strict liability, (4) negligence, (5) breach of express or implied warranty of fitness for a particular purpose, (6) breach of express or implied warranty of merchantability, (7) intentional misrepresentation, (8) negligent misrepresentation, and (9) promissory estoppel.

The plaintiff has moved to dismiss the seven of the nine counterclaims as time-

barred and as otherwise precluded by Kansas law. (Dkt. 69). The third-party defendants join in these arguments, as well as arguing the court lacks jurisdiction.(Dkt. 71). For the reasons provided herein, the court finds that the motions to dismiss should be granted, with the exception of the claim for intentional misrepresentation clam against Maplan.

Plaintiff Maplan's Motion

In its motion, Maplan argues that five of the counterclaims (strict liability, negligence, intentional misrepresentation, negligent misrepresentation, and promissory estoppel) are time-barred because they were not brought within two years of the accrual of the relevant cause of action, as required under Kansas law. *See* K.S.A. 60-513(a)(4) (two year limitation for any "action for injury to the rights of another, not arising on contract"). The face of the defendant Quanen's Answer and Counterclaim presents substantial support for this argument.

As noted earlier, the defendant's Answer was filed December 13, 2017. Accordingly, Quanen cannot recover under its various tort or warranty for injuries sustained prior to December 13, 2015. Yet the Answer also makes plain that Quanen knew of substantial problems with the pipe extrusion equipment before this time. The Answer alleges:

> The commissioning process for all the subject lines was plagued with serious problems. *It soon became apparent* that there were a host of problems with the design of the PE and the PVC lines and their related equipment, systems and features. These design flaws included problems with the sizing sleeve, saw design errors, puller design issues, cooling system issues and gearbox leakage, among others. Instead of acknowledging these problems and taking steps to correct them, Maplan, BC Extrusion and Battenfeld Germany denied

that there was a problem, made excuses and were non-responsive.

(Dkt. 53, ¶ 28) (emphasis added).

The Answer and Counterclaim alleges that this commissioning process began shortly after the equipment was assembled and installed in China, which commenced after the equipment was shipped "beginning in March 2014." (*Id.* at ¶ 27).

The Answer and Counterclaim thus alleges that the equipment was not only flawed but that these flaws were manifest and obvious more than two years before presenting its counterclaims.

In its response to the motion to dismiss, Quanen does not argue that its causes of action for strict liability, negligence, or breach of warranty were not ripe until after December 13, 2015. Rather, it argues that Maplan should be equitably estopped from presenting the statute of limitations defense as to those claims. It also argues that its misrepresentation and promissory estoppel claims were triggered only after fully learning that Maplan's various representations were untrue. In both cases, Quanen focuses on a series of representations by Maplan which supposedly lulled Quanen into not suing or in concealing the extent of the injury.

The Answer and Counterclaim itself provides little in the way of support for these contentions, other than the most conclusory of statements. It does allege that Maplan represented that it "had the capacity, ability, and know-how to repair or replace the extrusion lines and bring them up to the requirements and specifications of Quanen that it had promised." (Dkt. 53, ¶ 104). The defendant allegedly "induced Quanen not to take

legal action but to give [them] and their technical staffs additional time to make repairs." (Id. at ¶ 32). After discovering the alleged problems with the equipment, Quanen consulted with Maplan and the parties entered into a schedule in May 2015 "for the remediation and repair of the extrusion lines." (*Id*. at ¶ 30).

In particular, Quanen relies upon the following passage from the Answer and Counterclaim:

> By their conduct from 2013 through and including May 2015 (and thereafter) in assuring Quanen that they had the capacity, ability and know-how to repair or replace the extrusion lines and bring them up to meet the requirements and specifications they had promised to meet, and that they could and would do so, each of Maplan, BC Extrusion, and Battenfeld Germany affirmatively induced Quanen not to take legal action but to give these companies and their technical staffs additional time to make repairs — repairs that were never successfully completed.

(*Id*. at ¶ 32. See also ¶¶ 95, 104).

But in context, this "thereafter" language does not fairly allege conduct with the limitations period, that is, after December 13, 2015. The cited allegation is made immediately after asserting that "[t]he problems persisted well into 2015." (Id. at ¶ 30). As the result of their meetings, Quanen and Maplan entered into a May 27, 2015 agreement for Maplan to make repairs so that the equipment could be commissioned "by certain set dates in the future" (id.), but there is no allegation that these set dates were after December, 2015. Indeed, the Answer and Counterclaim itself makes no specific allegation of lulling conduct at any time in 2016.

The Answer and Counterclaim alleges that during testing which occurred as part

of the commissioning process, the Maplan equipment caused two explosions, on May 18, 2015, and July 23, 2015. These events produced no personal injuries. and apparently occurred not during ordinary use but while pipe was being subjected to preliminary high pressure tests. (Dkt. 53, ¶¶ 36, 52).

In relevant passage, the defendants also do not assert damages based on any injury, but instead allege that as a result of these two events, its "customer rejected all of the pipe, causing considerable additional cost to Quanen in excess of $1.5 million," and that the event "damaged Quanen's business relationship with this important customer." (Id. ¶ 36.) The defendants continue, raising other assertions of economic injury. Thus, as a result of the alleged design flaws,

> Quanen has been unable to fulfill customer orders, has incurred substantial additional costs, has experienced numerous shut-downs in the production process and has faced other serious delays in production and difficulties in producing pipe according to customer specifications. Its reputation in the marketplace has also been seriously affected.

(Dkt. 53, ¶ 37).

If the court was presented only with the Answer and Counterclaim itself, it would have little difficulty in concluding that the non-contract claims advanced by Quanen were time-barred. Given the extent of the alleged defects, and their manifest and "apparent[]" nature, those non-contract claims — even couched as promissory estoppel or misrepresentation — had all accrued by mid-2015, six months before the limitations deadline.

But Quanen expressly requests leave to amend the Answer and Counterclaim to add

allegations relating to later events, and Maplan's reply does not address the request.[1]

Specifically, defendants assert that they would further allege that in October of 2015, BC Extrusion was continuing to propose future resolutions to the problems, that these efforts continued in February, 2016, and that Quanen's testing of modified equipment continued into March of 2016. (Resp. at 13-14).

Maplan does argue Quanen was not lulled into inaction because it *did* sue other

---

[1] Under D.Kan.R. 15.1, a party requesting discretionary leave to amend a pleading must "(1) set forth a concise statement of the amendment or leave sought," and "(2) attach the proposed pleading or other document." Quanen's Response includes a factual statement of the allegedly lulling actions by Maplan, but fails to attach any proposed Amended Answer and Counterclaim. Failure to comply with Rule 15.1 renders the request subject to denial without prejudice, *see Tilley v. Maier*, 2011 WL 1102872, *1 (D. Kan. March 23, 2011). Notably, however, Maplan does not invoke Rule 15.1 in its Reply, or otherwise explain how an amendment would be prejudicial.

Under Fed.R.Civ.Pr. 15(a)(2), courts will "freely give leave [to amend] when justice so requires." The decision whether to grant leave to amend is committed to the court's discretion. *Zenith Radio Corp. v. Hazeltine Research,*, 401 U.S. 321, 330 (1971); *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). The court may refuse leave based on "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West*, 3 F.3d 1357, 1365 (10th Cir. 1993) (citations omitted). An amendment is futile "if the complaint, as amended, would be subject to dismissal for any reason." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239–40 (10th Cir. 2001) (citations omitted).

As discussed elsewhere in this opinion, the court finds that Maplan is entitled to dismissal of the Third, Fourth, Fifth, Sixth, Eighth and Ninth Counterclaims, based on the limitation of liability and disclaimer of warranty provisions, and in light of the existing contractual claims.

However, the only grounds offered by Maplan for dismissing the Seventh Counterclaim (intentional misrepresentation) is the contention that it is time-barred. (Dkt. 70, at 6). Because Quanen's proposed claims of tolling present a factual issue as to the timeliness of that claim, and Maplan has failed to demonstrate why the court should refuse amendment, the court will grant leave to amend the Counterclaim as to the intentional misrepresentation claim. Maplan is entitled to dismissal of the remaining claims, and leave to amend as to those is accordingly denied as futile.

Battenfeld entities (but not Battenfeld itself) in California. Maplan suggests that Quanen sued these other entities in California in order to avoid the various defenses Maplan may advance here pursuant to its purchase agreements.

The court finds that a question of fact is presented as to defendant's claims of estoppel. While the California suit might be strong evidence against any lulling, it is not conclusive. The California action was filed on May 24, 2016. A fact-finder could infer some degree of estoppel, or lulling, existed until the spring of 2016, and the December 2017 counterclaims could therefore be timely.

However, the court finds that amendment of the Answer and Counterclaim is not warranted to add estoppel allegations, because the non-contract claims are in any event properly dismissed for other reasons.

First, the court finds that language from the Maplan Purchase Agreements specifically excludes claims for strict liability, negligence, negligent misrepresentation, or promissory estoppel.

The Purchase Agreements first specifically limit the extent of recovery, providing that the purchaser is restricted to elimination of the fault alone. Under the heading "Conditions of delivery and payment," the Maplan Purchase Agreement provides:

**General:**

American Maplan shall not be responsible for any special, indirect, incidental or consequential damages in connection with the performance of the contract.

As discussed between us and agreed upon individually the following will

apply in regard to our liability:

> Any claims of the orderer other than those for elimination of the fault, in particular in respect of damage to property which is not the object of delivery, for loss of profit or any other subsequent indirect or consequential loss or damage, are excluded.

Under the heading "**TERMS AND CONDITIONS GOVERNING ALL SALES**,"

the Purchase Agreement provides as paragraph 5:

> **<u>LIMITED WARRANTY</u>:**
>
> **THIS LIMITED WARRANTY IS EXTENDED IN LIEU OF ALL OTHER WARRANTIES EXPRESS OR IMPLIED (INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE), WRITTEN OR ORAL, OR UNDER THE LAW OF ANY COUNTRY OR STATE OR OTHER JURISDICTION.**
>
> Unless otherwise specified, Maplan warrants goods built by it to be free from defects in material and workmanship under normal use and service for a period of twenty four (24) months from delivery date or twelve (12) months from installation and will repair or replace (at its sole discretion), free of charge, any defective goods during the said period.

Paragraph 6 of the "**TERMS AND CONDITIONS GOVERNING ALL SALES**"

provides:

> **Limitations of Liability:** The parties agree that the buyer's sole and exclusive remedy against Maplan shall be for the correction of the defects as defined in the Limited Warranty clause above. In no event shall Maplan be liable on any claim including, but not limited to, any claim of negligence, breach of performance, breach of terms or conditions, defective design, defective manufacture, strict liability arising from the sale, use, delivery, installation, repair or technical direction or advice concerning Maplan's goods except as to the repair or replacement of defective goods as provided herein. Under no circumstances shall be liable for any loss of use, loss of raw material or any indirect, incidental or consequential damages, including, lost profits.

In response, Quanen argues that the court should give no weight to the sample Purchase Agreement submitted by Maplan because lacks authentication and is not a document essential to its counterclaim, and further, citing K.S.A. 84-2-719, that the exclusionary language has no legal weight because the contract failed as to its "essential purpose." The court finds these arguments are insufficient to modify the explicit agreement between the parties.

Quanen provides no real reason to doubt the authenticity of the Purchase Agreement language. The Agreement is on Maplan letterhead and applies to all sales by the company. It is notable that, notwithstanding its lengthy relationship with Maplan, Quanen has not attempted to offer *any* documentation or purchase agreements which would suggest that this exclusionary language was not used in the transactions in question. The court finds that the Maplan Purchase Agreement, with its incorporated exclusionary language, is sufficiently authenticated for purposes of resolving the motion to dismiss. *See Law Co. v. Mohawk Constr. & Supply*, 577 F.3d. 11654, 1171 (10th Cir. 2009).

Moreover, the court may take account of the Purchase Agreement language because these agreements are central to the present dispute both as to Quanen's first counterclaim for breach of the agreement to sell the extrusion lines (Dkt. 53, ¶ 39-43) ("Quanen had a contractual relationship with Maplan"), and its third-party claim against the German defendants (discussed below), in which Quanen argues that the court has "closely related" jurisdiction over these defendants based on language from the standard Maplan Purchase Agreement.

The claim that the court should refuse to give effect to the exclusionary language because the agreement failed as to an essential purpose is unpersuasive. Section 84-2-719 of the Kansas U.C.C. does provide that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, *remedy may be had as provided in this act* [i.e., the U.C.C.]." (Emphasis added). This simply authorizes the various contract-related U.C.C. remedies, and Quanen indeed has lodged complaints of breach of contract, both as to the original sales agreements and the May 27, 2015 going-forward agreement. The cited provision is not a warrant to advance all sort of tort remedies not otherwise not "provided for" by the U.C.C.

The same result is applicable as to the Purchase Agreement's exclusion of implied warranties. As to this exclusion, Quanen advances the same argument related to a lack of authentication, and failure of essential purpose. The court rejects these arguments for the same reasons identified earlier.

Quanen also argues the disclaimer should have no effect because it was not conspicuous. The court set forth the disclaimer language earlier. In each instance, the bold, underline, and all-capital language is present in the original. The court finds that a reasonably experienced commercial party, reading the Purchase Agreement as a whole, would find that the relevant disclaim is conspicuous.

The court finds that Quanen's promissory estoppel claim is subject to dismissal as well. As noted earlier, Quanen already presents two separate breach of contract claims — that Maplan violated both the original sales contracts and the May 27, 2015 going-forward

Agreement. The promissory estoppel claim in the Answer and Counterclaim (Dkt. 53, at ¶¶ 103-106) is devoid of any specific, nonconclusory allegation that is not present in and duplicative of the allegations made in the underlying breach of contract claims.

Finally, Maplan argues that Quanen's tort-related claims are barred by the economic loss doctrine. Specifically, it asserts the doctrine should bar Quanen's claims for strict liability, negligence, negligent misrepresentation, and breach of warranty. (Dkt. 70, at 17). Under Kansas's economic loss rule, "a plaintiff seeking recovery for economic losses only cannot proceed under theories sounding in tort." *Rand Construction v. Dearborn Mid-West Conveyor*, 944 F. Supp. 2d 1042, 1062 (D. Kan. 2013) The doctrine is "'a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses.'" *David v. Hett*, 293 Kan. 679, 270 P.3d 1102, 1105 (Kan. 2011) (quoting *Indemnity Insurance v. American Aviation*, 891 So. 2d 532, 536 (Fla. 2004)).

The court finds that dismissal, at least as to Quanen's misrepresentation claim, should not be granted on the grounds sought. As a preliminary matter, the court observes that the other counterclaims are independently subject to dismissal in light of the disclaimers and exclusionary language in the Purchase Agreements.

Quanen accurately notes that the Kansas Supreme Court has determined that the economic loss doctrine does not preclude an action for negligent misrepresentation. *See Rinehart v. Morton Bldgs.*, 297 Kan. 926, 305 P.3d 926 (2013). Maplan replies that this is "incorrect" by citing this court's "detailed and well-reasoned opinion" in *Rand*. (Dkt. 87,

at 16). But, of course, however well-reasoned, *Rand* was decided two months before *Rinehart*, and that decision is controlling as to Kansas law.

Further, this court has also observed that the rationale in *Rinehart* "applies equally to fraudulent misrepresentation claims," and accordingly concluded that "fraudulent misrepresentation claims based on a breach of duty by operation of law are not subject to the economic loss doctrine." *Cinema Scene Marketing & Promotions v. Calidant Capital*, 2017 WL 3730475, *4 (D. Kan. Aug. 30, 2017).

The court does find that the economic loss doctrine would preclude Quanen's claims of strict liability and negligence, as well as the warranty claims to the extent these sound in tort. Quanen argues the doctrine should not apply to any of its claims, since the pipe produced by the Maplan equipment is unreasonably dangerous, and cites the two "explosions" of pipe produced by the equipment.

However, there is no substantial allegation that the equipment itself is dangerous, or indeed that the pipe it produces is dangerous in ordinary usage. The two explosions occurred during high-pressure testing of the pipe rather than ordinary usage. There is no indication any person was actually injured in the explosions, or that there is any substantial future risk. To the contrary, as noted earlier, the Counterclaim alleges only economic injuries — both missed sales caused by its inability to use the equipment to produce pipe, and injuries to its reputation. Under these circumstances the court finds that the economic loss doctrine is indeed applicable.

**Third-Party Complaint**

The German defendants (BC Extrusion Holding, Battenfeld Germany, and Gerold Schley) have moved to dismiss the third-party claims brought against them by Quanen, arguing that the court lacks personal jurisdiction over them. They contend that these claims should not be entertained in Kansas, because the facts or alleged facts of the case do not support a finding of either general jurisdiction or specific jurisdiction as to these defendants. In response, Quanen alleges that the facts alleged in the third-party complaint present a sufficient basis for finding either general jurisdiction or specific jurisdiction. Alternatively, Quanen argues that the German defendants should be deemed to be "closely related" to plaintiff Maplan, and bound to the Kansas consent-to-jurisdiction clause contained in the Maplan Purchase Agreements.

The court addressed the issue of personal jurisdiction and the "closely related" doctrine in its Memorandum and Order of November 21, 2017 (Dkt. 50, at 28-30), and that discussion is incorporated here. Application of the relevant law to the circumstances of the present case compels the conclusion that the court lacks jurisdiction over the German defendants.

During the relevant period of the sale and delivery of the pipeline equipment, the German corporate defendants were siblings or cousins of Maplan rather than a parent. Defendants have submitted the following chart to indicate the corporate structure as it existed at the relevant time period, and the court finds no grounds for doubt as to its veracity.



BC Extrusion Holding is a German corporation with a principal place of business in Bad Oeynhausen, Germany. It is organized under the laws of Germany with its registered seat in Germany and with its principal place of business in Bad Oeynhausen, Germany. The company has never maintained an office in Kansas, sold any products or goods in Kansas rented, leased, owned, or used any real or personal property in Kansas; has never contracted to insure or finance any person or property in Kansas, maintained a telephone number or had a directory listing in Kansas, or had any bank account or post office box in Kansas. It has ever been registered to do business or authorized to transact business as a foreign corporation in Kansas. It has never consented to jurisdiction in Kansas. It does not manufacture, distribute, package, ship, or sell any product, including the allegedly defective extrusion equipment that is the focus of this litigation.

BC Extrusion Holding did not enter into any contract with Hebei Quanen or any of its affiliates to sell the extrusion equipment at issue.

BC Extrusion Holding was created in 2007 to manage the financial risks to the battenfeld-cincinnati corporate family; it does not control the day-to-day operations of any affiliate. Gerold Schley has testified that he is "not legally responsible for the legal entities. I'm the manager or the general manager, for the BC Extrusion Holding." He testified that the role of BC Extrusion Holding "is that they manage the financial risks and they are responsible that they are actually financially healthy, the individual companies." Although it manages financial risk, BC Extrusion Holding does not finance any of its affiliates. Final authority for all day-to-day decision-making and signoff belongs to the individual affiliate CEOs.

Battenfeld Germany is a German corporation with a principal place of business in Bad Oeynhausen, Germany. Formerly known as BC Extrusionstechnik GmbH, Battenfeld Germany has always been a German corporation organized under the laws of Germany with a registered seat in Germany and with a principal place of business in Bad Oeynhausen, Germany.

Battenfeld Germany is a stand-alone operations company with its own sales force, engineering, production, and P&L. It is not a parent company to Battenfeld US or Battenfeld China, which are stand-alone, sister companies that are not controlled by Battenfeld Germany.

The company has never rented, leased, owned, or used any real or personal property

in Kansas; has never contracted to insure or finance any person or property in Kansas, maintained a telephone number or had a directory listing in Kansas, or had any bank account or post office box in Kansas. It has never been registered to do business or authorized to transact business as a foreign corporation in Kansas. It has never consented to jurisdiction in Kansas

To the extent Battenfeld Germany employees consult with other affiliates in the battenfeld-cincinnati corporate family to provide equipment, software, engineering, or technical assistance, Battenfeld Germany bills for and receives payments from its affiliates for the fair market value of any such hardware, software, or consulting services.

Battenfeld Germany did provide software to Battenfeld US that was installed in the extrusion equipment at issue and, at the request of Battenfeld US, Battenfeld Germany sent a software technician to Los Angeles in late 2012 or early 2013 to explain the functionality of the computer software.

Battenfeld Germany never licensed its software to Quanen, and never sold any products to it.

Gerold Schley is a citizen and resident of Germany. He has never rented, leased, owned, or used any real or personal property in Kansas; has never contracted to insure or finance any person or property in Kansas; has never maintained a telephone number in Kansas or had a listing in any Kansas telephone directory; and has never had any bank account or post office box in Kansas. Schley has never consented to jurisdiction in Kansas.

Schley joined BC Extrusion Holding as its Chief Executive Officer on

January 1, 2015. He was not part of BC Extrusion Holding at the time of, and played no role in, negotiating and executing the purchase agreements and/or manufacturing, delivering, or installing the extrusion equipment pursuant to those purchase agreements.

While Schley is currently a board member of Battenfeld US, at no point during his employment with BC Extrusion Holding has he controlled or directed the day-to-day operations of Battenfeld US.

In its response to the German defendants' motion to dismiss, Quanen argues that the court has jurisdiction because the Battenfeld entities are a closely-related group of businesses, headed by Industrie Holding Nimbus.

However, this unitary view of the Battenfeld corporate structure finds no support in the circumstances of the case, and Quanen's position is supported by the mere conclusory allegation in the Third-Party Complaint that each Battenfeld entity acted as alter egos for the group.

But the Third-Party Complaint specifically asserts that Quanen entered into the equipment Purchase Agreements with Battenfeld China and Battenfeld US, rather than the German defendants. (Dkt. 53 at 7, 21, 24). Further, Nimbus did not acquire ownership of the Battenfeld group until July 23, 2016 — well after the events underlying Quanen's third-party claims.

The contention that BC Extrusion Holding controlled the day-to-day operations of other entities has been rejected in California state court, after Quanen attempted to advance similar claims against the German defendants in Los Angeles. The court, after granting

leave for Quanen to conduct discovery on the issue of jurisdiction

> f[ound] the contention that BC Extrusion Holding controlled all these entities is not supported by the newly conducted jurisdictional discovery. This contention was firmly repudiated by all the officers of BC Extrusion Holding. The officers testified that BC Extrusion Holding does not control the day to day operations of any affiliate, but, that it is simply a holding company.

*Hebei Quanen High-Tech Piping v. BC Extrusion Holding*, Ruling Defendant, at 6-7 (Los Angeles Sup. Ct., March 27, 2017). The court further determined that BC Extrusion's contacts with Quanen in California were merely incidental to Walter Wang's residence in Los Angeles — the underlying "business transactions ... were to take effect in China." *Id.* at 8. And BC Extrusion "was not a party to the underlying transaction." *Id.*

Other assertions made by Quanen in response to the present motion appear related to the Battenfeld corporate structure as it existed in 2017. Accordingly, these assertions are not relevant to the determination of how the Battenfeld entities operated in the period of 2012-2015.

Quanen relies on deposition testimony to suggest that BC Extrusion Holding did in fact exercise control over Maplan. However, the actual testimony is more circumscribed, indicating that the CEO of the BC Extrusion Holding Company — the entity which is tasked with financial risk management for Battenfeld operating companies — can veto certain transactions to the extent that they present financial risk. But the deponent proceeded to testify that the Extrusion CEO cannot independently direct the operations of any operating company. To the contrary, a major transaction is "always a decision taken by the CEO of the individual company."

Quanen also notes that at one point Battenfeld proposed fielding a Project Implementation Team for the China project, which would have included employees of BC Extrusion and Battenfeld Germany. But the team was never actually implemented, after Quanen's subsidiary objected.

Quanen also claims that Battenfeld Germany "oversaw Maplan's manufacture of the equipment," and "supervised the Kansas production activities."(Dkt. 82, at 16, 24). However, this overstates the cited evidence, which merely indicates that the managing director of Battenfeld Germany had a "coordinating role" among the Battenfeld group. There is no evidence that Battenfeld Germany ever actually did anything in Kansas.

Finally, Quanen notes that in one communication, Schley reported that "we delivered multiple PE and PVC lines to China." The context of the communication, however, precludes giving the phrase any substantial weight. This communication was issued by Schley as the head of the financial entity BC Extrusion Holding, acting as liaison between the Battenfeld group and various creditors. There is nothing in the communication to otherwise suggest or imply that BC Extrusion Holding actually played any role in delivery of the equipment, and all of the other allegations and evidence confirm it did not. Schley affirmatively testified that BC Extrusion Holding does not have any technology that it could sell; those are owned by individual operating companies.

Under these circumstances, it is clear that the court has no general jurisdiction over the German defendants. Such jurisdiction arises if a nonresident's contacts with the forum "are so continuous and systematic as to render them essentially at home in the forum

State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). *See also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

Quanen argues that BC Extrusion Holding is subject to general jurisdiction because it effectively controls plaintiff Maplan. But the present action fails to indicate anything other than the typical sort of communications and relationships inherent in any group of sibling corporate entities; there is no nonconclusory allegation or any evidence of control before the court which would support a finding of general jurisdiction. This court has previously rejected a claim of general jurisdiction premised on corporate affiliation alone. *See Eaves Pirelli Tire*, No. 13-1271-SAC, 2014 U.S. Dist. LEXIS 64866, at *18-28 (D. Kan. May 12, 2014). *See also Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (observing that corporate structures are presumptively valid and that a corporate parent must be "treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity").

The court further finds that the German defendants do not have sufficient contacts with Kansas for this court to subject them to specific personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (nonresident's contacts with forum so extensive can anticipate appearing in court there); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Such jurisdiction may arise if a nonresident has "purposefully directed" its activities towards forum residents, and the injuries of the opposing party arose from those activities. *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir.2013). Such purposeful availment arises when a

defendant (1) takes an intentional action, (2) which was expressly aimed at the forum state, (3) while knowing that the brunt of the injury would be felt in the forum state. *Dudnikov v. Chalk & Vermillion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Here, Quanen has failed to demonstrate any basis for the exercise of specific personal jurisdiction. There are no grounds for believing that any of the German defendants took any action in Kansas or that Quanen felt any injury at all in the state, let alone that it bore the brunt of the injury here. The Third-Party Complaint alleges actions by German defendants as to equipment delivered to China for the production of pipe in China. After Quanen raised issues concerning the equipment, the defendants are alleged to have participated in negotiations in California and remediation efforts in China. There is simply no basis for concluding that the third-party defendants purposefully availed their activities towards Kansas.

Quanen argues alternatively that the third-party defendants are subject to the court's jurisdiction because they are "closely related" to Maplan, which issued the Purchase Agreements underlying the transaction, and are thus subject to the Kansas forum selection clause contained in those Agreements. Under this "closely related" doctrine, a non-signatory party to a forum selection clause may be deemed to have also consented to jurisdiction if it is closely related to a signatory, or if enforcement against the party is foreseeable. *Recurrent Capital Bridge Fund I, LLC v. ISR Systems & Sensors Corp.*, 875 F.Supp.2d 297, 307-08 (S.D.N.Y.2012).

The court discussed the doctrine in its prior order (Dkt. 50), and incorporates that

discussion here. The doctrine is not broadly applied;

> The case law makes clear that "closely related" in this sense is a fairly strict standard. Thus, according to one court in this District, in order to bind a non-party to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound. Or, according to another court in this District, a non-party is closely related to a dispute if its interests are completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct.

*Miller v. Mercuria Energy Trading*, 291 F.Supp.3d 509, 523 (S.D.N.Y. 2018) (citations and internal quotations omitted).

The court finds that no – again, no evidence that corporate formalities disregard, or that the any of the third-party defendants might appropriately be deemed to be closely related to Maplan or should have foreseen being subjected to jurisdiction in Kansas. The position and actions of Schley, BC Extrusion, and Battenfeld Germany are markedly *unlike* those of Quanen and Wang, who, as discussed in the court's prior ordered, were actively involved in the Maplan equipment transaction throughout the 2012 to 2015 period.

Schley joined BC Extrusion in January, 2015, after Maplan and the defendants had entered into the relevant Purchase Agreements. Schley was not involved in the negotiation or adoption of those Agreements. Of course, Schley did sign the May 27, 2015 Agreement which Quanen alleges was also violated by the Battenfeld entities, but this 2015 Agreement, unlike the earlier Purchase Agreements, has no provision expressly consenting to jurisdiction in Kansas. The court finds no basis for imposing jurisdiction over Schley based on his participation in a corporation which had previously agreed to jurisdiction in Kansas. *See Cascade Fund v. Alliance Capital Mgmt. Holdings*, 707 F.Supp.2d 1130, 1143 (D. Col. 2010)

(no jurisdiction based on " individual's mere status as a board member")

Similarly, the evidence before the court establishes that BC Extrusion supplied financial risk management services to Battenfeld entities, but it played no role in negotiation or adoption of the Purchase Agreements. Quanen has not identified any actions by BC Extrusion with respect to the Purchase Agreements beyond this general financial risk management role, and the court finds that the company may not be subject to jurisdiction in Kansas merely because of a horizontal corporate relationship, or a shared board membership, with Maplan.

The same result holds true for Battenfeld Germany. Although Quanen alleges that Battenfeld Germany was the source of some of the software used in the equipment in question, there is no allegation that the software was itself defective. More importantly, there is no evidence that this entity was involved in the negotiation or adoption of the Purchase Agreements which include the Kansas forum consent provisions.

Again, "[t]he 'closely related' exception is a narrow one," and non-signatories are "typically" deemed to be closely related "only in the context of an individual non-signatory who is employed by — or the principal of — a corporate entity which is a signatory." *See Beth Schiffer Fine Photographic Arts v. Colex Imaging*, No. 10-CV-5321 WHW, 2014 WL 1908500, at *5 (D.N.J. May 13, 2014) (collecting cases). *Cf. Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 210 (7th Cir. 1993) (applying doctrine to corporations "owned and controlled" by signatory).

As noted earlier, the German defendants are corporate siblings or cousins of plaintiff Maplan. There is no specific, nonconclusory allegation or evidence that the German

defendants ignored corporate formalities. As noted earlier, at the relevant time, neither BC Extrusion Holding or Battenfeld Germany acted as a parent of Maplan, and did not exercise control over the actual operations of Maplan, or vice versa. The German defendants, non-signatory corporate siblings of Maplan, did not negotiate or participate in the underlying Purchase Agreements, are not subject to the consent-to-jurisdiction provisions contained in those Agreements.

The court concludes that general jurisdiction does not exist as to the German defendants, and that no specific jurisdiction exists because Quanen has failed to show that the defendants purposefully availed themselves of doing business in Kansas. Accordingly, the court need not address the additional arguments presented by the German defendants, including the contention that, assuming purposeful availment existed, imposing jurisdiction in Kansas would offend traditional notions of fair play and substantial justice.

In sum, the court grants the Motion to Dismiss (Dkt. 71) the third-party defendants Schley, BC Extrusion, and Battenfeld Germany; the court also grants the Motion to Dismiss (Dkt. 69) of plaintiff Maplan, except that the motion is denied as to Quanen's claim of intentional misrepresentation. As to that claim, Quanen is given leave, within 20 days of this Order, to file an Amended Counterclaim which adds the tolling allegations set forth in its Response to the Motion to Dismiss. (Dkt. 81, at 13-14).

IT IS SO ORDERED this 3rd day of July, 2018.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE